Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Gerrick M. Warrington (State Bar No. 294890)
gwarrington@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
Los Angeles, California 90017-2427
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Secured Creditor
ARCHWAY BROADWAY LOAN SPE, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| In re | Case No. 2:24-bk-12076-VZ |
|---|---|
| Susan Halevy | Chapter 11 |
| Debtor and Debtor-in-Possession. | **TRANSFER OF CLAIM OTHER THAN FOR SECURITY** |

A CLAIM HAS BEEN FILED IN THIS CASE. Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

| **Name of Transferee:** | **Name of Transferor:** |
|---|---|
| Archway Broadway Loan SPE, LLC, a Delaware limited liability company | Archway Real Estate Income Fund I REIT, LLC, a Delaware limited liability company |
| **Name and Address where notices to transferee should be sent:**<br><br>Archway Broadway Loan SPE, LLC<br>c/o Michael Gerard Fletcher<br>Frandzel Robins Bloom & Csato, L.C.<br>1000 Wilshire Boulevard, Nineteenth Floor<br>Los Angeles, California 90017-2427<br>Phone: (323) 852-1000 | Court Claim #: 5<br>Amount of Claim: $2,715,337.50<br>Date Claim Filed: 7/15/24 |

1    I declare under penalty of perjury that the information provided in this notice is true and

2  correct to the best of my knowledge and belief.

3    By: _____    Date: October 3, 2024
      Bobby Khorshidi

4
5    A director of Archway Real Estate
     Income Fund I REIT, LLC, a Delaware
6    limited liability company, manager of
     Archway Broadway Loan SPE, LLC, a
7    Delaware limited liability company

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

5356258v1 | 101415-0002

2

# EXHIBIT A

**Fill in this information to identify the case:**

Debtor 1    Susan Halevy

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Central District of California

Case number   2:24-bk-12076-VZ

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Archway Real Estate Income Fund I REIT, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor Archway Real Estate Income Fund I SPE I, LLC

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| Frandzel Robins Bloom & Csato, L.C. <br> Attention: Michael Gerard Fletcher <br> Name | Archway Capital <br> Attention: Bobby Khorshidi <br> President & CEO <br> Name |
| 1000   Wilshire Boulevard, 19th Floor <br> Number    Street | 1875 Century Park East, 9th Floor <br> Number    Street |
| Los Angeles    CA    90017 <br> City    State    ZIP Code | Los Angeles    CA    90067 <br> City    State    ZIP Code |
| Contact phone (323) 852-1000 | Contact phone (310) 746-8999 |
| Contact email mfletcher@frandzel.com | Contact email bobby@archwayfund.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☒ No
☐ Yes. Claim number on court claims registry (if known) _____  Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

See attachment
$ 2,715,337.50 . **Does this amount include interest or other charges?**

☐ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money Loaned

**9. Is all or part of the claim secured?**

☐ No

☒ Yes. The claim is secured by a lien on property.

**Nature of property:**

☒ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☒ Other. Describe:    See Attachment

**Basis for perfection:**    See Attachment

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $ TBD

**Amount of the claim that is secured:**    $ TBD

**Amount of the claim that is unsecured:**    $ TBD    (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $ _____

**Annual Interest Rate** (when case was filed) See Attachment    %

☒ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $ _____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No | | |
|---|---|---|---|---|
| | | ☐ Yes. *Check one:* | | **Amount entitled to priority** |
| | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $ _____ |
| | | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $ _____ |
| | | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $ _____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $ _____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $ _____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | | $ _____ |
| | | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | | |

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  07/ 12 /2024
   MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Bobby                                    Khorshidi |
|---|---|
| | First name          Middle name          Last name |
| Title | Manager of AOL GP, LLC, authorized signer for Archway Real Estate Income Fund I REIT, LLC, fka Archway Real Estate Income Fund I SPE I, LLC |
| Company | Archway Capital |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1875 Century Park East, 9th Floor |
| | Number          Street |
| | Los Angeles                    CA     90067 |
| | City                           State  ZIP Code |
| Contact phone | (310) 746-8999          Email  bobby@archwayfund.com |

## ATTACHMENT TO PROOF OF CLAIM

### In re Susan Halevy

### Case No. 2:24-bk-12076-VZ (Bankr. C.D. Cal.)

---

Archway Real Estate Income Fund I REIT, LLC, fka Archway Real Estate Income Fund I SPE I, LLC ("Archway" or the "Claimant" or the "Creditor") hereby asserts the following claims against debtor Susan Halevy ("Sue" or the "Debtor"):

## I.    SUMMARY AND NATURE OF CLAIM

### A.    Principal, Interest, and Other Amounts Under the Loan Documents.

As of March 18, 2024 (the "Petition Date"), the debtor Susan Halevy owes Archway not less than **$2,715,337.50** plus interest (both contract and default interest), late fees, attorney's fees, and costs in amounts according to proof accruing after the Petition Date related to a loan made by Archway to (i) Alan Gomperts, and Sharon Halevy, as Trustees of The Gomperts and Halevy Family Trust, (ii) David Halevy and Sue Halevy, as Trustees of the Halevy Family Trust dated September 8, 2010, and (iii) Daniel Halevy on SLA Investments, LLC, on April 14, 2023.

This claim amount is composed of the following:

i.    Principal in an amount not less than $2,575,000.00; plus

ii.    Accrued Interest in an amount not less than $74,067.01; plus

iii.    Default Interest in an amount not less than $66,270.49; plus

iv.    Attorneys' fees, costs, and other charges in amounts according to proof.

Archway's claims are secured. Interest and costs continue to accrue on a daily basis.

The following loan documents, without limitation (collectively, the "Loan Documents" and each a "Loan Document") are attached hereto as Exhibits 1 through 5 and are submitted in support of Archway's secured claims:

**Exhibit 1.:**    Loan Agreement dated April 14, 2023, executed and delivered by to (i) Alan Gomperts, and Sharon Halevy, as Trustees of The Gomperts and Halevy Family Trust, (ii) David Halevy and Sue Halevy, as Trustees of the Halevy Family Trust dated September 8, 2010, and (iii) Daniel Halevy as borrower to and in favor of lender, Archway Real Estate Income Fund I SPE I, LLC.

**Exhibit 2.:**   Note dated April 14, 2023, executed and delivered by to (i) Alan Gomperts, and Sharon Halevy, as Trustees of The Gomperts and Halevy Family Trust, (ii) David Halevy and Sue Halevy, as Trustees of the Halevy Family Trust dated September 8, 2010, and (iii) Daniel Halevy as borrower to and in favor of lender, Archway Real Estate Income Fund I SPE I, LLC.

**Exhibit 3.:**   Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated April 14, 2023, recorded on April 24, 2023, in the County of Los Angeles Recorder's Office as recording number 20230259824, against the real property commonly known as 133 South Palm Dr. Apt 0005, Beverly Hills, which Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing was executed and delivered by David Halevy and Sue Halevy, as Trustees of the Halevy Family Trust dated September 8, 2010, as grantor to and in favor of lender, Archway Real Estate Income Fund I SPE I, LLC.

**Exhibit 4.:**   UCC-1 Financing Statement filed on April 24, 2023, in the County of Los Angeles Recorder's Office as recording number 20230258325.

**Exhibit 5.:**   Settlement and Loan Modification Agreement dated April 19, 2023, executed and delivered by Broadway Investments LLC, as borrower and Alan Gomperts, Daniel Halevy and David Halevy as guarantors to and in favor of lender, Archway Real Estate Income Fund I SPE I, LLC.

## II.    ADMINISTRATIVE EXPENSE CLAIMS AND OTHER CLAIMS

This Proof of Claim is without prejudice to claims, if any, that the Claimant has or may have for payment of any administrative expense allowable under Sections 361, 503(b), and/or 507(b) of the Bankruptcy Code or otherwise with respect to any prepetition or postpetition transaction, whether or not such amounts are included in this Proof of Claim, and the right to file such claim or any similar claim at an appropriate time is expressly reserved.  Claimant reserves its right to file an additional or amended proof of claim for, among other things, (a) any administrative claim, including for failure of adequate protection, and (b) any postpetition claim for pre-effective date pendency interest, fees, costs, or charges as provided for under the Loan Documents and applicable law, including 11 U.S.C. § 506(b).

## III.    ADDITIONAL PROOFS OF CLAIM

This Proof of Claim is filed without prejudice to the filling by, or on behalf of, the Claimant of additional proofs of claim with respect to any other liability or indebtedness of the Debtor or any affiliate of the Debtor.

## IV.    NO WAIVER

Filing of this Proof of Claim is not and should not be construed to be:  (a) a waiver or release of the Claimant's rights against any other entity or person liable for all or part of any claim described herein; (b) a waiver of the right to seek to have the reference withdrawn,

including, without limitation, with respect to (i) the subject matter of these claims, (ii) any objection or other proceedings commenced with respect thereto, or (iii) any other proceedings commenced in this case against or otherwise involving the Claimant; (c) a waiver of any right to the subordination, in favor of the Claimant, of indebtedness or liens held by creditors of the Debtor; or (d) an election of remedy which waives or otherwise affects any other right or remedy of the Claimant.

## V.      RESERVATION OF RIGHTS

Creditor reserves the right to amend this proof of claim to, without limitation, add additional Loan Documents, to change the claim amount and components of the claim amount, to include administrative claims, and/or to reflect different and/or additional forms of security for the claim. Any additional or supplemental documentation shall be deemed to have been filed as of the date hereof.

Neither the filing of this Proof of Claim, nor any subsequent appearance, pleading, claim, proof of claim, document, suit, motion, or any other writing or conduct shall be deemed or construed as (i) a consent by Creditor to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Creditor; (ii) a waiver or release of Creditor's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein or therein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related thereto, notwithstanding the designation of such matters as "core" proceedings pursuant to 28 U.S.C. § 157(b)(2), and whether such right to jury trial is pursuant to statute or the United States Constitution; (iii) a consent by Creditor to a jury trial in this Court or any court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (iv) a waiver or release of Creditor's right to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a United States District Judge; or (v) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or any other proceeding which may be commenced in this case against or otherwise involving Creditor. This proof of claim is conditional only and is not intended, nor should it be construed, as the Claimant's consent to jurisdiction in the Central District of California. Without in any way limiting the foregoing, the Claimant's rights to assert any claim they may have against the Debtor, or against any other  party or property other than the Debtor and the Debtor's estate, are expressly reserved.

# EXHIBIT 1

**LOAN AGREEMENT**

By and Between

(i) **ALAN GOMPERTS**, and **SHARON HALEVY, as Trustees of The Gomperts and Halevy Family Trust**, (ii) **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010**, and (iii) **DANIEL HALEVY**, an individual

and

ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC

<u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

ARTICLE I. DEFINITIONS ...............................................................................................1
    1.1.  Defined Terms ...........................................................................................1
    1.2.  Terms Generally; References and Titles......................................................1

ARTICLE II. THE LOAN ..................................................................................................1
    2.1.  The Loan ..................................................................................................1
          (a)  Interest .....................................................................................1
          (b)  Default Rate; Late Charge ..........................................................2
          (c)  Payment ...................................................................................2
          (d)  Method and Place of Payment.....................................................2
          (e)  Prepayment ..............................................................................3
          (f)  Additional Expenditures.............................................................3
          (g)  Additional Costs .......................................................................3
          (h)  Lender's Determinations.............................................................3
    2.2.  Security for the Loan ..................................................................................3
    2.3.  Origination Fee .........................................................................................3

ARTICLE III. REPRESENTATIONS....................................................................................3
    3.1.  Representations .........................................................................................3
          (a)  Status; Operational Authority......................................................3
          (b)  Power; Transactional Authority; Enforceability ............................3
          (c)  No Violation; No Consent...........................................................4
          (d)  Financial Matters ......................................................................4
          (e)  Contemplated Actions..............................................................4
          (f)  No Default ...............................................................................4
          (g)  Trade Name .............................................................................4
          (h)  Litigation ................................................................................4
          (i)  Title and Authority; Permitted Encumbrances ..............................4
          (j)  Taxes ......................................................................................5
          (k)  Other Agreements; Defaults........................................................5
          (l)  Foreign Person.........................................................................5
          (m)  ERISA ....................................................................................5
          (n)  Executive Order 13224; OFAC ...................................................5
          (o)  Purpose ...................................................................................5
          (p)  Investment Company Act ............................................................6
          (q)  No Financing Statement .............................................................6
          (r)  Location of Collateral................................................................6
          (s)  Compliance with Applicable Law ................................................6
          (t)  Brokerage Commissions.............................................................6
          (u)  Leases .....................................................................................6
          (v)  Collateral ................................................................................6
          (w)  Condition of Property................................................................6
          (x)  Intentionally Omitted ...................................**Error! Bookmark not defined.**
          (y)  Condemnation ..........................................................................6
          (z)  Access.....................................................................................6

(aa) Forfeiture. ................................................................................................7
(bb) Solvency. .................................................................................................7
(cc) Full and Accurate Disclosure. .................................................................7
(dd) Environmental .........................................................................................7

ARTICLE IV. COVENANTS AND AGREEMENTS OF BORROWER ....................................8
   4.1.   Covenants and Agreements ..................................................................................8
      (a)   Change of Name, Identity or Structure .................................................8
      (b)   Single Purpose Entity/Separateness. ......................................................8
      (c)   Indemnity; Fees and Expenses; Waivers ..............................................8
      (d)   Books and Records ................................................................................9
      (e)   Financial Statements and other Reports ..............................................10
      (f)   Compliance Certificate .......................................................................10
      (g)   Estoppel Certificate ............................................................................10
      (h)   Further Assurances ..............................................................................11
      (i)   Location and Use of Collateral ...........................................................11
      (j)   Insurance Requirements .....................................................................11
            (i)   Insurance. ...............................................................................11
            (ii)   Form and Quality. ..................................................................13
            (iii)   Assignment. ...........................................................................13
            (iv)   Adjustments ...........................................................................14
      (k)   Escrow .................................................................................................14
      (l)   Operation of Property ..........................................................................15
      (m)   Repair and Maintenance ......................................................................15
      (n)   Appraisal .............................................................................................15
      (o)   Casualty and Condemnation .................................................................15
      (p)   Title Insurance ....................................................................................17
      (q)   Borrower's Funds. ...............................................................................17
      (r)   Collateral .............................................................................................18

ARTICLE V. DEFAULTS AND REMEDIES ..........................................................................22
   5.1.   Event of Default ..................................................................................................22
      (a)   Monetary Obligations ..........................................................................23
      (b)   Representations ....................................................................................23
      (c)   Insolvency; Bankruptcy ......................................................................23
      (d)   Third Party Matters .............................................................................23
      (e)   Transfers; Liens; Debt .........................................................................23
      (f)   Death; Dissolution; Change in Ownership or Control ..........................23
      (g)   Financial Reporting .............................................................................23
      (h)   DSCR Test Default ..............................................................................23
      (i)   Lis Pendens. ........................................................................................23
      (j)   Non-Monetary Obligations ..................................................................23
   5.2.   Remedies ............................................................................................................24

ARTICLE VI. CASH MANAGEMENT .......................................**Error! Bookmark not defined.**
   6.1.   Lockbox Deposit Account. ....................................**Error! Bookmark not defined.**
   6.2.   Cash Management Account. ...................................**Error! Bookmark not defined.**
   6.3.   Monthly Excess Cash Flow Impound. ....................**Error! Bookmark not defined.**

ARTICLE VII. RESERVE FUNDS ...................................................................................27
   7.1.  Security; Establishment of Funds. .......................................................................27
        (i)   Interest Reserve. ................................**Error! Bookmark not defined.**
        (ii)  Pledge and Disbursement of Funds.. ....................................................27

ARTICLE VIII. RESERVED. ....................................................**Error! Bookmark not defined.**

ARTICLE IX. GENERAL CONDITIONS ...................................................................28
   9.1.  Waiver ....................................................................................................28
   9.2.  Lender's Action or Inaction .....................................................................28
   9.3.  Lender's Rights .......................................................................................29
   9.4.  Third Party Rights ..................................................................................29
   9.5.  Satisfaction of Condition; Time...............................................................29
   9.6.  Assignment; Loan Participations ..............................................................29
   9.7.  Heirs, Successors and Assigns .................................................................30
   9.8.  Exercise of Rights and Remedies .............................................................30
   9.9.  Headings ................................................................................................30
   9.10. Inconsistency..........................................................................................30
   9.11. Applicable Law .......................................................................................30
   9.12. Forum; Service .......................................................................................31
   9.13. Usury .....................................................................................................31
   9.14. Severability ............................................................................................31
   9.15. Counterparts ..........................................................................................31
   9.16. Joint Liability .........................................................................................31
   9.17. Modification or Termination.....................................................................31
   9.18. Notice ....................................................................................................31
   9.19. Signatures...............................................................................................32
   9.20. No Partnership ........................................................................................32
   9.21. Waiver of Jury Trial ...............................................................................32
   9.22. Consent of Lender; Approvals .................................................................33
   9.23. Imaging ..................................................................................................33
   9.24. Entire Agreement ...................................................................................33
   9.25. Payoff Statement....................................................**Error! Bookmark not defined.**
   9.26. Damage Waiver ......................................................................................33

# LOAN AGREEMENT

(i) **ALAN GOMPERTS**, and **SHARON HALEVY**, **as Trustees of The Gomperts and Halevy Family Trust** ("**G&H Trust**"), (ii) **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010** ("**D&S Trust**"),, and (iii) **DANIEL HALEVY**, an individual ("**DH**") (G & H Trust, D&S Trust and DH are collectively, referred to herein as, "**_Borrower_**") and **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("**_Lender_**") for the mutual promises in the Loan Documents and other good and valuable consideration, enter into this Agreement on the Closing Date.

## BACKGROUND RECITALS

A.      Borrower has requested that Lender make the Loan to Borrower in the amount of $2,575,000.00.

B.      Lender has agreed, subject to the terms of the Loan Documents, to make the Loan to Borrower.

C.      Borrower and Lender desire to enter into this Agreement to specify the terms and conditions of the Loan.

Borrower and Lender (1) acknowledge the receipt and sufficiency of the above-referenced consideration, and, (2) therefore, agree as follows:

## ARTICLE I.
## DEFINITIONS

1.1.      Defined Terms. Each capitalized term used in the Loan Documents has the meaning set forth in **Exhibit A** of this Agreement.

1.2.      Terms Generally; References and Titles. References in this Agreement to "Articles," "Sections," "Exhibits" or "Schedules" will be to the Articles, Sections, Exhibits or Schedules of this Agreement unless otherwise specifically provided. All Exhibits and Schedules attached to this Agreement are incorporated in, and are a part of, this Agreement for the purposes set forth in this Agreement. Any term defined in this Agreement may be used in the singular or plural. Words of any gender include all other genders. The terms "include," "includes," and "including" are followed by "without limitation". Except as otherwise specified or limited in this Agreement, a reference to any Person includes the successors and assigns of the Person. Unless otherwise specified all references "from" or "through" any date mean "from and including" or "through and including" the date. References to any statute or act include all related current regulations and all amendments and any successor statutes, acts and regulations. References to any statute or act, without additional reference, refer to federal statutes and acts of the United States. References to any agreement, instrument or document includes all schedules, exhibits, annexes and other attachments to the agreement, instrument or document.

## ARTICLE II.
## THE LOAN

2.1.      The Loan. Subject to the terms of this Agreement and in reliance on Borrower's representations and warranties in the Loan Documents, Lender agrees to lend, and Borrower agrees to borrow, the Loan. THEREFORE, FOR VALUE RECEIVED, Borrower promises to pay to the order of Lender the Principal Amount with fees, costs and interest as set forth in, and payable (in Dollars at Lender's Offices) pursuant to, this Agreement. The funding and closing of the Loan will take place in Lender's Offices or at such other place as Lender may designate.

(a)      Interest.

(i)     Subject to <u>Subsection 2.1(a)(ii)</u> below, the Principal Amount and Additional Costs bear interest at the Interest Rate.

(ii)     All interest accruing under the Loan Documents will be calculated on the basis of a 30/360 basis. Borrower shall make each payment which it owes under the Loan Documents on or before the Payment Deadline in immediately available Dollars without setoff, counterclaim or other deduction. If Lender receives any payment after the Payment Deadline, then the payment will be credited on the next following Business Day.

(b)     <u>Default Rate; Late Charge</u>.

(i)     Any time during an Event of Default Period, the Principal Amount, any Additional Costs, and all past due installments of interest will bear interest at the Default Rate.

(ii)     In addition to all other sums due under the Loan Documents, Borrower shall pay to Lender on demand the Late Charge upon all Past Due Indebtedness (other than the outstanding Principal Amount due on the Maturity Date). The Late Charge is not a penalty, but is intended to compensate Lender for the losses Lender incurs because of the delinquent payment. Borrower agrees that, considering all of the circumstances existing on the date this Agreement is executed, the Late Charge represents a reasonable estimate of the losses Lender will incur because of any late payment, and that proof of Lender's actual losses will be costly, inconvenient, impracticable and extremely difficult to fix. Lender does not waive the Event of Default resulting from a past due payment because Lender accepts a Late Charge.

(c)     <u>Payment</u>.

(i)     Borrower shall pay to Lender:

(A) interest on the Principal Amount, in arrears, on each Interest Payment Date computed at the Interest Rate, and

(B) on the Maturity Date, Borrower shall pay in full to Lender (1) the Principal Amount along with all unpaid, accrued interest, (2) the Exit Fee, and (3) all other Indebtedness.

(ii)     Except during an Event of Default Period, Lender will apply all Loan payments: (A) first, to any unpaid Claims arising out of the Loan; (B) second, to any unpaid Additional Costs; (C) third, to accrued but unpaid interest due under the Loan Documents; (D) fourth, to all other unpaid sums due under the Loan Documents, except for the Principal Amount; and (E) last, to the unpaid Principal Amount. During an Event of Default Period, Lender may apply all Loan payments in any order Lender elects in its sole discretion.

(iii)     Borrower may not send any payments to Lender with a Paid in Full Mark. If Borrower tenders a payment to Lender with a Paid in Full Mark, then Lender may accept the payment without losing any of Lender's rights under the Loan Documents, and Borrower will remain obligated to pay any further amounts owed to Lender under the Loan Documents.

(d)     <u>Method and Place of Payment</u>. Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 2:00 PM, Pacific time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or at such other place as Lender shall from time to time designate, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a

day which is not a Business Day, the due date thereof shall be the immediately preceding Business Day.

(e)    Prepayment. Borrower may prepay the Loan, in whole or in part, at any time without any Payment Premium.

(f)    Additional Expenditures. All sums Lender pays or expends pursuant to the Loan Documents in excess of the Maximum Principal Amount will be (i) an additional loan to Borrower, (ii) Indebtedness, and (iii) due and payable within 5 days of Lender's written demand to Borrower, together with interest at the Default Rate from the date of Lender's expenditure until Borrower repays the expenditure and interest to Lender. Notwithstanding anything to the contrary in the Loan Documents, Lender is not obligated to make any expenditures.

(g)    Additional Costs. Notwithstanding anything to the contrary in any of the Loan Documents, Borrower shall pay to Lender all Additional Costs within 5 days of Lender's written demand.

(h)    Lender's Determinations. All of Lender's determinations in this Section 2.1(a) are conclusive, absent manifest error.

2.2.    Security for the Loan. The Loan is secured by, among other things, the Security Instrument and is guaranteed by the Guaranty.

2.3.    Origination Fee.  On the Closing Date, Borrower shall pay the Loan Origination Fee to Lender.

2.4    Payoff Statement. Borrower will provide written notice to Lender specifying the proposed Business Day on which any payment of the Loan in full is to be made pursuant to hereof, which date shall be no earlier than 30 days after the date of such payoff notice. In the event Borrower wishes to set the payoff date at a date which is earlier than 30 days after the date of such payoff notice, Borrower shall be responsible for payment of 30 days interest regardless of the actual payoff date.


ARTICLE III.
REPRESENTATIONS

3.1.    Representations. On the Closing Date and, on each Compliance Certificate Delivery Date, Borrower represents to Lender that:

(a)    Status; Operational Authority. Each Borrower Party: (i) is duly organized, validly existing, in good standing, under the laws of the jurisdiction of its formation; (ii) is duly qualified, authorized to do business, and in good standing, in every jurisdiction (other than the jurisdiction of its formation) in which it must be qualified; and (iii) has the power and authority to own the Property and its other assets, and to transact its present and proposed business.

(b)    Power; Transactional Authority; Enforceability. Each Borrower Party has the requisite power and authority to execute, deliver and carry out the terms and provisions of the Loan Documents to which it is a party, and has taken all necessary actions to authorize its execution, delivery and performance of the Loan Documents. Each Borrower Party has duly executed and delivered the Loan Documents.  The Loan Documents each Borrower Party executes or under which it is obligated constitute the Borrower Party's legal, valid and binding obligations, enforceable in accordance with the terms of the Loan Document, subject to (i) the effect of any

3

Applicable Bankruptcy Law, or (ii) general principles of equity.

(c)     No Violation; No Consent. Each Borrower Party's execution, delivery and performance of the Loan Documents, and compliance with the terms and provisions of the Loan Documents, will not (i) contravene any Applicable Law, (ii) conflict or be inconsistent with or result in any breach of any term, covenant, condition or provision of, the terms of any indenture, mortgage, deed of trust, agreement or other instrument to which the Borrower Party is a party or by which the Borrower Party or any of the Property or the Borrower Party's other assets is bound or may be subject, or (iii) violate any term of any Borrower Party's certificate of formation or other documents and agreements governing the Borrower Party's existence, management or operation. No Borrower Party is required to obtain the consent of any other party, including any Governmental Authority, in connection with the execution, delivery, performance, validity or enforceability of the Loan Documents.

(d)     Financial Matters. Each Borrower Party financial statement previously delivered to Lender was prepared in accordance with an Approved Accounting Method or GAAP and completely, correctly and fairly present the financial condition and the results of operations of each Borrower Party on the date and for the period covered by the financial statements. All other reports, statements and other data that any Borrower Party furnished to Lender in connection with the Loan are true and correct in all material respects and do not omit any fact or circumstance necessary to ensure that the statements are not misleading. Each Borrower Party (i) is solvent, (ii) is not bankrupt and (iii) has no outstanding liens, suits, garnishments, bankruptcies or court actions which may render the Borrower Party insolvent or bankrupt. Since the date of the last financial statements each Borrower Party delivered to Lender, no event, act, condition or liability has occurred or exists, which has had, or may reasonably be expected to have, a material adverse effect upon (a) the Borrower Party's business, condition (financial or otherwise) or operations, or (b) the Borrower Party's ability to perform or satisfy, or Lender's ability to enforce, any of the Indebtedness.

(e)     Contemplated Actions. Neither Borrower nor any Borrower Party is contemplating either the filing of a petition by it under state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and neither Borrower nor any Borrower Party has knowledge of any Person contemplating the filing of any such petition against it.

(f)     No Default. No Event of Default exists.

(g)     Trade Name. Borrower does not do business under any trade name or other name with respect to the Property or otherwise.

(h)     Litigation. There are no suits or proceedings (including condemnation) pending or (to Borrower's knowledge, after reasonable inquiry) threatened against or affecting any Borrower Party or the Property (including a condemnation proceeding) or involving the validity, enforceability or priority of any of the Loan Documents. Borrower has not received notice from any Governmental Authority alleging that any Borrower Party or the Property is violating any Applicable Law.

(i)     Title and Authority; Permitted Encumbrances. Borrower is the lawful owner of good and marketable and indefeasible title to the Property free and clear from all liens, security interests and encumbrances, except the lien and security interest evidenced by the Security Instrument and the Permitted Encumbrances. Borrower has good right and authority to transfer and mortgage the Property and to grant a security interest in the Collateral. There are no mechanic's or materialmen's liens, or other claims that may constitute a lien on the Property other than claims for Real Estate Taxes which are not yet due or payable. There are no defaults under any of the Permitted Encumbrances. No Permitted Encumbrance has been modified unless approved by Lender in

4

writing.

(j)      Taxes. Each Borrower Party has filed all required Tax returns. Each Borrower Party has paid all Taxes for which it is obligated, other than those Taxes which (A) are not yet delinquent or (B) the appropriate Borrower Party is diligently, and in good faith, contesting and for which the Borrower Party has made adequate reserves acceptable to Lender. There are no unpaid or outstanding real estate or other taxes or assessments on or against the Property or any part thereof, except general real estate taxes not due or payable. The Property is comprised of one or more parcels, each of which constitutes a separate tax lot and none of which constitutes a portion of any other tax lot. There are no pending or, to Borrower's best knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(k)      Other Agreements; Defaults. Neither Borrower nor any Borrower Party is a party to any agreement or instrument or subject to any court order, injunction, permit, or restriction which would result in a Material Adverse Change to the Property or the business, operations, or condition (financial or otherwise) of Borrower or any Borrower Party. Neither Borrower nor any Borrower Party is in violation of any agreement which violation could reasonably be expected to result in a Material Adverse Change to the Property, Borrower or any Borrower Party or Borrower's or any Borrower Party's business, properties, or assets, operations or condition, financial or otherwise.

(l)      Foreign Person. Borrower is not a "foreign person" within the meaning of the Internal Revenue Code of 1986, as amended, Sections 1445 and 7701 (i.e., Borrower is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined in the Internal Revenue Code and the regulations promulgated thereunder). Borrower's Taxpayer Identification Number is true and correct.

(m)      ERISA. (i) Borrower is not an "employee benefit plan" or a "governmental plan" within the meaning of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; (iii) Borrower's assets do not constitute "plan assets" under ERISA; and (iv) one or more of the following circumstances is true: (1) Equity interests in Borrower are publicly offered securities under ERISA or are securities issued by an investment company registered under the Investment Company Act of 1940; (2) Less than 25% of the value of any class of equity interests in Borrower is held by "benefit plan investors" within the meaning of ERISA; or (3) Borrower qualifies as an "operating company," a "venture capital operating company," or a "real estate operating company" within the meaning of ERISA. Borrower will deliver to Lender such certifications and other evidence periodically requested by Lender, in its sole discretion, to verify the representations in this Subsection.

(n)      Executive Order 13224; OFAC. No Borrower Party or any Person with which a Borrower Party is associated or affiliated is (i) referred to or described in Executive Order 13224 (Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, as amended) or (ii) subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department. Borrower will not use any Loan proceeds in violation of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

(o)      Purpose. The Loan is solely for the purpose of carrying on or acquiring Borrower's business, and is not for personal, family, household or agricultural purposes. Borrower does not use any portion of the Property as Borrower's residence or business homestead and, therefore, no portion of the Property is exempt from forced sale under Applicable Bankruptcy Law or any other Applicable Law. Borrower will not use any Loan proceeds to purchase or carry "margin stock" within the meaning of Federal Reserve Regulation U (12 C.F.R. § 221 et seq., as amended).

South Los Angeles - Loan Agreement

(p)    <u>Investment Company Act</u>. No Borrower Party is (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended, (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

(q)    <u>No Financing Statement</u>. There are no effective financing statements covering any of the Property, except for those financing statements filed in connection with the Loan.

(r)    <u>Location of Collateral</u>. All tangible Collateral is located on the Land located at (i) 3538 Greenfield Avenue, Los Angeles, CA 90034, (ii), 8561 Horner Street, Los Angeles, CA 90035 and (iii) 133 South Palm Dr, Apt 0005, Beverly Hills, CA 90212.

(s)    <u>Compliance with Applicable Law</u>. Borrower and the Property comply with all Applicable Laws. Borrower has not received notice that it or the Property is violating Applicable Law. Borrower has obtained all requisite licenses, permits, franchises, qualifications, certificates of occupancy or other governmental authorizations to own, lease and operate the Property and carry on its business from all Governmental Authorities with jurisdiction over the Property.

(t)    <u>Brokerage Commissions</u>. Any brokerage commission due in connection with any Lease has been paid in full.

(u)    <u>Leases</u>.  As of the date hereof, there are no existing Leases for the Property.

(v)    <u>Collateral</u>. Borrower is the sole owner of, has good title to, and the right to assign, the Collateral. No Person (other than Borrower and Lender) has any right, title or interest in the Collateral. The Licenses and Contracts are (or will be when issued or entered into) in full force and effect and there are no defaults (or any events which with the passage of time or the giving of notice, would be a default) under the Licenses or Contracts. Borrower has not assigned, transferred, encumbered, created or permitted any lien upon or charge against the Collateral (except in favor of Lender).

(w)    <u>Condition of Property</u>. The Property has all necessary utility services required for Borrower's use of the Property. The Property has legal access to all streets, alleys and easements necessary to serve the Property, and all of the streets, alleys and easements use have been completed, dedicated and accepted by the appropriate Governmental Authority. The Property including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, (a) are in good condition, order and repair in all material respects; and (b) has no structural or other material defects or damages and no deferred maintenance, whether latent or otherwise.

(x)    <u>Condemnation</u>. No condemnation has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

(y)    <u>Access</u>. To the best of Borrower's knowledge, the Property has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities. To the best of Borrower's knowledge, all public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property, except to the extent such other property is subject to a perpetual easement for such utility benefiting the Property. To the best of Borrower's knowledge, all roads necessary for the full utilization of

6

the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

(z)    Forfeiture. There has not been and shall never be committed by Borrower or to the Borrower's knowledge, any other person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

(aa)    Solvency. After giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and, immediately following the making of the Loan, will be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured, and Borrower's assets, immediately following the making of the Loan, will not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, or believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower). No petition in bankruptcy has been filed against Borrower or any Borrower Party in the last seven years, and neither Borrower nor Borrower Party in the last seven years has ever made an assignment of its assets for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Neither Borrower nor any Borrower Party is contemplating either the filing of a petition by it under state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and neither Borrower nor any Borrower Party has knowledge of any Person contemplating the filing of any such petition against it.

(bb)    Full and Accurate Disclosure. No statement of fact made by or on behalf of Borrower or any Borrower Party in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements contained herein or therein, taken as a whole, not misleading. There is no fact presently known to Borrower which has not been disclosed to Lender which materially and adversely affects, nor as far as Borrower can foresee, would result in a Material Adverse Change to, the Property or the business, operations or condition (financial or otherwise) of Borrower or any Borrower Party. All information supplied by Borrower regarding any other Collateral is accurate and complete in all material respects. All evidence of Borrower and Borrower Party's identity provided to Lender is genuine, and all related information is accurate.

(cc)    Environmental.

(i)    Compliance. Except as otherwise disclose in the Phase 1 environmental report delivered to Lender in connection herewith, Borrower (A) is in compliance with all applicable Environmental Laws, (B) has obtained all Environmental Approvals required to operate its business as presently conducted or as reasonably anticipated to be conducted, (C) has not received any written communication, whether from a Governmental Authority, citizens group, employee or otherwise, that alleges that Borrower has failed to comply with any Environmental Law, (D) no civil, criminal or administrative action, suit, claim, hearing, investigation or proceeding has been brought or been threatened against Borrower, nor have any settlements been reached by or with any parties or any liens imposed in

South Los Angeles - Loan Agreement

connection with Material of Environmental Concern or Environmental Laws, and to the best of Borrower's knowledge no circumstance exists that may prevent or interfere with Borrower's full compliance in the future with all applicable Environmental Laws.

(ii)    <u>No Claim</u>. There is no Environmental Claim pending or threatened against Borrower or the Property.

(iii)    <u>No Violation</u>. There are no past or present actions, activities, circumstances, conditions, events or incidents, including the release, emission, discharge or disposal of any Material of Environmental Concern that could form the basis of any Environmental Claims against Borrower or the Property.

(iv)    <u>No Materials of Environmental Concern</u>. (a) There are no on-site or off-site locations in which Borrower has stored, disposed or arranged for the disposal of Materials of Environmental Concern; (b) there are no underground storage tanks located on Property; (c) there is no asbestos in the Improvements and (d) no polychlorinated biphenyls (PCBs) are used or stored at the Property.

3.2.    <u>Survival</u> .  Borrower's representations and warranties hereunder shall survive until (1) payment in full of all Indebtedness, (2) maturity of the Loan and (3) termination of this Agreement and the other Loan Documents


## ARTICLE IV.
## COVENANTS AND AGREEMENTS OF BORROWER

4.1.    <u>Covenants and Agreements</u>. Borrower covenants to Lender as follows:

(a)    <u>Change of Name, Identity or Structure</u>. Borrower shall not change its name, identity (including trade name) or its entity structure or governance without notifying Lender of any change in writing at least 30 days prior to the date of the change.

(b)    <u>Single Purpose Entity/Separateness</u>. Borrower represents, warrants and covenants to comply with the Single Purpose Entity Covenants set forth on <u>Exhibit E</u> attached hereto:

(c)    <u>Indemnity; Fees and Expenses; Waivers</u>. Borrower's obligations under this <u>Section 4.1(c)</u> shall survive (1) payment in full of all Indebtedness, (2) maturity of the Loan and (3) termination of this Agreement and the other Loan Documents.

(i)    Borrower shall protect, defend, indemnify, reimburse and hold each Indemnified Party harmless from all Claims of every kind, known or unknown, foreseeable or unforeseeable, which may be imposed upon, asserted against or incurred or paid by an Indemnified Party at any time, arising out of or in any way connected with (A) the Loan, (B) the Property, (C) any Loan Document, (D) bodily injury, death, or property damage occurring in, upon or adjacent to the Property, through any cause whatsoever, (E) Indemnified Party's exercise of legal remedies under the Loan Documents, (F) any act performed or omitted to be performed by any Indemnified Party under any Loan Document, (G) any Borrower failure to perform its obligations under any Contract or License, (H) any Event of Default, (I) any Environmental Claim, or (J) any Borrower Party violation of Applicable Law, **INCLUDING ANY CLAIMS ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, OR STRICT LIABILITY, OF ANY INDEMNIFIED PARTY**, except to the extent a court of competent jurisdiction determines in a final, non-appealable judgment that the Claims actually arose from the

8

Indemnified Party's gross negligence, fraud, intentional or willful misconduct.

      (ii)      If an Indemnified Party notifies Borrower of any Claims for which Borrower's indemnity in <u>Subsection (1)</u> above applies, Borrower shall, on behalf of the Indemnified Party, assume and conduct, with due diligence and in good faith, the investigation and defense of the Claims with counsel mutually selected by the Indemnified Party and Borrower. If both Borrower and an Indemnified Party are defendants to the Claims and the Indemnified Party has been advised in writing by counsel that there may be legal defenses available to it which are inconsistent with those available to Borrower, then the Indemnified Party may select separate counsel to participate in the investigation and defense of the Claims on its own behalf, and Borrower will pay or reimburse the Indemnified Party for all reasonable Attorneys' Fees incurred with respect to separate counsel.

      (iii)      If an Indemnified Party notifies Borrower of any Claims for which Borrower's indemnity in <u>Subsection (1)</u> above applies and Borrower fails to comply with the terms of <u>Subsection (2)</u> above, within 15 days after being notified of the Claims, then (A) notwithstanding anything to the contrary in any of the Loan Documents, an Event of Default will immediately occur, and (B) the Indemnified Party may contest (or settle) the Claims at Borrower's expense using counsel selected by the Indemnified Party.

      (iv)      Borrower shall pay, immediately upon Lender's demand, all fees (including appraisal fees, filing and recording fees, inspection fees, survey fees, taxes, brokerage fees and commissions, abstract fees, title policy fees, uniform commercial code search fees, escrow fees, and reasonable Attorneys' fees) and all other costs Lender or Borrower incurs in connection with (A) the Loan and the Loan Documents, (B) any Event of Default, (C) Lender's (1) exercise of remedies under the Loan Documents or (2) protection of the Property, or (D) any modification to the Loan Documents.

      (v)      Borrower, with respect to the Indebtedness, waives: (A) **PRESENTMENT FOR PAYMENT**; (B) **DEMAND**; (C) **NOTICE OF DEMAND, DISHONOR AND NONPAYMENT**; (D) **NOTICE OF INTENTION TO ACCELERATE**; (E) **NOTICE OF ACCELERATION**; (F) **NOTICE OF DISPOSITION OF COLLATERAL**; (G) **THE DEFENSE OF IMPAIRMENT OF COLLATERAL**; (H) **THE RIGHT TO A COMMERCIALLY REASONABLE SALE OF COLLATERAL**; (I) **PROTEST AND NOTICE OF PROTEST**; and (J) **AND DILIGENCE IN COLLECTING, AND BRINGING SUIT AGAINST ANY OTHER PARTY**.

      (vi)      If Lender appoints a substitute or successor Trustee, then Borrower waives any right to attack the validity, or require Lender to show proof of the authorization, of the appointment for any reason.

      (vii)      Borrower further waives and releases the rights (A) of redemption, valuation, and appraisement of the Property or other Collateral, (B) to (i) marshaling of Borrower's assets (including the Property), (ii) the sale in inverse order of alienation, (iii) a homestead exemption concerning any of the Collateral, and (C) to any matter to defeat, reduce or affect the Lender's right under the terms of the Loan Documents to sell the Collateral or collect the full Indebtedness.

      (d)      <u>Books and Records</u>. Borrower shall keep accurate books and records in accordance with the Approved Accounting Method. Lender and its representatives may, with at least 24-hour prior notice in writing, and during reasonable business hours, inspect and copy all of Borrower's books and records (including all contracts, statements, invoices, bills and claims for labor, materials and services supplied for the construction and operation of the improvements forming a part of the Property).

<div align="center">9</div>

(e)    <u>Financial Statements and other Reports</u>. Borrower shall deliver to Lender the below statements and reports on or before the below delivery deadline. Borrower shall also deliver to Lender any other information, reports or certificates as and when reasonably requested by Lender.

| **Statement or Report** | **Frequency** | **Delivery Deadline** |
|---|---|---|
| Certified Borrower's balance sheet and income/operating statement | Annually | Within 30 days after each calendar year ends |
| Certified rent roll | Annually | Within 30 days after each calendar year ends |
| Copies of filed federal income tax returns of Borrower | Annually | The earlier of (i) 120 days after each calendar year ends or (ii) 10 days after filing |
| Copies of filed federal income tax returns of Guarantor | Annually | The earlier of (i) 120 days after each calendar year ends or (ii) 10 days after filing |
| Compliance Certificate | Monthly//Quarterly | Delivered along with Borrower's monthly/quarterly statements |

All statements and reports must be in scope and detail reasonably satisfactory to Lender. During any Event of Default Period, Lender may require that all statements and reports be prepared (and audited after the occurrence of an Event of Default at Borrower's cost and expense) by an independent certified public accountant, in a manner reasonably acceptable to Lender. Each rent roll and/or delinquency report must, with respect to each of the Leases, contain: (i) each Tenant's name and address; (ii) rental amount; (iii) square footage of the premises; (iv) security deposit; (v) commencement date; (vi) termination date; (vii) date through which rent is paid; and (viii) the occurrence of any default. . Borrower shall provide Lender with such additional financial, management, or other information regarding Borrower or the Property, as Lender may reasonably request. Upon Lender's request, Borrower shall deliver all items required by this <u>Subsection</u> in an electronic format or by electronic transmission reasonably acceptable to Lender.

Each financial statement shall be certified by any representative of Borrower or acceptable to Lender if such financial statement is delivered by Borrower. Each financial statement, report or other information required to be delivered or caused to be delivered by Borrower to Lender under this Agreement and required hereunder to be certified by the chief financial representative of Borrower shall also certify that: (i) all of the covenants set forth in this <u>Section 4.1(e)</u> are fully performed and (ii) the representations and warranties set forth in the this Agreement and in the other Loan Documents are and remain true, correct and complete in all material respects except as disclosed in writing in the certificate. If Borrower fails to provide to Lender the financial statements and other information specified herein within the respective time period specified, and if such failure continues for 5 days after notice from Lender, then Borrower shall pay to Lender a fee in the amount of $1,000.00. In the event such failure shall continue for 15 days after notice from Lender, it shall constitute an Event of Default hereunder.

(f)    <u>Compliance Certificate</u>. Borrower shall deliver a Compliance Certificate to Lender on or before the Compliance Certificate Due Date.

(g)    <u>Estoppel Certificate</u>. Borrower shall:

(i)    within 10 days after receiving Lender's request, deliver a certificate stating

10

(or explaining why the statement is false) (A) that the Loan Documents are valid and binding obligations of Borrower, (B) that the Loan Documents are enforceable against Borrower in accordance with their terms, (C) the Principal Amount, (D) that the Loan Documents have not been released, subordinated or modified, (E) the date of the last Loan payment, and (F) that Borrower is entitled to no offsets or defenses against enforcement of the Loan Documents; and

(ii)    within 10 days after receiving Lender's request, deliver a certificate from each requested Tenant, in form and substance acceptable to Lender, confirming the terms of the Tenant's Leases.

(h)    <u>Further Assurances</u>. Borrower shall, on Lender's request and at Borrower's cost: (i) promptly correct any defect concerning the Loan Documents, the Leases or the Collateral; (ii) execute, deliver and file any instrument, and do anything Lender reasonably determines to be necessary or desirable to carry out the purposes of the Loan Documents; (iii) take all necessary action to promptly protect the liens or the security interests under the Loan Documents against any Person other than Lender; (iv) take all actions reasonably necessary or desirable in Lender's determination to comply with the requirements or requests of any Governmental Authority; and (v) submit to Lender such additional information concerning the Collateral or the Contractors as Lender may reasonably request.

(i)    <u>Location and Use of Collateral</u>. All tangible Collateral will be used in the business of Borrower and shall remain in Borrower's control at all times at Borrower's risk of loss and shall be located on the Property. The Property shall not be used to sell, grow, produce, or distribute cannabis or for any service directly related to the sale, growth, production, or distribution of cannabis.

(j)    <u>Insurance Requirements</u>.

(i)    <u>Insurance</u>. Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(A)    comprehensive "All Risk" or "Special Form" insurance on the Improvements and the personal property (A) in an amount equal to one hundred percent (100%) of the "***Full Replacement Cost***," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations) with no waiver of depreciation, but the amount shall in no event be less than the outstanding Principal Amount; (B) containing an agreed amount endorsement with respect to the Improvements and personal property waiving all co-insurance provisions, or confirmation that co-insurance does not apply; and (C) providing for no deductible in excess of $25,000.00 for all such insurance coverage. In addition, Borrower shall obtain: (x) if any portion of the Improvements is currently, or at any time in the future, located in a Federally designated "special flood hazard area", flood hazard insurance in an amount equal to the outstanding Principal Amount or such other amount as Lender shall require; (y) earthquake insurance in amounts and form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity with a probable maximum loss (PML) exceeding twenty percent (20%), and (z) coastal windstorm insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in any coastal region, and if such windstorm coverage is excluded under the Special Form Coverage, provided that the insurance pursuant to clauses (x), (y) and (z) hereof shall be on terms consistent with the comprehensive "All Risk" or "Special Form" insurance policy required under this <u>Subsection (i)</u>;

11

(B)      commercial general liability insurance, including a broad form comprehensive general liability endorsement and coverage against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (1) to be on the so-called "occurrence" form with a combined limit of not less than $2,000,000.00 in the aggregate and $1,000,000.00 per occurrence (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (2) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (3) to cover at least the following hazards: (i) premises and operations; (ii) products and completed operations on an "if any" basis; (iii) independent contractors; (iv) blanket contractual liability for all legal contracts; and (v) contractual liability covering the indemnities contained in the Security Instrument to the extent the same is available;

(C)      rental loss and/or business income interruption insurance (1) with loss payable to Lender; (2) covering all risks required to be covered by the insurance provided for in subsection (A) above; for loss of Rents in an amount equal to one hundred percent (100%) of the projected gross income from operations for a period of twelve (12) months from the date of such Casualty (assuming such Casualty had not occurred) and notwithstanding that the policy may expire at the end of such period. The amount of such loss of Rents or business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate from the Property for the succeeding twelve (12) month period. Notwithstanding anything to the contrary contained in this Agreement, all proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied at Lender's sole discretion to (I) the Indebtedness, or (II) Operating Expenses approved by Lender in its sole discretion; *provided, however*, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the Indebtedness, except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(D)      at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the Property coverage forms do not otherwise apply, owner's and contractor's protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy

(E)      worker's compensation insurance with respect to any employees of Borrower, as required by any Governmental Authority or Applicable Laws;

(F)      comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(G)      motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of not less than $1,000,000.00;

South Los Angeles - Loan Agreement

(H)    umbrella or excess liability insurance in an amount not less than $5,000,000.00 per occurrence on terms consistent with the commercial general liability insurance policy required under subsection (ii) above;

(I)    if the Property is or becomes a legal "non-conforming" use, ordinance or law coverage to compensate for the cost of demolition and rebuilding of the undamaged portion of the Property along with any increased cost of construction in amounts as requested by Lender;

(J)    the commercial property business income, general liability and umbrella or excess liability insurance required hereunder shall cover perils of terrorism and acts of terrorism and Borrower shall maintain commercial property and business income insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required hereunder at all times during the term of the Loan so long as Lender determines that either (I) prudent owners of real estate comparable to the Property are maintaining same or (II) prudent institutional lenders (including, without limitation, investment banks) to such owners are requiring that such owners maintain such insurance; and

(K)    upon 60 days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(ii)    <u>Form and Quality</u>. All insurance policies shall be endorsed in form and substance reasonably acceptable to Lender to name Lender as an additional insured, loss payee or mortgagee thereunder, as its interest may appear, with loss payable to Lender, without contribution, under a standard mortgagee clause. All such insurance policies and endorsements shall be fully paid for and contain such provisions and expiration dates and be in such form and issued by such insurance companies licensed to do business in the state in which the Property is located, with a rating of "A:X" or better as established by Best's Rating Guide. Each policy shall provide that such policy may not be canceled or materially changed except upon 30 days' prior written notice of intention of non-renewal, cancellation or material change to Lender and that no act or thing done by Borrower shall invalidate any policy as against Lender. Blanket policies shall be permitted only if (A) Lender receives appropriate endorsements and/or duplicate policies containing Lender's right to continue coverage on a pro rata pass-through basis and that coverage will not be affected by any loss on other properties covered by the policies and (B) the policy contains a sublimit equal to the replacement cost of the Property in an amount approved by Lender which is expressly allocated for the Property, and any such policy shall in all other respects comply with the requirements of this Section.  Borrower authorizes Lender to pay the premiums for such policies (the "***Insurance Premiums")*** from the Insurance Impound, if any, as the same become due and payable annually in advance. If Borrower fails to deposit funds into the Insurance Impound, if any, sufficient to permit Lender to pay the Insurance Premiums when due, Lender may obtain such insurance and pay the premium therefor and Borrower shall, on demand, reimburse Lender for all expenses incurred in connection therewith.

(iii)    <u>Assignment</u>. Borrower shall assign the policies or proofs of insurance to Lender, in such manner and form that Lender and its successors and assigns shall at all times have and hold the same as security for the payment of the Loan. If requested by

13

Lender, Borrower shall deliver copies of all original policies certified to Lender by the insurance company or authorized agent as being true copies, together with the endorsements required hereunder. If Borrower elects to obtain any insurance which is not required under this Agreement, all related insurance policies shall be endorsed in compliance with Section 4.1(j), and such additional insurance shall not be canceled without prior notice to Lender. From time to time upon Lender's request, Borrower shall identify to Lender all insurance maintained by Borrower with respect to the Property. The proceeds of insurance policies coming into the possession of Lender shall not be deemed trust funds, and Lender shall be entitled to apply such proceeds as herein provided.

      (iv)    Adjustments. Borrower shall give immediate written notice of any loss to the insurance carrier and to Lender. Borrower irrevocably authorizes and empowers Lender, as attorney in fact for Borrower coupled with an interest, to notify any of Borrower's insurance carriers to add Lender as a loss payee, mortgagee insured or additional insured, as the case may be, to any policy maintained by Borrower that is required under this Agreement, and if Borrower fails to diligently do so, to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Lender's reasonable expenses incurred in the collection of such proceeds. Nothing contained in this Section 4.1(j), however, shall require Lender to incur any expense or take any action hereunder

      (k)    Escrow. Borrower shall not be required to make monthly deposits into the Tax and Insurance Escrow Account for Taxes and Insurance Premiums provided that (i) no Event of Default has occurred and is continuing, (ii) the Property is covered by insurance as required in herein, (iii) Borrower has provided sufficient evidence to Lender that the Insurance Premiums have been paid on or before the date the Insurance Premiums are due, and (iv) Borrower has provided sufficient evidence to Lender that the Taxes have been paid on or before the date the Taxes are delinquent. In the event the foregoing conditions are not satisfied, as additional security for the Indebtedness and Borrower's obligations under the Loan Documents, Borrower shall establish and maintain the Tax and Insurance Escrow Account. Contemporaneously with the establishment of the Tax and Insurance Escrow Account, Borrower will deposit into the Tax and Insurance Escrow Account a sum equal to all Real Estate Taxes and Insurance Premiums for the then current year, as Lender reasonably estimates. Thereafter, on each Interest Payment Date, Borrower shall pay to Lender, which Lender will deposit into the Tax and Insurance Escrow Account a sum of money equal to 1/12th of the annual charges for the Insurance Premiums and (ii) sum of money equal to 1/12th of the annual Taxes, which amounts shall be calculated as the necessary sufficient funds (as Lender reasonably estimates) to permit Lender to pay, at least 30 days prior to the due date, the next installments for Real Estate Taxes and Insurance Premiums. Borrower shall ensure that Lender receives, at least 30 days prior to the due date, all invoices for Real Estate Taxes and Insurance Premiums. So long as no Event of Default has occurred and Lender has received all invoices for Real Estate Taxes and Insurance Premiums, Lender shall pay (or will permit Borrower to make withdrawals from the Tax and Insurance Escrow Account to pay) all invoices for Real Estate Taxes and Insurance Premiums. Any excess amounts in the Tax and Insurance Escrow Account may, at Lender's option, be retained in the account for future use, applied to the Indebtedness or refunded to Borrower. Borrower shall immediately remit to Lender funds (as Lender determines and demands) sufficient to satisfy any deficiency in the Tax and Insurance Escrow Account. The Tax and Insurance Escrow Account is not, unless otherwise explicitly required by Applicable Law, an escrow or trust fund. The Tax and Insurance Escrow Account will not bear interest. The Tax and Insurance Escrow Account may be mingled with the general funds of Lender. Borrower grants to Lender a security interest in all funds deposited with Lender for the purpose of securing the Loan. If any time (i) the amount on deposit with Lender, together with amounts to be deposited by

<div align="center">14</div>

Borrower before such Insurance Premiums are payable, is insufficient to pay such Insurance Premiums, or (ii) the amount on deposit with Lender, together with amounts to be deposited by Borrower before such Taxes are payable, is insufficient to pay such Taxes, Borrower shall deposit any deficiency with Lender after 10 days' written notice. Lender shall pay such Taxes when the amount on deposit with Lender is sufficient to pay such Taxes and Lender has received a bill for such Taxes. During an Event of Default Period, Lender may apply the Tax and Insurance Escrow Account funds to the Indebtedness as Lender determines.

(l)    Operation of Property. Borrower shall operate the Property in accordance with all Applicable Laws and in the same manner as is customary and usual in the operation of comparable commercial properties in the same metropolitan area as the Property. Borrower shall use the Property solely for commercial purposes. Borrower shall not use or allow the use of the Property in any manner which constitutes a public or private nuisance. Without obtaining Lender's prior written consent, Borrower shall: (i) use all commercially reasonable efforts to oppose any zoning reclassification of the Property, (ii) not seek, or acquiesce to, any zoning reclassification or variance for the Property; (iii) not impose any additional restrictive covenants or encumbrances upon the Property; (iv) not execute or file any subdivision plat affecting the Property; (v) not consent to any municipality's annexation of the Property to any municipality; (vi) not permit the Property to be operated as a cooperative or condominium; (vii) not permit any drilling or exploration for, or extraction, removal or production of, minerals from the surface of the Property; (viii) not permit any action or inaction which may reasonably be expected to diminish the value of the Property.

(m)    Repair and Maintenance. Borrower shall keep the Property in good order, repair, condition and appearance. Borrower shall promptly make all necessary repairs and replacements, to the Property. Borrower shall insure that the Property is not deteriorated, misused, abused or wasted. All replacements to the Property must be equal or better than the replaced Property was when it was new. Borrower may not, without Lender's prior written consent: (i) erect any new buildings or structures or other Improvements on the Property (other than Property repairs, restoration in connection with any casualty and/or improvements in connection with Leases); (ii) except for the foregoing repairs, remove any Property from the Land; or (iii) make any structural alteration or any other alteration to the Property involving an estimated expenditure of $25,000.00 or more. Lender (or its designee) may, at Borrower's expense, inspect or examine the Property during normal business hours and without unnecessarily interrupting the Tenants or the operations of the Property. Except during any Event of Default Period, Lender (or its designee) shall give Borrower 24 hours advanced notice (by any means and not subject to the terms of Section 8.18 below). Borrower shall assist Lender (and its designees) in completing any inspection. Borrower (or its designee) may accompany Lender (and its designee) during any inspection of the Property. If Lender's inspection reveals that repairs to the Property are necessary, then Borrower shall complete all repairs or other work to Lender's reasonable satisfaction within 90 days after Lender delivers written notice of the necessary repairs to Borrower.

(n)    Appraisal. At Borrower's expense, Lender may obtain from time to time an Appraisal. The costs for any Appraisal are Additional Costs. Notwithstanding anything to the contrary in the Loan Documents, Borrower will only be liable for the cost of one Appraisal after the occurrence of an Event of Default or in connection with the exercise of the First Option to Extend.

(o)    Casualty and Condemnation.

(i)    Borrower's Obligation. If any Damage or a Taking occurs, then Borrower shall promptly (A) notify Lender of the Damage and take all necessary steps to preserve the Collateral, (B) at Borrower's expense (1) diligently prosecute any Taking proceedings,

(2) consult and cooperate with Lender in handling the Taking proceedings, and (C) subject to <u>Sections 4.1(o)(ii) – (iv)</u> below and regardless of whether the Net Proceeds are, or Award is, sufficient, commence and diligently (but, unless Lender approves otherwise in writing, no later than 90 days after the Damage occurs) complete the Restoration. Borrower shall comply with Lender's reasonable requirements to preserve the Collateral. Borrower may not settle any Taking proceedings without Lender's prior written consent.  Lender may (but is not obligated to) participate in all Taking proceedings. Borrower shall sign and deliver all instruments Lender reasonably requests in connection with Lender's participation in any Taking proceeding. All of Lender's reasonable costs in any Taking proceeding are Additional Costs.

(ii)    <u>Lender's Rights</u>. Borrower will remain liable for the Indebtedness outstanding after Lender applies any Net Proceeds or Award. Lender will not pay interest on any Net Proceeds or Award Lender holds. If Borrower receives any insurance proceeds for the Damage or an Award, then Borrower shall promptly deliver all of the proceeds or Award to Lender, without deduction. Notwithstanding anything in the Loan Documents, at law or in equity to the contrary, the Net Proceeds and Award will not be trust funds and Lender may dispose of the Net Proceeds or Award as permitted in the Loan Documents. Borrower assumes all risk of loss from any Damage or Taking.

a.      If any Damage occurs which is, at least partially, covered by insurance, then: (A) if Borrower does not promptly make an insurance claim for the Damage, then Lender may, but is not obligated to, make the insurance claim; (B) if Lender makes an insurance claim, then Borrower authorizes and empowers Lender to settle, adjust, or compromise the claim; (C) Borrower authorizes and directs the insurer to make any Damage payment directly to Lender; and (D) unless otherwise expressly set forth in <u>Subsection (iii)</u> below, Lender may apply the Net Proceeds in any order it determines.

b.      Borrower assigns all Awards to Lender. All Awards must be paid to Lender. Lender may (A) collect, receive, and give receipt for, any Award, (B) accept any Award in any amount without question, and (C) appeal any judgment, decree, or Award. Borrower shall sign and deliver all instruments Lender reasonably requests to evidence Borrower's assignments and authorizations in this <u>Subsection</u>.

(iii)    <u>Application of Net Proceeds or Award</u>. Except during an Event of Default Period, Lender shall make the Net Proceeds or the Award available to Borrower for Restoration if: (A) prior to beginning the Restoration, in Lender's determination, the Restoration is practical and will be completed (1) within a reasonable time and (2) at least 90 days prior to the Scheduled Maturity Date; (B) prior to beginning the Restoration, in Lender's determination, Borrower has sufficient business interruption insurance; (C) prior to beginning the Restoration, Borrower enters into Contracts acceptable to Lender for Restoration; (D) prior to the beginning and until completion of the Restoration, Borrower has deposited and continuously maintains all Additional Funds with Lender; and (E) prior to the beginning and until completion of the Restoration, in Lender's determination, once the Restoration is complete, the Debt Service Coverage Ratio will exceed 1.20:1.0. Lender may (as Lender determines in its sole discretion) apply against the Indebtedness any Net Proceeds or Award in excess of the Restoration costs.

(iv)    <u>Disbursement of Net Proceeds or Award</u>. If Net Proceeds or an Award are available for Restoration, then Lender shall, in its sole discretion, establish a disbursement procedure (including lien releases and title insurance) and periodically make the Award or Net Proceeds (and the Additional Funds, if any) available to Borrower (in installments).

(v)     Effect on Indebtedness. Prior to, during and after any Damage or Taking, Borrower must pay the Indebtedness and perform its obligations under the Loan Documents. Lender's receipt of Net Proceeds, Rent Loss Proceeds, Additional Funds or an Award does not reduce the Indebtedness until Lender actually applies Net Proceeds, Rent Loss Proceeds, Additional Funds or the Award to the Indebtedness.

(p)     Title Insurance. On or before the Closing Date, Borrower shall furnish to Lender, at Borrower's expense, the Loan Title Policy. If the Loan Title Policy becomes invalid, or the insurer becomes insolvent or is placed in receivership, then Borrower shall, within 30 days after Lender's demand, furnish to Lender, at Borrower's expense, a substitute Loan Title Policy.

(q)     Borrower's Funds. Borrower represents, warrants and covenants to Lender that:

(i)     It has taken, and shall continue to take until after the Loan is fully repaid, such measures as are required by law to verify that the funds invested in Borrower are derived (i) from transactions that do not violate U.S. law and, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under U.S. law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

(ii)     To the best of its knowledge, neither Borrower, nor any Borrower Party, nor any holder of a direct interest in Borrower, nor any Person providing funds to Borrower (i) is under investigation by any Governmental Authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws; (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; and (iii) has had any of its/his/her funds seized or forfeited in any action under any Anti-Money Laundering Laws.

(iii)     Borrower shall make payments on the Loan using funds invested in Borrower, Revenues or insurance proceeds unless otherwise agreed to by Lender.

(iv)     As of the Closing Date and at all times during the term of the Loan, all Revenues are and will be derived from lawful business activities of Borrower, rent paid by Tenants of the Property or other permissible sources under U.S. law.

(v)     On the Maturity Date, Borrower will take reasonable steps to verify that funds used to repay the Loan in full (whether in connection with a refinancing, asset sale or otherwise) are from sources permissible under U.S. law and to the extent such funds originate outside the United States, permissible under the laws of the jurisdiction in which they originated.

(vi)     Borrower is and at all times shall be in compliance with the Office of Foreign Assets Control sanctions and regulations promulgated under the authority granted by the Trading with the Enemy Act ("**TWEA**"), 50 U.S.C. App. Section 1 et seq., and the International Emergency Economic Powers Act ("**IEEPA**"), 50 U.S.C. Section 1701 et seq., as the TWEA and the IEEPA may apply to Borrower's activities;

(vii)     Borrower is and at all times shall be in compliance with the Patriot Act and all rules and regulations promulgated under the Patriot Act applicable to Borrower; and

South Los Angeles - Loan Agreement

(viii)    Borrower (1) is not now, nor has ever been, under investigation by any Governmental Authority for, nor has been charged with or convicted for a crime under, 18 U.S.C. Sections 1956 or 1957 or any predicate offense thereunder, or a violation of the Bank Secrecy Act; (2) has never been assessed a civil penalty under any anti-money laundering laws or predicate offenses thereunder; (3) has not had any of its funds seized, frozen or forfeited in any action relating to any anti-money laundering laws or predicate offenses thereunder; (4) has taken such steps and implemented such policies as are reasonably necessary to ensure that Borrower is not promoting, facilitating or otherwise furthering, intentionally or unintentionally, the transfer, deposit or withdrawal of criminally derived property, or of money or monetary instruments which are (or which Borrower suspects or has reason to believe are) the proceeds of any illegal activity or which are intended to be used to promote or further any illegal activity; and (5) has taken such steps and implemented such policies as are reasonably necessary to ensure that Borrower is in compliance with all laws and regulations applicable to its business for the prevention of money laundering and with anti-terrorism laws and regulations, with respect both to the source of funds from its investors and from its operations, and that such steps include the development and implementation of an anti-money laundering compliance program within the meaning of Section 352 of the Patriot Act, to the extent Borrower is required to develop such a programs under the rules and regulations promulgated pursuant to Section 352 of the Patriot Act.

(r)    Collateral. Until the Maturity Date, Borrower:

(i)    shall faithfully perform each of its affirmative and negative obligations under the Additional Collateral and the Leases;

(ii)    shall promptly enforce against all Persons (other than Lender), including Tenants, the terms of the Additional Collateral and the Leases;

(iii)    except as otherwise permitted in Section 4.1(t) below, may not, without Lender's prior written approval, (A) waive, modify or amend any terms of the Additional Collateral or the Leases, (B) release or discharge any Person (including any Tenant) from its obligations under any of the Additional Collateral or the Leases, or (C) terminate any of the Licenses, Contracts or Leases;

(iv)    may not enter into any new Contracts without Lender's prior written approval; however, notwithstanding the foregoing, Borrower may, without Lender's approval, enter into, modify or amend (i) Contracts terminable upon 30 days' notice, and (ii) Contracts for tenant improvements in connection with Leases that are entered into in accordance with the terms of the Loan Documents;

(v)    except as otherwise permitted in Section 4.1(t) below or in the Security Instrument, may not enter into any new Leases without Lender's prior written approval;

(vi)    shall, unless Lender otherwise agrees in writing, assign to Lender any letter of credit securing any Tenant Lease obligations; and

(vii)    shall give Lender prompt notice of any actual or alleged default under the Additional Collateral or the Leases along with a copy of any written notice Borrower receives concerning the actual or alleged default.

(s)    Covenants on Environmental Matters.

(i)    Borrower shall (i) comply strictly and in all respects with applicable Environmental Laws; (ii) notify Lender immediately upon Borrower's discovery of any

18

spill, discharge, release or presence of any Material of Environmental Concern at, upon, under, within, contiguous to or otherwise affecting the Property; (iii) at Borrower's sole cost and expense, promptly remove such Materials of Environmental Concern and remediate the Property in full compliance with Environmental Laws or as reasonably required by Lender based upon the recommendations and specifications of an independent environmental consultant approved by Lender; and (iv) promptly forward to Lender copies of all orders, notices, permits, applications or other communications and reports in connection with any spill, discharge, release or the presence of any Material of Environmental Concern or any other matters relating to the Environmental Laws or any similar laws or regulations, as they may affect the Property or Borrower.

(ii)      Borrower shall not cause and shall use commercially reasonable efforts to prohibit any Tenant or other Person from (i) causing any spill, discharge or release, or the use, storage, generation, manufacture, installation, or disposal, of any Materials of Environmental Concern at, upon, under, within or about the Property or the transportation of any Materials of Environmental Concern to or from the Property (except for cleaning and other products used in connection with routine maintenance or repair of the Property in full compliance with Environmental Laws), (ii) installing any underground storage tanks at the Property, or (iii) conducting any activity that requires a permit or other authorization under Environmental Laws.

(iii)      Borrower shall provide to Lender, at Borrower's sole cost and expense, promptly upon the written request of Lender from time to time, a Site Assessment or, if required by Lender, an update to any existing Site Assessment for the Property, to assess the presence or absence of any Materials of Environmental Concern and the potential costs in connection with abatement, cleanup or removal of any Materials of Environmental Concern found on, under, at or within the Property. Borrower shall pay the cost of no more than one such Site Assessment or update for the Property in any 12-month period, unless Lender's request for a Site Assessment is based on a reasonable suspicion of Materials of Environmental Concern at or near the Property, a breach of representations hereunder, or an Event of Default, in which case any such Site Assessment or update shall be at Borrower's expense.

(iv)      As between Borrower and Lender, all risk of loss associated with non-compliance with Environmental Laws, or with the presence of any Material of Environmental Concern at, upon, within, contiguous to or otherwise affecting the Property, shall lie solely with Borrower. Accordingly, Borrower shall bear all risks and costs associated with any loss (including any loss in value attributable to Materials of Environmental Concern), damage or liability therefrom, including all costs of removal of Materials of Environmental Concern or other remediation required by Lender or by law. Borrower shall indemnify, defend and hold Lender and its directors, officers, employees and agents harmless from and against all actual loss, liabilities, damages, claims, costs and expenses (including reasonable costs of defense and consultant fees, investigation and laboratory fees, court costs, and other litigation expenses) arising or alleged to have arisen out of or associated, in any way, with (a) the non-compliance with Environmental Laws, (b) the existence of Materials of Environmental Concern in, on, or about the Property, (c) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to Materials of Environmental Concern, (d) any lawsuit brought or threatened, settlement reached, or government order relating to such Materials of Environmental Concern, (e) a breach of any representation, warranty or covenant contained in this Article 4, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, or (f) the imposition of any environmental lien

19

encumbering the Property; **INCLUDING, WITHOUT LIMITATION, LOSS, LIABILITY, DAMAGE, CLAIM, COST OR EXPENSE RESULTING OR ALLEGED TO HAVE RESULTED SOLELY FROM LENDER'S NEGLIGENCE OR STRICT LIABILITY**, but Borrower shall not be liable under such indemnification to the extent such liabilities result solely from Lender's gross negligence, willful misconduct or fraud as determined by a final non-appealable judgment of a court of competent jurisdiction; and provided, further, that Borrower also shall not be liable under such indemnification to the extent such liabilities result solely from Lender's or any other bona fide third party purchaser's acts or omissions as owner of the Property by foreclosure deed or deed in lieu of foreclosure (or other acquisition of title by Lender or such bona fide third party purchaser), or from any Materials of Environmental Concern that first come to be located at, upon, under, within, contiguous to or otherwise affecting the Property after the date that Borrower no longer owns the Property. Borrower's obligations under this Section 4.1 shall arise whether or not any Governmental Authority has taken or threatened any action in connection with the presence of any Material of Environmental Concern, and whether or not the existence of any such Material of Environmental Concern or potential liability on account thereof is disclosed in any Site Assessment and shall continue notwithstanding the repayment of the Loan or any transfer or sale of any right, title and interest in the Property (by foreclosure, deed in lieu of foreclosure or otherwise). Additionally, if any Materials of Environmental Concern affect or threaten to affect the Property, and provided Borrower has not taken action, Lender may (but shall not be obligated to) give such notices and take such actions as it deems necessary or advisable at the expense of Borrower in order to abate the discharge of any Materials of Environmental Concern or remove the Materials of Environmental Concern. Any amounts payable to Lender by reason of the application of this Section 4.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid. The obligations and liabilities of Borrower under this Section 4.1 shall survive any termination, satisfaction, assignment, entry of a judgment of foreclosure or delivery of a deed in lieu of foreclosure.

(v)    Lender's Right to Protect Collateral. If any discharge of Materials of Environmental Concern or the threat of a discharge of Material of Environmental Concern affecting the Property occurs, whether originating or emanating from the Property or any contiguous real estate and/or Borrower fails to comply with any Environmental Laws or related regulations, Lender may at its election, but without the obligation so to do, give such notices and/or cause such work to be performed at the Property and/or take any and all other actions as Lender shall deem necessary or advisable in order to abate the discharge of any Material of Environmental Concern, remove the Material of Environmental Concern or cure Borrower's noncompliance.

(vi)    Notwithstanding any provision hereunder or elsewhere in the Loan Documents, or any rights or remedies granted by the Loan Documents, Lender does not waive and expressly reserves all rights and benefits now or hereafter accruing to Lender under the "security interest" or "secured creditor" exception under applicable Environmental Laws, as the same may be amended. No action taken by Lender pursuant to the Environmental Indemnity Agreement or the Loan Documents shall be deemed or construed to be a waiver or relinquishment of any such rights or benefits under the "security interest" exception.

(t)    Leasing Matters.

South Los Angeles - Loan Agreement

(i)      ; Approval Rights.  Any Major Lease executed after the date hereof shall require the prior written consent of Lender, which consent shall not be unreasonably withheld.  Any modification to a Major Lease shall require the prior written consent of Lender, which consent shall not be unreasonably withheld All Leases and other rental arrangements shall in all respects be approved by Lender. All leases shall provide that (a) the lease is subordinate to the Security Instrument, (which may be subject to Lender agreement of non-disturbance), (b) the tenant shall attorn to Lender, and (c) any cancellation, surrender, or amendment of a Lease without the prior written consent of Lender shall be voidable by Lender.  Borrower shall hold all tenant security deposits in the manner required by Applicable Law. Within twenty (20) days after Lender's request, Borrower shall furnish to Lender a statement of all tenant security deposits, and copies of all leases not previously delivered to Lender, certified by Borrower as being true and correct. Notwithstanding anything contained in the Loan Documents, Borrower shall have the right to enter into Leases or amendments, renewals, expansions or modifications of any existing Leases without Lender's consent provided (i) the proposed Lease, renewal, modification, expansion is an arm's length transaction, on economic terms conforming to current market conditions, with a Tenant that is not an Affiliate

(ii)      Deemed Approval. For any Lease other than a Major Lease, whenever Lender's approval or consent, which approval or consent shall not be unreasonably withheld, conditioned or delayed, is required pursuant to the provisions of this Section 4.1(t), Lender shall use reasonable good faith efforts to respond in writing within 5 Business days after Lender's receipt of Borrower's written request and all required information and documentation relating thereto in which to approve or disapprove such matter. If Lender fails to respond in writing to such request within 5 Business Days, and Borrower sends a second request containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters "**REQUEST DEEMED APPROVED IF NO WRITTEN RESPONSE WITHIN 5 DAYS**", Lender shall be deemed to have approved or consented to such matter if Lender fails to respond in writing to such second written request before the expiration of such 5 day period.

(iii)      Covenants. Borrower shall (or shall cause Property Manager to):

(A)      perform the obligations which Borrower is required to perform under the Leases;

(B)      enforce the obligations to be performed by the Tenants under the Leases;

(C)      promptly furnish to Lender any notice of default or termination received by Borrower from any Tenant, and any notice of default or termination given by Borrower to any Tenant;

(D)      not collect any Rents for more than 30 days in advance of the time when the same shall become due, except for bona fide security deposits not in excess of an amount equal to 1 months' rent;

(E)      not enter into any ground lease of any part of the Property;

(F)      not further assign or encumber any Lease;

21

      (G)     not, except with Lender's prior written consent, cancel or accept surrender or termination of any Lease;

      (H)     not, except with Lender's prior written consent, modify, amend or terminate any Lease; and

      (I)     assign to Lender any letter of credit evidencing a security deposit on such terms as may be required by Lender and shall deliver the original of such letter(s) of credit to Lender.

      (u)    <u>Management Agreement</u>.  As of the date hereof, Borrower shall self-manage the Property. If Borrower employs an third party Property Manager, Borrower shall (i) cause Property Manager to manage the Property in accordance with the Management Agreement approved by Lender, (ii) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (iii) promptly notify Lender of any default under the Management Agreement of which it is aware, (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under the Management Agreement, and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Property Manager under the Management Agreement. If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed. Borrower shall not (i) surrender, terminate, cancel, modify, renew or extend the Management Agreement, (ii) enter into any agreement relating to the management or operation of the Property with Property Manager or any other Person, (iii) consent to the assignment by the Property Manager of its interest under the Management Agreement, or (iv) waive or release any of its rights and remedies under the Management Agreement, in each case without the express consent of Lender. Lender shall have the right to require Borrower to hire or replace the Property Manager with (x) an Unaffiliated Qualified Manager selected by Borrower, or (y) another property manager chosen by Borrower and approved by Lender in its sole and absolute discretion, upon the occurrence of any one or more of the following events: (i) at any time following the occurrence of an Event of Default, (ii) if Property Manager shall be in material default under the Management Agreement beyond any applicable notice and cure period, (iii) if Property Manager shall become insolvent or a debtor in any bankruptcy or insolvency proceeding, or (iv) if at any time the Property Manager has engaged in gross negligence, fraud, willful misconduct or misappropriation of funds.

      (v)    <u>Control of Borrower</u>. There shall be no change in the day-to-day control and management of Borrower without the written consent of Lender.

    4.2.    <u>Survival</u> .  Borrower's covenants hereunder shall survive until (1) payment in full of all Indebtedness, (2) maturity of the Loan and (3) termination of this Agreement and the other Loan Documents.

<div align="center">ARTICLE V.<br><u>DEFAULTS AND REMEDIES</u></div>

    5.1.    <u>Event of Default</u>. The term "***Event of Default***" means that:

<div align="center">22</div>

(a) <u>Monetary Obligations</u>. Borrower fails to pay: (i) prior to the Maturity Date, any Indebtedness within **5 days** after it is due and payable; or (ii) all of the Indebtedness on the Maturity Date; or

(b) <u>Representations</u>. Any representation, warranty, certificate or other statement (financial or otherwise) made or furnished by or on behalf of Borrower to Lender under this Agreement or any of the other Loan Documents, or as an inducement to Lender to enter into this Agreement and the other Loan Documents, shall be false, incorrect, incomplete or misleading in any respect when made or furnished; or

(c) <u>Insolvency; Bankruptcy</u>. A Bankruptcy Event occurs; or

(d) <u>Third Party Matters</u>. Any Borrower Party (i) is in default under any material agreement in excess of $50,000 (other than the Loan Documents), (ii) fails to pay any final money judgment in excess of $50,000 , (iii) becomes party to any proceeding, or (iv) fails to comply with any Applicable Laws, which may (in Lender's reasonable determination) materially and adversely impair (A) the Borrower Party's ability to perform its obligations under the Loan Documents, or (B) the value of, or Lender's rights in, the Collateral; or

(e) <u>Transfers; Liens; Debt</u>. Without Lender's prior written consent (which Lender may withhold for any reason or condition upon any event or consideration, as Lender determines in its sole discretion), Borrower:

(i) sells, leases (except as expressly permitted in the Loan Documents), exchanges, assigns, transfers, conveys or otherwise disposes of any part of, or any interest in, the Property or the Collateral, or legal or equitable title to any part of, or any interest in, the Property is vested in any Person other than Borrower or Lender by operation of law or otherwise, whether voluntary or involuntary. Notwithstanding anything to the contrary in this <u>Section5.1(e)</u> or elsewhere in the Loan Documents, a sale wherein all of Borrower's obligations are paid in full to Lender, shall not constitute an Event of Default; or

(ii) creates or permits any (voluntary or involuntary) lien, whether statutory, constitutional or contractual (except for the lien for ad valorem taxes on the Collateral which are not delinquent), security interest or other encumbrance, conditional sale or other title retention document, against or covering any portion of the Collateral; or

(f) <u>Death; Dissolution; Change in Ownership or Control</u>. (i) Guarantor dies or becomes legally incapacitated (unless, within 60 days of such event, Borrower provides Lender with a replacement Guarantor acceptable to Lender in its sole and reasonable discretion or the remaining Guarantors satisfy the nete worth and liquidity covenants set for in the Guaranty); or (ii) Borrower dissolves, liquidates, merges or consolidates any interest in Borrower is, voluntarily or involuntarily, assigned, encumbered, or otherwise transferred; or

(g) <u>Financial Reporting</u>. Lender does not receive any item on the date it is due under Section 4.1(e); or

(h) <u>Intentionally Omitted</u>.

(i) <u>Lis Pendens.</u> A Notice of lis pendens affecting Property is filed, and such lis pendens is not lifted within 15 days of such filing; or

(j) <u>Default Under Organizational Documents</u>. The occurrence of a default under any of the organizational documents of Borrower, which remains uncured beyond any applicable grace or cure periods available to Borrower; or

South Los Angeles - Loan Agreement

(k)    <u>Insurance</u>. Borrower's fails to maintain insurance as required under this Agreement; or

(l)    <u>Taxes</u>. Borrower's fails to pay Taxes as required under this Agreement; or

(m)    <u>Single Purpose Entity</u>. Borrower's fails to  maintain its status as a Single Purpose Entity; or

(n)    <u>Default Under Guaranty</u>. A material default occurs under the Guaranty and such default is not cured within any grace or cure periods provided therein; or

(o)    <u>Certificate of Occupancy</u>. Borrower fails to obtain a certificate of occupancy on or before the date which is 6 months from the Closing Date; or

(p)    <u>Cannabis Use</u>. The Property is used to sell, grow, produce, or distribute cannabis.

(q)    <u>Non-Monetary Obligations.</u> Any Borrower Party fails, on or before the expiration of the Grace Period, to timely perform any of its obligations in any Loan Document, other than those failures specifically governed by any other Subsection of this <u>Section 5.1</u>.

5.2.    <u>Remedies</u>.

(a)    <u>Pre-Event of Default</u>. Lender may file, appear in, or defend any Loan Matter. Unless otherwise provided herein, Lender may employ counsel (including in-house counsel) and incur any reasonable expenses, including Attorneys' Fees, in connection with any Loan Matter. If Lender incurs any expense in connection with any Loan Matter, Borrower shall have 10 days to pay such expenses upon written demand from Lender.  If Borrower fails to pay within such time, then the expenditure will bear interest at the Default Rate from the date incurred until the date on which Borrower fully repays the expenditure along with all accrued interest. The expenditure and all accrued interest are Indebtedness. Borrower shall immediately pay to Lender all amounts due under this <u>Subsection</u> upon Lender's demand.

(b)    <u>Post-Event of Default</u>. During any Event of Default Period:

(i)    Lender may declare all Indebtedness in its entirety to be immediately due and payable or exercise any right at law or in equity, or any remedy expressly provided in any of the Loan Documents, including foreclosing any liens or security interests;

(ii)    Lender may: (1) enforce all Additional Collateral terms and exercise all rights under the Additional Collateral; (2) enter into, terminate, renew or modify Contracts or Licenses, and make concessions to Governmental Authorities; and (3) exercise all proprietary rights in, and fully utilize, the Plans and Specifications.

(iii)    Contractors and Governmental Authorities may: (1) continue work under the Additional Collateral under the sole direction of Lender; and (2) permit Lender to retain and use the Additional Collateral for any purpose Lender deems appropriate. In furtherance of the foregoing, any Person may rely on an affidavit from any officer, agent or attorney of Lender confirming the Event of Default Period.

By exercising any rights under the Loan Documents, Lender does not (unless Lender expressly agrees in writing) become (i) a party to any of the Additional Collateral, or (ii) liable to any Person, **EVEN IF THE LIABILITY ACTUALLY OR ALLEGEDLY AROSE FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, OR STRICT LIABILITY OF LENDER**. Lender will only be liable for liabilities if a court of competent jurisdiction determines in a final, non-appealable judgment that the liability arose from

<div align="center">24</div>

Lender's gross negligence, intentional misconduct or fraud.

Lender's rights under this <u>Section</u> are in addition to any other rights and remedies Lender may have under the Loan Documents, at law, in equity or otherwise. Lender may (but will not be obligated to) also:

  (iv) at Borrower's sole cost and expense, take whatever action Lender deems necessary or appropriate, including the use of legal proceedings, to (A) cause Borrower to vacate the Property, and (B) take possession of the Property;

  (v) at Borrower's sole cost and expense, employ security watchmen to protect the Property; or

  (vi) at Borrower's sole cost and expense, perform or cause to be performed any covenant or agreement of Borrower under any of the Loan Documents.

  (c) <u>Costs</u>. All sums Lender incurs in connection with exercising its rights under the Loan Documents will be (1) Additional Costs and will bear interest from the date on which Lender incurs the sum until the date on which the sum is repaid in full at the Default Rate, and (2) secured by the Loan Documents. In addition to Lender's rights under the Loan Documents, Lender will be automatically subrogated to all rights of the Person receiving any sum from Lender.

<div align="center">

ARTICLE VI.
<u>CROSS DEFAULT AND CROSS COLLATERALIZATION.</u>

</div>

  6.1. <u>737 S Broadway</u>.  In addition to the obligations herein, Borrower shall also be subject to the payment and performance of all obligations secured by:

  (a) The 737 S Broadway Security Instrument made by 737 S Broadway Borrower made in connection the 737 S Broadway Loan, which 737 S Broadway Security Instrument secures a lien on the 737 S Broadway Property;

  (b) In addition to the obligations secured by the 737 S Broadway Security Instrument shall also secure the payment and performance of all obligations secured by this Loan.

  (c) An Event of Default under the Note, the Security Instrument or any of the other Loan Documents shall constitute an Event of Default under 737 S Broadway Security Instrument and the 737 S Broadway Loan.

  (d) An Event of Default under the 737 S Broadway the Security Instrument or the 737 S Broadway Loan shall constitute an Event of Default under this Security Instrument and the Loan.

  (e) Borrower waives all rights to have all or part of the Collateral described herein and the Land marshalled upon any foreclosure of the 737 S Broadway Security Instrument or the exercise of Borrower's rights and remedies hereunder.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of the Land and Collateral described in either or both of said security instruments as a whole or in separate parcels, in any order that Lender may designate.  Borrower makes this waiver for itself, for all persons and entities claiming through or under Borrower and for persons and entities who may acquire a lien or security interest on all or any part of the 737 S Broadway Loan and Collateral described in the 737 S Broadway Security Instrument or herein.

  6.2. <u>South Los Angeles</u>.  In addition to the obligations herein, Borrower shall also be subject to the payment and performance of all obligations secured by:

<div align="center">25</div>

(a)    The South Los Angeles Security Instrument made by South Los Angeles Borrower made in connection the South Los Angeles Loan, which South Los Angeles Security Instrument secures a lien on the South Los Angeles Property;

(b)    In addition to the obligations secured by the South Los Angeles Security Instrument shall also secure the payment and performance of all obligations secured by this Loan.

(c)    An Event of Default under the Note, the Security Instrument or any of the other Loan Documents shall constitute an Event of Default under South Los Angeles Security Instrument and the South Los Angeles Loan.

(d)    An Event of Default under the South Los Angeles the Security Instrument or the South Los Angeles Loan shall constitute an Event of Default under this Security Instrument and the Loan.

(e)    Borrower waives all rights to have all or part of the Collateral described herein and the Land marshalled upon any foreclosure of the South Los Angeles Security Instrument or the exercise of Borrower's rights and remedies hereunder.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of the Land and Collateral described in either or both of said security instruments as a whole or in separate parcels, in any order that Lender may designate.  Borrower makes this waiver for itself, for all persons and entities claiming through or under Borrower and for persons and entities who may acquire a lien or security interest on all or any part of the South Los Angeles Loan and Collateral described in the South Los Angeles Security Instrument or herein..

6.3.    <u>Foxdale</u>.  In addition to the obligations herein, Borrower shall also be subject to the payment and performance of all obligations secured by:

(a)    The Foxdale Security Instrument made by Foxdale Borrower made in connection the Foxdale Loan, which Foxdale Security Instrument secures a lien on the Foxdale Property;

(b)    In addition to the obligations secured by the Foxdale Security Instrument shall also secure the payment and performance of all obligations secured by this Loan.

(c)    An Event of Default under the Note, the Security Instrument or any of the other Loan Documents shall constitute an Event of Default under Foxdale Security Instrument and the Foxdale Loan.

(d)    An Event of Default under the Foxdale the Security Instrument or the Foxdale Loan shall constitute an Event of Default under this Security Instrument and the Loan.

(e)    Borrower waives all rights to have all or part of the Collateral described herein and the Land marshalled upon any foreclosure of the Foxdale Security Instrument or the exercise of Borrower's rights and remedies hereunder.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of the Land and Collateral described in either or both of said security instruments as a whole or in separate parcels, in any order that Lender may designate.  Borrower makes this waiver for itself, for all persons and entities claiming through or under Borrower and for persons and entities who may acquire a lien or security interest on all or any part of the Foxdale Loan and Collateral described in the Foxdale Security Instrument or herein.

South Los Angeles - Loan Agreement

6.4.    <u>Payoff</u>.  Notwithstanding anything to the contrary contained herein, Borrower shall not pay off this Loan while the 737 S Broadway Loan, the Greenfield PH Loan or the Foxdale Loan remain outstanding.

6.5.    <u>Substitution of Collateral</u>.  Notwithstanding anything to the contrary contained herein, Borrower may provide a substitute real property as collateral for release of one or more of the 737 S Broadway Property, the South Los Angeles Property or the Foxdale Property; provided; however any such the terms and conditions of any such substitution (including, but not limited the substitute property) must be approved by Lender in its sole and absolute discretion.  Borrower shall bear all costs and expenses in connection with any proposed or completed substitution.

## ARTICLE VII.
## RESERVE FUNDS

7.1.    <u>Security; Establishment of Funds.</u>

(a)    <u>Security</u>. The Loan shall be secured by the Security Instrument creating a first lien on the Property, the Assignment of Rents and the other Loan Documents.

(b)    <u>Establishment of Funds</u>. Borrower agrees to establish the certain reserves (the "**_Funds_**") with Lender, to be held by Lender as further security for the Loan.

7.2.    <u>Reserves.</u>

(a)    <u>Tax and Insurance Escrow Account.</u>

(i)    Borrower shall establish and maintain the Tax and Insurance Escrow Account pursuant to the terms and provisions of Section 4.1(k) herein.

(ii)    Borrower pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Tax and Insurance Escrow Account as additional security for the payment of the Loan. Lender shall make disbursements from the Tax and Insurance Escrow Account pursuant to the terms and provisions herein, but not more often than monthly. The Tax and Insurance Escrow Account shall be held in Lender's name and may be commingled with Lender's own funds at financial institutions selected by Lender in its reasonable discretion. Tax and Insurance Escrow Account will not bear interest. Upon the occurrence of and during the continuance of an Event of Default, Lender may apply any sums then present in the Tax and Insurance Escrow Account to the payment of the Loan in any order in its reasonable discretion. Until expended or applied as above provided, the Tax and Insurance Escrow Account shall constitute additional security for the Loan. Lender shall have no obligation to release any of the Tax and Insurance Escrow Account while any Event of Default (or any event or condition which, with the giving of notice, the passage of time, or both, would constitute an Event of Default) exists or any Material Adverse Change has occurred in Borrower or the Property. All costs and expenses incurred by Lender in the disbursement of any of the Tax and Insurance Escrow Account shall be paid by Borrower promptly upon demand or, at Lender's sole discretion, deducted from the Tax and Insurance Escrow Account. On the Maturity Date or on the date the Loan is paid in full, the monies then remaining on deposit with Lender under this Section 7.2 shall, at Lender's option, be applied against the Indebtedness or if no Event of Default exists, returned to Borrower.

South Los Angeles - Loan Agreement

(b)    Interest Reserve.

(i)    On the Closing Date, a portion of the Loan equal to $142,697.92 shall be retained and not funded by Lender on the date hereof.  These monies shall be retained as an Interest Reserve to be held in an account controlled by Lender for the monthly payment of Debt Service on the Loan.  On each Interest Payment Date during the initial term of the Loan, Lender shall disburse and apply from the Interest Reserve an amount equal to the monthly Debt Service of the Loan.  If the funds on deposit in the Interest Reserve are insufficient to pay the monthly Debt Service on the Loan on the applicable Interest Payment Dates, Borrower shall replenish the Interest Reserve by depositing an amount necessary, as determined by Lender in its reasonable discretion, to bring the amount on deposit in the Interest Reserve to that which is sufficient to make the monthly Debt Service on the Loan for the applicable Interest Payment Dates.

(ii)    Borrower pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Interest Reserve as additional security for the payment of the Loan. The Interest Reserve shall be held in Lender's name and may be commingled with Lender's own funds at financial institutions selected by Lender in its reasonable discretion. The Interest Reserve will not bear interest. Borrower shall pay interest on the entire amount in the Interest Reserve commencing on the Closing Date. Upon the occurrence of an Event of Default, Lender may apply any sums then present in the Interest Reserve to the payment of the Loan in any order in its reasonable discretion. Until expended or applied as above provided, the Interest Reserve shall constitute additional security for the Loan. Lender shall have no obligation to release any of the Interest Reserve while any Event of Default Period (or any event or condition which, with the giving of notice, the passage of time, or both, would constitute an Event of Default) exists or any Material Adverse Change has occurred in Borrower or the Property. All reasonable costs and expenses incurred by Lender in the disbursement of any of the Interest Reserve shall be paid by Borrower promptly upon demand or, at Lender's sole discretion, deducted from the Interest Reserve. On the Maturity Date or on the date the Loan is paid in full, the monies then remaining on deposit with Lender under this Section 7.2(b) shall, at Lender's option, be applied against the Indebtedness or if no Event of Default exists, returned to Borrower.

ARTICLE VIII.
GENERAL CONDITIONS

8.1.    Waiver. Lender may, without impairing its rights under the Loan Documents (a) waive or not enforce any term of the Loan Documents (b) release any part of the Collateral from the lien or security interest of the Loan Documents or (c) release any Person, directly or indirectly, liable for the Indebtedness or any covenant in the Loan Documents, without releasing the liability of any Person.

8.2.    Lender's Action or Inaction. The liens, security interest or other security rights of Lender in any Loan Document will not be impaired by any indulgence, moratorium or release that Lender may grant, including (a) any renewal, extension, increase or modification which Lender may grant with respect to any Indebtedness, (b) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant in respect of the Property, or any part thereof or any interest therein, or (c) any release or indulgence granted to any endorser, guarantor or surety of any Indebtedness. If Lender takes additional security, then Lender will not be deemed to have released or impaired Lender's liens, assignments, security interests or other rights in and to the Property or under the Loan Documents and Borrower's, Guarantor's and any other endorser's, guarantor's or other surety's liability will not be affected, and the rights of any permitted junior lienholder will not be improved, thereby. Lender may resort to any

28

Collateral (or to any other security now existing or hereafter given to secure payment of the Indebtedness) in such order as Lender deems best (in its sole discretion) without waiving any of the rights, benefits, liens or security interests evidenced by the Security Instrument.

8.3.    <u>Lender's Rights</u>. Lender may waive any Event of Default without waiving any other prior or subsequent Event of Default. Lender may remedy any Event of Default without waiving the Event of Default remedied. Lender's failure to exercise (in any period of time) any right, power or remedy after any Event of Default will not be a waiver of (i) any Event of Default or (ii) Lender's right to exercise any power or remedy at a later date. Lender's single or partial exercise of any right, power or remedy under the Loan Documents will not exhaust the same or preclude any other or further exercise thereof, and every such right, power or remedy under any of the Loan Documents may be exercised at any time and from time to time. Borrower will not be entitled to any additional notice or demand under the Loan Documents, unless specified therein, regardless of whether Lender has given Borrower any notice or made any demand on Borrower which was not expressly required under the terms of the Loan Documents. Lender may accept, on account only, any payment in an amount less than the amount then due on the Indebtedness without in any way affecting the existence of an Event of Default.

8.4.    <u>Third Party Rights</u>. No Person, other than Lender or Borrower is a beneficiary of the Loan Documents. Lender makes no representations and assumes no duties or obligations to any Person concerning the Improvements.

8.5.    <u>Satisfaction of Condition; Time</u>. Lender may freely establish to its satisfaction but based on what a reasonable person would determine under the circumstances) the existence (or nonexistence) of any fact actually or implicitly required to satisfy any condition of this Agreement. Time is of the essence for the Loan Documents.

8.6.    <u>Assignment; Loan Participations</u>.

(a)    Notwithstanding anything to the contrary in the Loan Documents, Borrower may not assign its rights under any of the Loan Documents without the written consent of Lender. Any Borrower assignment without Lender's written consent will (i) be an immediate Event of Default, (ii) relieve Lender from all further obligations under the Loan Documents, and (iii) at Lender's option, be null and void.

(b)    Lender may assign, sell or offer to assign or sell interests in the Loan or any portion of the Loan Documents and disseminate to any purchaser, assignee or prospective purchaser or assignee any information Lender has pertaining to the Loan, including credit information on Borrower Parties and any of their respective principals without the knowledge or consent of Borrower. If Lender makes any assignment or sells any interest in the Loan, then Borrower shall make all modifications, at Lender's or its purchaser's or assignee's expense, to this Agreement as will facilitate Lender's sale or assignment, provided that no modification will materially add to Borrower's obligations under the Loan Documents.

(c)    Lender shall have the right (i) to sell or otherwise transfer the Loan or any portion thereof as a whole loan, or (ii) to sell participation interests in the Loan.  The transaction referred to in clauses (i) and (ii)) above shall hereinafter be referred to collectively as "***Secondary Market Transactions***".

(d)    If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace in connection with any Secondary Market Transactions, at Borrower's cost and expense, including, without limitation, to:

<div align="center">29</div>

(i)      (A) provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Guarantor, sponsor and Property Manager, (B) provide updated budgets relating to the Property and (C) provide updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "*Updated Information*"), together, if customary, with appropriate verification of the Updated Information acceptable to Lender;

(ii)      provide updated, as of the closing date of the Secondary Market Transaction, representations and warranties made in the Loan Documents;

(iii)      at any time prior to a Secondary Market Transaction, execute such amendments to the Loan Documents as requested by Lender, in its discretion, to change the dates on which the monthly payment date and Maturity Date occur; provided that such change in Maturity Date shall only be with respect to the day of the month, and not the year or month, of such Maturity Date; and

(iv)      execute such amendments to the Loan Documents and Borrower organizational documents as may be reasonably requested by Lender or otherwise to effect the Secondary Market Transaction, including, without limitation, bifurcation of the Loan into two or more components and/or separate notes and/or creating a senior/subordinate note structure (any of the foregoing, a "*Loan Bifurcation*"); provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would change the interest rate, the stated maturity or the amortization of principal set forth in the Note, except in connection with a Loan Bifurcation which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note.

8.7.      Heirs, Successors and Assigns. The Loan Documents (i) are binding upon Borrower, and its heirs, devisees, representatives, successors and permitted assigns, including all of Borrower's successors-in-interest in and to all or any part of the Property, (ii) inure to the benefit of Trustee and Lender and their respective successors, substitutes and assigns, and (iii) will constitute covenants running with the Land. All references in this Agreement to Borrower, Trustee or Lender will include all of their heirs, devisees, representatives, successors, substitutes and permitted assigns.

8.8.      Exercise of Rights and Remedies. Lender may exercise each right and remedy under the Loan Documents, at law or in equity at any time and from time to time. All of Lender's rights and remedies under the Loan Document, at law or in equity are separate, distinct and cumulative. Lender's exercise of any right or remedy under the Loan Document, at law or in equity will not preclude Lender from later exercising any other right or remedy under the Loan Documents, at law or in equity.

8.9.      Headings. The headings of the sections and subsections of this Agreement are for convenience of reference only and will not affect the scope or meaning of the sections of this Agreement.

8.10.      Inconsistency. If there are any inconsistencies between this Agreement and the other Loan Documents, then this Agreement will control all inconsistencies, except those inconsistencies necessary to create or preserve a valid lien upon or security interest in the Collateral. The Security Instrument will control all inconsistencies among the Loan Documents concerning the creation, preservation, perfection and foreclosure of all liens upon or security interests in the Collateral.

8.11.      Applicable Law. The Loan Documents and the rights and obligations of Borrower, Trustee and Lender are in all respects governed by, and construed and enforced in accordance with the laws of the state of California (without giving effect to its principles of conflicts of law) and the law of the United

30

States applicable to transactions in the state of California, except for those terms of the Security Instrument pertaining to the creation, perfections, validity or foreclosure of the liens or security interests on the Property located within the state of California, which terms will be governed by, and construed and enforced in accordance with the laws of the state of California (without giving effect to its principles of conflicts of law).

8.12.    <u>Forum; Service</u>. **BORROWER IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, IN THE STATE OF CALIFORNIA OVER ANY PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS. BORROWER AGREES THAT, IN ADDITION TO ANY METHOD OF SERVICE UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING RELATING TO THE LOAN DOCUMENTS AND FILED IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA MAY BE SENT AND GIVEN AS SET FORTH IN <u>SECTION 8.18</u>.**

8.13.    <u>Usury</u>. Lender and Borrower intend that the Loan Documents strictly comply with applicable usury law. Therefore, Lender and Borrower agree that: (i) none of the terms of the Loan Documents create a contract to pay for the use, forbearance or detention of money, or interest at a rate in excess of the Maximum Rate; (ii) no Borrower Party will ever be obligated or required to pay interest on the Indebtedness or any other sums due under the Loan Documents at a rate in excess of the Maximum Rate; and (iii) this <u>Section</u> controls over all other provisions of the Loan Documents which may be in conflict with this <u>Section</u>. Lender expressly disavows any intention to charge or collect excessive unearned interest or finance charges on any portion of the Indebtedness. If at any time the interest received for the Indebtedness exceeds the Maximum Rate, then Lender will, at its option, either refund to Borrower the amount of the excess or credit the amount of the excess against the Principal Amount. Borrower agrees that the Loan is not usurious and agrees that if, at any time, Borrower believes that the Loan is usurious, it shall give Lender (a) notice of the condition and (b) sixty 60 days in which to make an appropriate refund or other adjustment, if necessary, to correct the condition.

8.14.    <u>Severability</u>. If any part of the Loan Documents is unenforceable or invalid, then that part of the Loan Documents will be removed from the Loan Documents. All remaining portions of the Loan Documents will remain enforceable and valid.

8.15.    <u>Counterparts</u>. The Loan Documents may be executed in any number of counterparts with the same effect as if all signers executed the same instrument. All counterparts of each Loan Document must be construed together and will constitute one instrument.

8.16.    <u>Joint Liability</u>. If more than one Person is included in the definition of "Borrower", then each Person included in the definition of "Borrower" will be jointly and severally liable for Borrower's obligations under this Agreement.

8.17.    <u>Modification or Termination</u>. The Loan Documents may only be amended, modified or terminated by a written instrument executed by Lender and each Borrower Party (who is a party to the Loan Document). Notwithstanding the foregoing, Borrower agrees that it will be bound by any written amendment or modification of the Loan Documents between Lender and any subsequent owner of the Collateral, with or without notice to Borrower, and Borrower's obligations under the Loan Documents will not be impaired because of any such amendment or modification. This <u>Section</u> does not permit Borrower to transfer any of the Collateral.

8.18.    <u>Notice</u>. Any notice or communication required or permitted under the Loan Documents must be made in writing and sent by (a) personal delivery, (b) expedited delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, addressed as follows:

To Lender:                Archway Real Estate Income Fund I SPE I, LLC

31

South Los Angeles - Loan Agreement

1875 Century Park East. Suite #900
Los Angeles, CA 90067
Attention: Joshua Kohan
Phone: (310) 893-5277
Email: joshua@archwayfund.com

with a copy to:    Thompson Coburn LLP
10100 Santa Monica Blvd., Suite 500
Los Angeles, CA 90067
Attention: Joshua Mogin
Phone: (310) 282-2520
Email: jmogin@thompsoncoburn.com

To Indemnitor:    SLA Investments, LLC
257 S. Linden Drive
Beverly Hills CA 90212
Attnetion: David Halevy
Phone: (310) 666-2885
Email: danhalevy@gmail.com

with a copy to    Locke Lord LLP
300 S. Grand Ave., Suite 2600
Los Angeles, CA 90071
Attention: David S. Kupetz
Phone: (213) 687-6774
Email: David.Kupetz@lockelord.com

or to such other address as Lender or Borrower may designate in writing and deliver in accordance with this Section. Any change of address will be effective on the 5th Business Day after notice is given pursuant to the terms of this Section. Any notice or communication sent in accordance with this Section will be deemed to be given (i) at the time of personal delivery, or (ii) if sent by delivery service or mail, as of the date of the first attempted delivery at the address and in the manner provided in this Section. Borrower consents to Lender recording any telephone communications between Lender and Borrower.

8.19.    Signatures. The Loan Documents may be executed by Facsimile Signature and delivered by electronic means, including a PDF (or other format) attachment to an email or fax. Subject to Applicable Law, any Loan Documents executed by Facsimile Signature will have the same force and effect as a Loan Document containing an original signature and will be binding on all parties to the Loan Documents. Lender may require that any Loan Document with a Facsimile Signature be confirmed by an original signature. However, Lender's failure to request or Borrower's failure to deliver any original signature confirmation will not limit the effectiveness of any Loan Document executed by Facsimile Signature. In this Section, "*original signature*" means a manually signed document by a natural person, as opposed to an electronic signature, and "*Facsimile Signature*" means the signature of a natural person produced by mechanical means, printer or stamp.

8.20.    No Partnership. Borrower and Lender are not partners or joint venturers with respect to the Property. Nothing in the Loan Documents is intended to create any partnership, joint venture or association between Borrower and Lender.

8.21.    Waiver of Jury Trial. **BORROWER AND LENDER WAIVE ANY RIGHT TO A JURY TRIAL CONCERNING ANY DISPUTE ARISING FROM OR IN CONNECTION WITH ANY OF THE LOAN DOCUMENTS. BORROWER AND LENDER HAVE BOTH BEEN**

South Los Angeles - Loan Agreement

**ADVISED BY COMPETENT COUNSEL IN CONNECTION WITH THIS WAIVER.**

8.22.    <u>Consent of Lender; Approvals</u>. Except as otherwise expressly provided in the Loan Documents, if Lender's approval, consent or judgment is required under any Loan Document, then Lender may, in its sole discretion, exercise its judgment in granting or denying its approval or consent regardless of the reasonableness of the request or Lender's judgment.

8.23.    <u>Imaging</u>. Except for the Note, Lender may image and destroy the executed, original Loan Documents. Except for the Note, Borrower waives any right it has, or may have in the future, to claim that the imaged copies of the Loan Documents are not originals or the best evidence of the Loan Documents.

8.24.    <u>Entire Agreement</u>. The Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Loan. The Loan Documents supersede all prior written or oral understandings and agreements between Borrower and Lender with respect to the Loan.

8.25.    <u>Damage Waiver</u>. Borrower (and any other Borrower Party, who now or hereafter executes a Loan Document) and Lender agree that neither party will be liable to the other party or any other Person for any punitive, exemplary, consequential or other special damages which may actually or allegedly arise from the Loan, the Loan Documents or the Collateral, **INCLUDING ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY, OF ANY BORROWER PARTY OR LENDER**.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

South Los Angeles - Loan Agreement

Borrower and Lender have executed this Agreement to be effective on the Closing Date.

**BORROWER:**

_____
**ALAN GOMPERTS, Trustee of**
**The Gomperts and Halevy Family Trust**

_____
**SHARON HALEVY, Trustee of**
**The Gomperts and Halevy Family Trust**

_____
**DAVID HALEVY, Trustee of**
**the Halevy Family Trust dated September 8, 2010,**
**by Daniel Halevy as his attorney in fact**

_____
**SUE HALEVY, Trustee of**
**the Halevy Family Trust dated September 8, 2010**

_____
**DANIEL HALEVY**, an individual

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

**LENDER:**

**ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name: Bobby Khoshdi
Title: Authorized Signer


[END OF SIGNATURE PAGES]


LENDER'S SIGNATURE PAGE
TO
LOAN AGREEMENT

## EXHIBIT A

## DEFINITION OF TERMS

"*737 S Broadway Borrower*" means **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company.

"*737 S Broadway Loan*" means that Loan made to 737 S Broadway Borrower in an amount equal to $16,9420,500.00.

"*737 S Broadway Loan Documents*" means the loan agreement, the 737 S Broadway Security Instrument, the environmental indemnity agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the 737 S Broadway Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing 737 S Broadway Loan Documents.

"*737 S Broadway Property*" means the property located at 737 S. Broadway, Los Angeles, CA 90014.

"*737 S Broadway Security Instrument*" means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by 737 S Broadway Borrower, in favor of the Trustee for the benefit of Lender concerning the 737 S Broadway Property.

"*Additional Collateral*" means, collectively, any (a) Licenses, (b) Contracts (c) Plans and Specifications, (d) Net Proceeds, (e) Rent Loss Proceeds, and (f) Additional Funds.

"*Additional Costs*" means (1) all costs, losses and expenses Lender (in its reasonable determination) incurs (at any time) from (i) making or maintaining the Loan, (ii) protecting the Collateral (to the extent permitted under the Loan Documents), or (iii) enforcing its remedies under the Loan Documents during an Event of Default Period, and (2) any reduction in any amount to which Lender is entitled under the Loan Documents. Additional Costs includes costs which (a) subject Lender to any tax, duty or other charge with respect to the Loan, or changes the basis of taxation of any amounts payable to Lender under the Loan (other than income, capital gain or other taxes imposed on the overall net income of Lender or of its applicable lending office or in connection with any sale of the Loan by Lender by the jurisdiction in which Lender's principal office or such applicable lending office is located) or (b) impose or modify any reserve, special deposit or similar requirements relating to Lender. For purposes of this definition, the term "Lender," at Lender's option, includes Lender's present and future participants in the Loan.

"*Additional Funds*" means the difference, in Lender's reasonable determination from time to time, between (i) the cost to complete the Restoration and (ii) the Net Proceeds or Award, as the case may be.

"*Affiliate*" means (a) any corporation in which Borrower or any partner, shareholder, director, officer, member, or manager of Borrower directly or indirectly owns or controls more than 10% of the beneficial interest, (b) any partnership, joint venture or limited liability company in which Borrower or any partner, shareholder, director, officer, member, or manager of Borrower is a partner, joint venturer or member, (c) any trust in which Borrower or any partner, shareholder, director, officer, member or manager of Borrower is a trustee or beneficiary, (d) any Person which is directly or indirectly owned or controlled by Borrower or any partner, shareholder, director, officer, member or manager of Borrower, (e) any partner, shareholder, director, officer, member, manager or employee of Borrower, (f) any Person related by birth, adoption or marriage to any partner, shareholder, director, officer, member, manager, or employee of Borrower, or (g) any Borrower Party.

"*Agreement*" means this Loan Agreement as, from time to time, amended, modified or restated.

"*Anti-Money Laundering Laws*" means the Bank Secrecy Act of 1970, the US Patriot Act and all other laws and regulations applicable to the prevention of money laundering.

"*Applicable Bankruptcy Law*" means Title 11 of the United States Code, any regulation or rule promulgated thereunder or any other present or future insolvency, bankruptcy or similar law, including laws concerning assignments for the benefit of creditors, appointment of a receiver, trustee, custodian or liquidator, under the laws of the United States or the State of California.

"*Applicable Law*" means all Laws, covenants, conditions and restrictions (including private restrictive covenants) and other requirements relating to or affecting Borrower, Guarantor, Lender or the Property.

"*Appraisal*" means an MAI appraisal of the Property ordered by Lender, dated within 30 days of its use, and prepared by a licensed appraiser satisfactory to Lender.

"*Approved Accounting Method*" shall mean the cash or accrual basis of accounting including, without limitation, a calculation of net operating income and occupancy statistics for the Property, currently utilized by Borrower and certain of its Affiliates in the preparation of financial data heretofore delivered to Lender so long as the same is and remains in general use by significant segments of the United States accounting profession.

"*Attorneys' Fees*" means all reasonable fees, costs and expenses of attorneys (including allocated costs of in-house counsel), other professional consultants and experts.

"*Award*" means all condemnation awards, judgments, decrees, or proceeds of any sale in lieu of condemnation.

"*Bankruptcy Event*" means any of the following events: (i) any Borrower Party files a petition for relief under Applicable Bankruptcy Law; (ii) any party (other than Lender) files an involuntary petition for relief under Applicable Bankruptcy Law against any Borrower Party and such petition is not dismissed within 90 days after being filed; (iii) a court of competent jurisdiction enters an order for relief under any Applicable Bankruptcy Law which is related in any way to a petition filed under (i) or (ii) above; (iv) any Borrower Party, at any time, requests or consents to any composition, rearrangement, extension, reorganization or other relief of any debtor; (v) any Borrower Party (A) is generally not paying its debts as they become due, (B) is insolvent, (C) fraudulently transfers any of its assets to the detriment of any of its creditors, (D) makes an assignment for the benefit of creditors, or (E) admits in writing that it is unable to pay its debts as they become due; or (vi) a receiver, trustee or custodian is appointed for, or takes possession of, all or substantially all of a Borrower Party's assets or any of the Property, either in a proceeding a Borrower Party brings, or any other Person (except for Lender) brings against a Borrower Party, and any such appointment is not discharged or such possession is not terminated within 60 days after commencing, or the Borrower Party consents to or acquiesces in such appointment or possession (unless such consent or acquiescence is in connection with any Lender initiated proceeding). A Bankruptcy Event may exist even if an Event of Default cannot be declared because of Applicable Bankruptcy Law.

"*Borrower*" means (i) **ALAN GOMPERTS**, and **SHARON HALEVY**, **as Trustees of The Gomperts and Halevy Family Trust** ("*G&H Trust*"), (ii) **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010** ("*D&S Trust*"),, and (iii) **DANIEL HALEVY**, an individual ("*DH*").

"**Borrower Operating Account*" means an account specified to Lender by Borrower in writing from time to time as Borrower's operating account.

"*Borrower Party*" means, collectively, Borrower and Guarantor.

"*Business Day*" means each day of the week which is not a Saturday, Sunday or a holiday

recognized and observed by the Federal Reserve Board of Governors.

"*Casualty*" means if the Property shall be damaged or destroyed, in whole or in part, by fire or any other casualty.

"*Claims*" means any claim (including any Environmental Claim or any other claims arising under Environmental Laws), demands, liabilities, losses, damages, causes of action, judgments, penalties, fines, costs and expenses (including Attorneys' Fees, and of the investigation and defense of any claim, whether or not such claim is ultimately defeated, and the settlement of any claim or judgment including all value paid or given in settlement).

"*Closing Date*" means April 14, 2023.

"*Collateral*" means the Property and all of Borrower's other assets, whether now owned or hereafter acquired, including the Leases, and all proceeds from Borrower's assets.

"*Compliance Certificate"* means a certificate in the form set forth in **Exhibit C** of this Agreement and executed by David Halevy on behalf of Borrower in favor of Lender.

"*Compliance Certificate Delivery Date*" means each date on which (1) Borrower delivers a Compliance Certificate to Lender, and (2) if Borrower fails to deliver a Compliance Certificate to Lender, then the Compliance Certificate Due Date.

"*Compliance Certificate Due Date*" means the **15th** calendar day following the end of each calendar quarter. If the Compliance Certificate Due Date is on a day which is not also a Business Day, then the Compliance Certificate Due Date will be the next Business Day.

"*Condemnation*" means any threatened or instituted proceedings for the taking by eminent domain, or offer to purchase in lieu of a taking, of all or any portion of the Property including any change in any street (whether as to grade, access, or otherwise).

"*Contractors*" means, collectively, all parties with whom or to whom the Contracts have been made or are given.

"*Contracts*" means all contracts, subcontracts, agreements, site development agreements, service agreements, management agreements, warranties and purchase orders, together with any and all renewals, extensions and modifications thereof and all amendments, exhibits and addenda thereto, which have been or will be executed by or on behalf of Borrower, or which have been assigned to Borrower, in connection with the acquisition, use, operation or maintenance of the Property or the construction of improvements on the Property.

"*Control*" or "*controls*" means, with respect to Borrower, the power to direct the management and policies of Borrower, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; and the terms "*Controlling*" and "*Controlled*" have meanings correlating to the foregoing.

"*Damage*" means any damage to, loss, or destruction of the Property.

"*Debt*" means, for any Person, without duplication: (a) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or any of its assets is liable; (b) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person or any of its assets would be liable or subject, if such amounts were advanced under the credit facility; (c) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests; (d) all indebtedness guaranteed by such Person, directly or indirectly; (e) all obligations under leases that constitute capital leases for which such Person or any of its assets is liable or subject; and

(f) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person or any of its assets is liable or subject contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"***Debt Service***" means the amount of the outstanding principal balance of the Loan multiplied by the Interest Rate divided by 360 and multiplied by 30 ("***30/360 Basis***"). Interest for the full or partial calendar month at the beginning of the term of this Loan will be calculated on the basis of a 360-day year and the actual number of days elapsed. Interest for any partial calendar month at the end of the term of this Note will be calculated on the basis of a 360-day year and the actual number of days elapsed..

"***Debt Service Coverage Ratio***" means the ratio that Lender reasonably determines on the DSCR Testing Date of (i) Net Cash Flow, to (ii) Debt Service of the Loan for the prior twelve (12) month period.

"***Default Rate***" means a per annum rate of interest equal to the lesser of (i) 18.0% and (ii) the Maximum Rate.

"***Dollars***" and "**$**" means lawful money of the United States of America, which at the time of payment is legal tender for the payment of all public and private debts.

"***Environmental Indemnity Agreement***" means the Hazardous Materials Indemnity Agreement of even date herewith executed by Borrower in favor of Lender.

"***Environmental Approvals***" means any permit, license, approval, ruling, variance, exemption or other authorization required under applicable Environmental Laws.

"***Environmental Claim***" means, with respect to any Person, any notice, claim, demand or similar written communication by any other Person alleging potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, fines or penalties arising out of, based on or resulting from (a) the presence, or release into the environment, of any Material of Environmental Concern at any location, whether or not owned by such Person or (b) circumstances forming the basis of any violation, or alleged violation of any Environmental Law.

"***Environmental Laws***" means all federal, state and foreign laws and regulations relating to pollution or protection of human health or the environment (including ambient air, surface water, ground water, land surface or subsurface strata), including laws and regulations relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use treatment, storage, disposal, transport or handling of Materials of Environmental Concern. The term "Environmental Laws" includes the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations, guidelines and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including Subtitle I relating to underground Storage Tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act. The term "Environmental Law" also includes any present and future federal, state and local laws, statutes, ordinances, rules, regulations, guidelines and the like, as well as common law, conditioning transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Property; requiring notification or disclosure of any releases of any Material of Environmental Concern or other environmental condition of the Property to any Governmental Authority or other Person, whether or not in connection with transfer of title to or

interest in the Property; or imposing conditions or requirements in connection with permits or other authorization for lawful activity.

"***ERISA***" means, as amended, the Employee Retirement Income Security Act of 1974 and all rules, regulations and guidance promulgated thereunder.

"***Event of Default***" has the meaning set forth in <u>Section 5.1</u>.

"***Event of Default Period***" means the period beginning on the occurrence of an Event of Default and ending on the cure of the Event of Default.

"***Exit Fee***" means $0 payable to Lender.

"***Extraordinary Expenses***" means any extraordinary operating which are not budgeted operating costs and expenses, capital expenditures, or leasing costs (each as set forth in an approved budget).

"***Financing Statement***" means a Financing Statement naming Borrower, as debtor, and Lender, as secured party, perfecting the security interest in the Collateral.

"***Foxdale Borrower***" means Negev Investments, LLC, a California limited liability company.

"***Foxdale Loan***" means that Loan made to Foxdale Borrower in an amount equal to $1,300,000.00.

"***Foxdale Loan Documents***" means the loan agreement, the Foxdale Security Instrument, the environmental indemnity agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Foxdale Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Foxdale Loan Documents.

"***Foxdale Property***" means the property located at property known as "The Sandpiper" and located at 12800 Foxdale Drive, Desert Hot Springs, CA 92240.

"***Foxdale Security Instrument***" means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by Foxdale Borrower, in favor of the Trustee for the benefit of Lender concerning the Foxdale Property.

"***Funds***" means collectively, the definition set forth in <u>Section 7.1</u>, together with all reserve or impound accounts (including the Interest Reserve) as set forth in this Agreement.

"***GAAP***" means those generally accepted accounting principles and practices recognized from time-to-time by the Financial Accounting Standards Board (or any generally recognized successor). Borrower, Guarantor and all parties who must deliver any financial information to Lender under this Agreement or any other Loan Document must consistently apply the generally accepted accounting principles and practices recognized by the Financial Accounting Standards Board (or any generally recognized successor) to all statements and information delivered or provided, or otherwise made available, to Lender.

"***Governmental Authority***" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"***Grace Period***" means a period of either (i) 10 days after Lender delivers written notice to Borrower (the "***Initial Grace Period***") and demand for the performance of any default of any covenant, agreement, warranty or condition set forth in this Agreement, or (ii) if (A) Borrower immediately commences and diligently pursues the cure of such default and delivers (prior to the end of the Initial Grace Period) to Lender a written request for more time, and (B) Lender reasonably determines that (1) such default cannot be cured within the Initial Grace Period but can be cured within 10 days after the default, 30 days (for a

<u>Exhibit A</u>
TO
LOAN AGREEMENT

total of 40 days from the date Lender delivers written notice to Borrower of the default).

"*Guarantor*" means N/A.

"*Guaranty*" means the Continuing Guaranty of even date herewith made by Guarantor in favor of Lender relating to the Loan.

"*Improvements*" means all improvements now or hereafter located upon the Land.

"*Indebtedness*" means all obligations, liabilities and indebtedness of Borrower arising under the Loan Documents (including all Additional Costs).

"*Indemnified Party*" means Lender, Trustee and the directors, officers, employees and agents of Lender and Trustee and any Person owned or controlled by, owning or controlling, or under common control or affiliated with Lender or Trustee.

"*Insurance Impound*" means the impound account Borrower establishes with Lender for the payment of all insurance on the Property as required under this Agreement.

"*Insurance Premiums*" means all costs for the insurance policies required under Section 4.1(j) above.

"*Interest Payment Date*" means the first (1st) day of each calendar month commencing on May 1, 2023, and ending on the earlier of (i) the date the Loan is repaid in full, and (ii) the Maturity Date.

"*Interest Period*" means a 1-month period commencing on the first day, and ending on the last day, of each calendar month.

"*Interest Rate*" means 9.50% per annum.

"*Interest Reserve*" means the funds deposited by Borrower with Lender for the payment of debt service.

"*Land*" means the land described in **Exhibit B** of this Agreement.

"*Late Charge*" means a product equal to 5.0% of the amount of any Past Due Indebtedness.

"*Law*" means any statute, law, regulation, ordinance, rule, treaty, judgment, order, decree, permit, concession, franchise, license, agreement or other governmental restriction, or binding judicial (or tribunal) decisions of the United States or any state or political subdivision thereof, or of any foreign country or any department, province or other political subdivision thereof. All references to Law include any amendment or modification to the Law, and all regulations, rulings, and other Laws promulgated under such Law.

"*Lease(s)*" means all rights, title, interests, estates, powers, privileges, options and other benefits of Borrower in, to and under the lease agreements which now or hereafter cover or affect all or any portion of the Property, together with all renewals, extensions, modifications, amendments, subleases and assignments of such lease agreements.

"*Lender*" means collectively, ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company, its successors and/or assigns.

"*Lender's Offices*" means 16 N. Marengo Avenue, Suite 212, Pasadena, California 91101, Attention: Chuck Ng, or any other place Lender designates from time to time.

"*Licenses*" means, collectively, all licenses, permits, approvals, certificates and agreements with or from all boards, agencies, departments, governmental or otherwise, relating directly or indirectly to the ownership, use, operation and maintenance of the Property, or the construction of the Improvements, whether heretofore or hereafter issued or executed.

<div align="center">
Exhibit A
TO
Loan Agreement
</div>

"*Loan*" means the loan or loans Lender makes to Borrower pursuant to this Agreement (or the other Loan Documents) up to the Maximum Principal Amount.

"*Loan Documents*" means this Agreement, the Security Instrument, the Environmental Indemnity Agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Loan Documents.

"*Loan Matter*" means any action or proceeding which may affect the rights or duties of any Person under the Loan Documents.

"*Loan Origination Fee*" means $_____ payable to Lender, in consideration for Lender agreeing to make the Loan to Borrower.

"*Loan Title Policy*" means the title insurance policy (i) naming Lender as the insured, (ii) in the amount of the Maximum Principal Amount, (iii) in form (including endorsements), date and substance, and written by a title insurance underwriter, satisfactory to Lender, (iv) insuring a valid first lien upon the Property by virtue of the Security Instrument, and (v) containing no exceptions other than the preprinted exceptions and the Permitted Encumbrances.

"*Loan to Value Ratio*" means the percentage resulting from a fraction having (i) a numerator equal to the Principal Amount plus any unfunded amounts under the Loan and (ii) a denominator equal to the value of the Property, as determined by the most recent Appraisal, established as of the date on which the fraction is determined.

"*Major Lease*" means any Lease (i) which, either individually or when taken together with any other Lease with the same Tenant or its Affiliates, demises in equal to or in excess of 10% square feet in the Improvements or (b) made with a Tenant that is paying base rent in an amount equal to or exceeding 10% of the Total Revenue.

"*Material Action*" means to file any insolvency, or reorganization case or proceeding, to institute proceedings to have Borrower or any Borrower Party be adjudicated bankrupt or insolvent, to institute proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of bankruptcy or insolvency proceedings against Borrower or any Borrower Party, to file a petition seeking, or consent to, reorganization or relief with respect to Borrower or any Borrower Party under any applicable federal or state law relating to bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official of or for Borrower or any Borrower Party or a substantial part of its respective property, to make any assignment for the benefit of creditors of Borrower or any Borrower Party, the admission in writing by Borrower or any Borrower Party of such Person's inability to pay its debts generally as they become due, or to take action in furtherance of any of the foregoing.

"*Material Adverse Change*" or "*material adverse change*" means, in Lender's reasonable discretion, the business prospects, operations or financial condition of a Person or property has changed in a manner which would reasonably be expected to substantially and materially impair the value of Lender's security for the Loan, prevent timely repayment of the Loan or otherwise prevent the applicable Person from timely performing any of its material obligations under the Loan Documents.

"*Material of Environmental Concern*" means all chemicals, pollutants, contaminants, wastes, toxic substances, petroleum and petroleum products, and all other substances regulated by Environmental Laws (but excluding any cleaning or other products, materials or substances in concentrations and amounts used in the ordinary course of operating a similar business on similar property).

"*Maturity Date*" means the earlier to occur of (1) the Scheduled Maturity Date and (2) the date on which the entire Loan must be paid in full after acceleration pursuant to the terms of the Loan Documents.

"*Maximum Principal Amount*" means $2,575,000.00.

"*Maximum Rate*" means the maximum interest rate permitted under Applicable Law.

"*Net Cash Flow*" means Total Revenue less Operating Expenses.

"*Net Proceeds*" means the amount of all insurance proceeds Lender receives <u>less</u> all reasonable costs and expenses Lender incurs in connection with the collection and disbursement of the proceeds.

"*Note*" means the promissory note evidencing the Loan executed by Borrower in favor of Lender as of the date hereof.

"*Operating Expenses*" means shall equal the greater of (x) annual pro forma operating expenses or (y) the most recent quarter's operating expenses multiplied by four, as reasonably approved by the Lender. Operating expenses shall exclude depreciation, and be inclusive of adjustments for accrual of certain non-recurring expenses, annualized Insurance Premiums, Taxes and management fees (in the amount equal to the greater of (x) management fees actually paid, or (y) an imputed rate of 3% of Total Revenue, (b) Taxes and Insurance Premiums, (c) adjustments reflecting the accrual of certain non-recurring expenses, and (d) professional and partnership fees.

"*Paid in Full Mark*" means any payment Borrower tenders to Lender marked "*paid in full*," "*without recourse*," or any similar language.

"*Past Due Indebtedness*" means the sum of any Indebtedness which Borrower fails to pay to Lender within the earlier to occur of (i) 10 days after the date on which the Indebtedness is due (or such longer period as my be applicable hereunder), and (ii) the Maturity Date.

"*Payment Deadline*" means no later than 2:00 p.m. (Pacific time zone) on the date any payment is due and payable under this Agreement or the date any voluntary prepayment is made.

"*Permitted Encumbrances*" means the encumbrances, approved by Lender, set forth in Schedule B of the Loan Title Policy, except for the preprinted exceptions to title coverage.

"*Person*" means a natural person, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"*Plans and Specifications*" means, collectively, all plans, specifications, notes, drawings, approvals, certifications and similar work product (and all modifications thereof) relating to the Property, including all engineering plans, complete architectural plans, specifications and work drawings, Property costs and related information, site plans, proposed plat dedications and proposed development restrictions and conditions and all requisite building permits authorizing construction of the Improvements (and repairs, modifications and additions thereto).

"*Prepayment Date*" means the day on which Borrower (or any other Person) tenders any Indebtedness which is not then due and payable.

"*Prepayment Premium*" means $0.

"*Principal Amount*" means, at any point in time, that portion of the principal balance of the Loan which is unpaid.

"*Principal Payment Date*" means the earlier of (i) the date the Loan is repaid in full, and (ii) the Maturity Date.

Exhibit A

TO

Loan Agreement

"***Property***" means, collectively, the Land, the Improvements and the Additional Collateral.

"***Property Manager***" means any management company approved by Lender to manage the Property.

"***Property Management Agreement***" means the agreement between Borrower and Property Manager for the operation and management of the of the Property.

"***Qualifying Leases***" means all Leases in place, fully executed and in good standing for the Property with Tenant's is possession and paying rent.

"***Real Estate Taxes***" means all ad valorem taxes, assessments and charges (including ground rents, water and sewer rents, and all other recurring charge) which may create a lien against the Property.

"***Reimbursable Expenses***" means budgeted operating costs and expenses, capital expenditures, or leasing costs (each as set forth in an approved budget). The Reimbursable Expenses shall include management fees owed to the Property Manager but shall not include any administrative fees owed to Property Manager.

"***Rent***" means all of the rents, income, receipts, revenues, issues, profits and other sums of money that are now or at any time hereafter become due and payable to Borrower under the terms of any Lease or arising or issuing from or out of any Lease or from or out of the Property or any part thereof, including minimum rents, additional rents, percentage rents, deficiency rents and liquidated damages following default, payments in consideration for cancellation of a Lease, security deposits (whether cash, one or more letters of credit, bonds or other form of security), advance rents, all proceeds payable under any policy of insurance covering loss of rents resulting from untenantability caused by destruction or damage to the Property and all of Borrower's rights to recover monetary amounts from any lessee in bankruptcy including rights of recovery for use and occupancy and damage claims arising out of lease defaults, including rejection, disaffirmance, repudiation, and similar actions, under Applicable Bankruptcy Law and other statutes governing the rights of creditors, including the immediate and continuing right to collect and receive each and all of the foregoing.

"***Rent Loss Proceeds***" means the aggregate of any loss or business interruption insurance proceeds which the carrier acknowledges is payable to Lender.

"***Restoration***" means the restoration, replacement, and rebuilding of the Property as nearly as possible to its value and condition immediately prior to any Damage or Taking in accordance with Plans and Specifications Lender approves.

"***Security Instrument***" means, collectively

   (a)    that certain Deed of Trust Assignment of Lease and Rents, Security Agreement and Fixture Filing executed by G&H Trust for 3538 Greenfield Avenue, Los Angeles, CA 90034**,**

   (b)    that certain Deed of Trust Assignment of Lease and Rents, Security Agreement and Fixture Filing executed by D&S Trust 133 South Palm Dr, Apt 0005, Beverly Hills, CA 90212

   (c)    that certain Deed of Trust Assignment of Lease and Rents, Security Agreement and Fixture Filing executed by DH for 8561 Horner Street, Los Angeles, CA 90035

"***Site Assessment***" means an environmental engineering report for the Property prepared by an engineer engaged by Borrower and approved by Lender, and in a manner satisfactory to Lender, based upon an investigation relating to and making appropriate inquiries concerning the existence of hazardous

materials on or about the Property, and the past or present discharge, disposal, release or escape of any such substances, all consistent with ASTM Standard E1527-05 (or any successor thereto published by ASTM) and good customary and commercial practice.

"***State***" means the state in which the Land is situated.

"***Scheduled Maturity Date***" means December 1, 2023.

"***South Los Angeles Borrower***" means SLA Investments LLC, a California limited liability company.

"***South Los Angeles Loan***" means that Loan made to South Los Angeles Borrower in an amount equal to $125,000.00.

"***South Los Angeles Loan Documents***" means the loan agreement, the South Los Angeles Security Instrument, the environmental indemnity agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the South Los Angeles Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing South Los Angeles Loan Documents.

"***South Los Angeles Property***" means the property located at 1040 S Los Angeles Street, Los Angeles, CA 90015.

"***South Los Angeles Security Instrument***" means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by South Los Angeles Borrower, in favor of the Trustee for the benefit of Lender concerning the South Los Angeles Property.

"***Taking***" means any threatened or instituted proceedings for the condemnation or taking by eminent domain, or offer to purchase in lieu of a taking, of all or any portion of the Property including any change in any street (whether as to grade, access, or otherwise).

"***Tax***" or "***Taxes***" means all (1) income, franchise, margin and other taxes, which now or in the future, may be assessed against a Borrower Party, (2) stamp or other taxes due with respect to the Loan Documents, (3) taxes and assessments, which now or in the future, are levied or assessed against the Collateral, (4) taxes (except for ordinary income taxes) and assessments, which now or in the future, are levied or assessed against Lender in any way related to the Indebtedness or the Loan Documents, and (5) all Real Estate Taxes.

"***Tax and Insurance Escrow Account***" means the impound account Borrower establishes with Lender for the payment of real estate taxes and assessments against and insurance on the Property.

"***Tax Impound***" means the impound account Borrower establishes with Lender for the payment of all Taxes on the Property as required under this Agreement.

"***Taxpayer Identification Number***" means _____.

"***Tenant***" means each occupant of any portion of the Land or Improvements under a Lease.

"***Testing Determination Date***" means the date which is the last day of the calendar quarter.

"***Total Revenues***" means, the most recent calendar quarter's revenues for operations pursuant to fully executed approved Leases in good standing and in full force and effect, multiplied by four. Total revenues shall include a reasonable market vacancy factor equal to the greater of (a) the actual vacancy rate at the Property, or (b) 5.0%. The term "Total Revenues" will not include rentals, revenues or income derived from a Lease concerning a Tenant which is not yet in possession of its respective premises and paying rent;

<u>provided that</u> for the calculation of Debt Service Coverage Ratio in connection with Interest Rate, Total Revenues will include rentals revenues or income derived from a Lease concerning a Tenant in possession of its respective premises and paying rent.

"***Transfer Event***" means the conveyance of any Collateral to Lender or another Person through a foreclosure (or deed in lieu), receivership, bankruptcy or other voluntary or involuntary Borrower action.

"***Trustee***" has the meaning set forth in the Security Instrument.

"***UCC***" means the Uniform Commercial Code of the State in effect from time to time or, if the creation, perfection and enforcement of any security interest herein granted is governed by the laws of a state other than the State, then, as to the matter in question, the Uniform Commercial Code in effect in that state from time to time.

"***Unaffiliated Qualified Manager***" means an unaffiliated property manager of the Property that (A) is a reputable, nationally or regionally recognized management company having at least five (5) years' experience in the management of similar type properties, (B) at the time of its engagement as property manager has leasable square footage of the same property type as the Property equal to the lesser of 100,000 leasable square feet and five (5) times the leasable square feet of the Property and (C) is not the subject of a bankruptcy or similar insolvency proceeding.

## EXHIBIT B

## LEGAL DESCRIPTION OF LAND

**3538 Greenfield Avenue, Los Angeles, CA 90034**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 195 OF TRACT NO. 10516, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 159, PAGES 18 TO 20 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**133 South Palm Dr, Apt 0005, Beverly Hills, CA 90212**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 1118 TRACT 6380, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 69 PAGES 11 TO 20 INCLUSIVE OF MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**8561 Horner Street, Los Angeles, CA 90035**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 192 OF TRACT NO. 7385, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 81 PAGES 72 AND 73 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**EXHIBIT C**

**COMPLIANCE CERTIFICATE**

On April 14, 2023, (i) **ALAN GOMPERTS**, and **SHARON HALEVY, as Trustees of The Gomperts and Halevy Family Trust** ("*G&H Trust*"), (ii) **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010** ("*D&S Trust*"),, and (iii) **DANIEL HALEVY**, an individual ("*DH*") (G& H Trust, D&S Trust and DH are collectively, referred to herein as, "*Borrower*") and **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*") entered into a Loan Agreement (the "*Agreement*"). Borrower delivers this certificate (this "*Certificate*") to Lender in order to comply with the terms of the Agreement. Capitalized terms used, but not defined, in this Certificate have the meanings specified in the Agreement.

Borrower certifies to Lender that as of the Closing Date (as defined below):

(1)    No Event of Default exists;

(2)    The natural person executing this Certificate on Borrower's behalf (a) holds the title or position with Borrower required under the Agreement to execute this Certificate, (b) has been duly authorized to execute this Certificate on Borrower's behalf, and (c) has the capacity to duly execute, and make the certifications in, this Certificate; and

(3)    Borrower's calculations of the Debt Service Coverage Ratio are effective as of the most recent DSCR Testing Date and are set forth on **Schedule 1** to this Certificate.

_____
Date Borrower Executed this Certificate
(the "Closing Date")


**BORROWER:**

_____
**ALAN GOMPERTS**, Trustee of
**The Gomperts and Halevy Family Trust**


_____
**SHARON HALEVY**, Trustee of
**The Gomperts and Halevy Family Trust**


_____
**DAVID HALEVY, Trustee of**
**the Halevy Family Trust dated September 8, 2010,**
**by Daniel Halevy as his attorney in fact**


_____
**SUE HALEVY, Trustee of**
**the Halevy Family Trust dated September 8, 2010**


EXHIBIT C
TO
LOAN AGREEMENT

_____
**DANIEL HALEVY**, an individual

EXHIBIT C
TO
LOAN AGREEMENT

## EXHIBIT D

## CONDITIONS PRECEDENT

Each of the following conditions must be satisfied, at Borrower's cost and to Lender's satisfaction (in Lender's sole discretion), before this Agreement is effective.

1. <u>Documents</u>. Lender has received:

    a.  fully executed originals of each Loan Document;

    b.  legal opinions from each Borrower Party's counsel;

    c.  the Loan Title Policy;

    d.  an Appraisal establishing a Loan to Value Ratio less than or equal to 70%;

    e.  immediately available funds from Borrower sufficient to reimburse Lender for all costs (including attorneys' fees) Lender incurred to underwrite, document and close the Loan;

    f.  evidence that all Borrower Parties have all insurance policies required under the Loan Documents; and

    g.  all reports, including environmental assessments, Lender desires;

2. <u>Default</u>. On the day on which Lender receives the last satisfactory document under <u>paragraph 1</u> above:

    a.  no Event of Default exists; and

    b.  no event exists that after delivery of notice or passage of time will become an Event of Default.

## EXHIBIT E

### Single Purpose Entity Covenants

(d)   <u>Single Purpose Entity/Separateness</u>. Borrower represents, warrants and covenants as follows:

(i)   <u>Limited Purpose</u>. The sole purpose conducted or promoted by Borrower is to engage in the following activities:

(1)   to acquire, own, hold, lease, operate, manage, maintain, develop and improve the Property (or an undivided interest therein) and to contract for the operation, maintenance, management and development of the Property. Borrower has not owned, does not own, and will not own any asset or property other than (A) the Property, and (B) incidental personal property necessary for the ownership or operation of the Property;

(2)   to enter into and perform its obligations under the Loan Documents;

(3)   to sell, transfer, service, convey, dispose of, pledge, assign, borrow money against, finance, refinance or otherwise deal with the Property to the extent permitted under the Loan Documents; and

(4)   to engage in any lawful act or activity and to exercise any powers permitted that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above mentioned purposes.

(ii)   <u>Limitations on Debt, Actions</u>. Notwithstanding anything to the contrary in the Loan Documents or in any other document governing the formation, management or operation of Borrower, Borrower shall not:

(1)   guarantee any obligation of any Person, including any Affiliate, or become obligated for the debts of any other Person or hold out its credit as being available to pay the obligations of any other Person;

(2)   engage, directly or indirectly, in any business other than as required or permitted to be performed under this Section;

(3)   incur, create or assume any Debt other than (A) the Loan and (B) unsecured trade payables incurred in the ordinary course of its business that are related to the ownership and operation of the Property, and which shall (1) not exceed 2% of the outstanding balance of the Loan, (2) not be evidenced by a note, and (3) be paid within 60 days;

(4)   make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person, except that Borrower may invest in those investments permitted under the Loan Documents;

(5)   to the fullest extent permitted by law, engage in any dissolution, liquidation, consolidation, merger, sale or other transfer of any of its assets outside the ordinary course of Borrower's business;

<div align="center">

Exhibit E
TO
Loan Agreement
</div>

(6) buy or hold evidence of indebtedness issued by any other Person (other than cash or investment-grade securities);

(7) form, acquire or hold any subsidiary (whether corporate, partnership, limited liability company or other) or own any equity interest in any other entity;

(8) own any asset or property other than the Property (or an undivided interest therein) and incidental personal property necessary for the ownership or operation of the Property; or

(9) take any Material Action without the unanimous written approval of all partners of Borrower.

(iii) <u>Separateness Covenants</u>. In order to maintain its status as a separate entity and to avoid any confusion or potential consolidation with any Affiliate, Borrower represents and warrants that in the conduct of its operations since its organization it has observed, and covenants that it will continue to observe, the following covenants:

(1) maintain books and records and bank accounts separate from those of any other Person;

(2) maintain its assets in such a manner that it is not costly or difficult to segregate, identify or ascertain such assets;

(3) comply with all organizational formalities necessary to maintain its separate existence;

(4) hold itself out to creditors and the public as a legal entity separate and distinct from any other entity;

(5) maintain separate financial statements, showing its assets and liabilities separate and apart from those of any other Person and not have its assets listed on any financial statement of any other Person; except that Borrower's assets may be included in a consolidated financial statement of its Affiliate so long as appropriate notation is made on such consolidated financial statements to indicate the separateness of Borrower from such Affiliate and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliate or any other Person;

(6) prepare and file its own tax returns separate from those of any Person to the extent required by applicable law, and pay any taxes required to be paid by applicable law;

(7) allocate and charge fairly and reasonably any common employee or overhead shared with Affiliates;

(8) not enter into any transaction with Affiliates except on an arm's-length basis on terms which are intrinsically fair and no less favorable than would

<div align="center">

Exhibit E
to
Loan Agreement

</div>

be available for unaffiliated third parties, and pursuant to written, enforceable agreements;

(9)  conduct business in its own name, and use separate stationery, invoices and checks;

(10)  not commingle its assets or funds with those of any other Person;

(11)  not assume, guarantee or pay the debts or obligations of any other Person;

(12)  correct any known misunderstanding as to its separate identity;

(13)  not permit any Affiliate to guarantee or pay its obligations (other than limited guarantees and indemnities set forth in the Loan Documents);

(14)  not make loans or advances to any other Person;

(15)  pay its liabilities and expenses out of and to the extent of its own funds; provided, however, that the foregoing shall not require any equity owner to make any additional capital contributions to Borrower;

(16)  maintain a sufficient number of employees in light of its contemplated business purpose and pay the salaries of its own employees, if any, only from its own funds; provided, however, that the foregoing shall not require any equity owner to make any additional capital contributions to Borrower;

(17)  maintain adequate capital in light of its contemplated business purpose, transactions and liabilities; provided, however, that the foregoing shall not require any equity owner to make any additional capital contributions to Borrower; and

(18)  cause the managers, officers, employees, agents and other representatives of Borrower to act at all times with respect to Borrower consistently and in furtherance of the foregoing and in the best interests of Borrower.

SCHEDULE 1
TO
LOAN AGREEMENT

# EXHIBIT 2

# PROMISSORY NOTE

$2,575,000.00                                                      As of April 14, 2023

FOR VALUE RECEIVED, (i) **ALAN GOMPERTS**, and **SHARON HALEVY**, **as Trustees of The Gomperts and Halevy Family Trust** ("*G&H Trust*"), (ii) **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010** ("*D&S Trust*"),, and (iii) **DANIEL HALEVY**, an individual ("*DH*") (G& H Trust, D&S Trust and DH are collectively, referred to herein as, "*Borrower*"), promises and agrees to pay to the order of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*"), in lawful money of the United States of America, the principal sum of Two Million Five Hundred Seventy -Five Thousand and No/100 Dollars ($2,575,000.00) (the "*Loan*"), or so much thereof as may be advanced and outstanding under the Loan Agreement of even date herewith between Borrower and Lender (the "*Loan_Agreement*"), with interest on the unpaid principal sum owing thereunder at the rate or rates or in the amounts computed in accordance with the Loan Agreement, together with all other amounts due Lender under the Loan Agreement, all payable in the manner and at the time or times provided in the Loan Agreement. Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Loan Agreement.

If not sooner due and payable in accordance with the Loan Agreement, Borrower shall pay to Lender all amounts due and unpaid under the Loan Agreement dated as of the date hereof, or on any earlier Maturity Date as set forth in the Loan Agreement. Unless otherwise specified in writing by Lender, all payments hereunder shall be paid to Lender at its office located at 1875 Century Park East. Suite #900, Los Angeles, CA 90067, Attention: Joshua Kohan. Lender reserves the right to require any payment on this Note, whether such payment is a regular installment, prepayment or final payment, to be by wired federal funds or other immediately available funds.

Borrower, co-makers, sureties, endorsers and guarantors, and each of them, expressly waive demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith, ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED BY BORROWER, except as otherwise provided in the Loan Agreement or other Loan Documents; such parties are and shall be jointly, severally, directly and primarily liable for the payment of all sums owing and to be owing hereon, regardless of and without any notice, diligence, act or omission as or with respect to the collection of any amount called for hereunder or in connection with any right, lien, interest or property at any and all times had or existing as security for any amount called for hereunder.

This Promissory Note ("*Note*") evidences a portion of the advances made, interest due and all amounts otherwise owed to Lender under the Loan Agreement. This Note is executed in conjunction with the Loan Agreement and is secured by the liens and security interests created under the Loan Documents (including those arising under the Security Instrument). Reference is made to the Loan Agreement for provisions relating to repayment of the indebtedness evidenced by this Note, including mandatory repayment, acceleration following default, late charges, default rate of interest, limitations on interest, and restrictions on prepayment.

Lender reserves the right, at Lender's sole expense, exercisable in Lender's sole discretion and without notice to Borrower or any other person, to sell participations, to assign its interest or both, in all or any part of this Note or this debt or the debt evidenced hereby.

Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents.  Neither this Note, the Loan Agreement nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law.  It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Indebtedness evidenced by this Note and the other Loan Documents.  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Loan, or on acceleration of the maturity of the Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation.  Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Loan without the payment of the Prepayment Premium (or, if the Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Documents.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Loan.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Loan.

**WAIVER OF TRIAL BY JURY.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**THIS WRITTEN NOTE ALONG WITH THE LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

This Note shall be governed by and construed in accordance with the laws of the State of California without regard to conflicts of laws principles.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

2

EXECUTED as of the date first written above.

**BORROWER:**

_____
**ALAN GOMPERTS, Trustee of
The Gomperts and Halevy Family Trust**

_____
**SHARON HALEVY, Trustee of
The Gomperts and Halevy Family Trust**

_____
**DAVID HALEVY, Trustee of
the Halevy Family Trust dated September 8, 2010,
by Daniel Halevy as his attorney in fact**

_____
**SUE HALEVY, Trustee of
the Halevy Family Trust dated September 8, 2010**

_____
**DANIEL HALEVY**, an individual

SIGNATURE PAGE TO
PROMISSORY NOTE

# EXHIBIT 3



**This page is part of your document - DO NOT DISCARD**





# 20230259824

**Pages:
0027**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**04/24/23 AT 08:00AM**

| | |
|---|---:|
| FEES: | 170.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 225.00 |
| PAID: | 395.00 |



**L E A D S H E E T**



**202304240110008**

**00023380271**



**014033488**

**SEQ:
01**

SECURE – 8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**

30097266C-DZ

*E442358*

FOR REFERENCE ONLY 20230259824

Case 2:24-bk-12076-VZ   Doc ...   Filed 02/05/24   Desc Main Document   Page 72 of 126

RECORDING REQUESTED BY
Fidelity National Title Company

AND WHEN RECORDED MAIL TO:

Thompson Coburn LL
10100 Santa Monica Blvd., Suite 500
Los Angeles, CA 90067
Attn: Joshua Morgan

30097266C D2

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS
## SECURITY AGREEMENT AND FIXTURE FILING

RECORDING REQUESTED BY
Fidelity National Title Company

AND WHEN RECORDED MAIL TO:

Thompson Coburn LL
10100 Santa Monica Blvd., Suite 500
Los Angeles, CA 90067
Attn: Joshua Morgan

3009726C·DZ

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS
### SECURITY AGREEMENT AND FIXTURE FILING

**RECORDING REQUESTED BY**
**FIDELITY NATIONAL TITLE**

**RECORDING REQUESTED BY**
**AND WHEN RECORDED MAIL TO:**

Thompson Coburn LLP
10100 Santa Monica Blvd., Suite 500
Los Angeles, CA 90067
Attention: Joshua Mogin
Phone: (310) 282-2520
Email: jmogin@thompsoncoburn.com

30097266C-DZ      *(space above this line for recorder's use only)*
APN: 4331-018-029

**DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010**, as grantor
(Trustor)

to

**FIDELITY NATIONAL TITLE**, as trustee
(Trustee)

for the benefit of

**ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, as beneficiary

(collectively, Lender)

**DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,**
**SECURITY AGREEMENT AND FIXTURE FILING**

Dated:        April 14, 2023

Address:      133 South Palm Dr, Apt 0005
              Beverly Hills, CA 90212

THIS INSTRUMENT IS TO BE INDEXED AS BOTH A DEED OF TRUST AND A FIXTURE FILING FILED AS A FINANCING STATEMENT.

THIS INSTRUMENT CONSTITUTES A FIXTURE FILING UNDER SECTION 9502 OF THE CALIFORNIA COMMERCIAL CODE. TO THE EXTENT THE GOODS ARE FIXTURES UNDER THE LAWS OF THE STATE OF CALIFORNIA, THE FIXTURES ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY LOCATED IN RIVERSIDE COUNTY, CALIFORNIA, MORE PARTICULARLY DESCRIBED ON EXHIBIT A ATTACHED TO THIS SECURITY INSTRUMENT.

### DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

This Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing is executed as of April 14, 2023, by **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010** ("**Trustor**") to **FIDELITY NATIONAL TITLE** ("**Trustee**"), for the benefit of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company, as beneficiary ("**Lender**").

This Security Instrument is made in connection with that certain Loan Agreement (the "**Loan Agreement**"), between (i i) **ALAN GOMPERTS**, and **SHARON HALEVY, as Trustees of The Gomperts and Halevy Family Trust ("G&H Trust"),** (ii) **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010 ("D&S Trust"),,** and (iii) **DANIEL HALEVY**, an individual ("**DH**") (G& H Trust, D&S Trust and DH are collectively, referred to herein as, "**Borrower**") and Lender, and the Promissory Note (the "**Note**") described in the Loan Agreement, in the original principal amount of $2,575,000.00 in evidence of the loan (the "**Loan**") made by Lender to Borrower..

### W I T N E S S E T H:

In order to secure payment of the Indebtedness and performance of Borrower's obligations under the Loan Documents, Trustor hereby irrevocably grants, bargains, sells and conveys to Trustee IN TRUST, WITH POWER OF SALE, the following property and rights, whether now owned or held or hereafter acquired and Trustor further grants to Trustee a first priority security interest in the Property.

#### GRANTING CLAUSE ONE

All of Trustor's right, title and interest in and to the Land.

#### GRANTING CLAUSE TWO

All of Trustor's right, title and interest in and to the Additional Land.

#### GRANTING CLAUSE THREE

All of Trustor's right, title and interest in and to the Improvements.

#### GRANTING CLAUSE FOUR

All easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, oil, gas and mineral rights, air rights and development rights, zoning rights, tax credits or benefits and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever in any way now or hereafter belonging, relating or pertaining to the Real Property or any part thereof and the reversion and reversions, remainder and remainders and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land or any part thereof to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy, property, possession, claim and demand whatsoever, both in law and in equity, of Trustor in, of and to the Real Property and every part and parcel thereof, with the appurtenances thereto.

#### GRANTING CLAUSE FIVE

All right, title and interest in and to the Equipment and the right, title and interest of Trustor in and to any of the Equipment which may be subject to any Security Agreements (as defined in the Uniform

1

Commercial Code) superior, inferior or pari passu in lien to the lien of this Security Instrument. In connection with Equipment which is leased to Trustor or which is subject to a lien or security interest which is superior to the lien of this Security Instrument, this Security Instrument shall also cover all right, title and interest of each Trustor in and to all deposits and the benefit of all payments now or hereafter made with respect to such Equipment.

### GRANTING CLAUSE SIX

All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Real Property or any part thereof, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of said right), or for a change of grade or for any other injury to or decrease in the value of the Real Property.

### GRANTING CLAUSE SEVEN

All leases and subleases (including, without limitation, all guarantees thereof) and other agreements affecting the use, enjoyment and/or occupancy of the Real Property or any part thereof, now or hereafter entered into (including any use or occupancy arrangements created pursuant to Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings or any assignment for the benefit of creditors in respect of any tenant or occupant of any portion of the Real Property) and all income, rents, issues, profits, revenues and proceeds including, but not limited to, all oil and gas or other mineral royalties and bonuses from the Real Property (including any payments received pursuant to Section 502(b) of the Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings or any assignment for the benefit of creditors in respect of any tenant or occupant of any portion of the Real Property and all claims as a creditor in connection with any of the foregoing) and all proceeds from the sale, cancellation, surrender or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Indebtedness.

### GRANTING CLAUSE EIGHT

All proceeds of and any unearned premiums on any insurance policies covering the Real Property or any part thereof including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Real Property or any part thereof.

### GRANTING CLAUSE NINE

All tax refunds, including interest thereon, tax credits and tax abatements and the right to receive or benefit from the same, which may be payable or available with respect to the Real Property.

### GRANTING CLAUSE TEN

The right, in the name of and on behalf of Trustor, to appear in and defend any action or proceeding brought with respect to the Real Property or any part thereof and to commence any action or proceeding to protect the interest of Lender in the Real Property or any part thereof and all awards and/or judgments received by Trustor from any source whatsoever.

### GRANTING CLAUSE ELEVEN

All cash on hand, bank accounts, accounts receivable, security deposits, utility or other deposits, intangibles, contract rights, interests, estates or other claims, both in law and in equity, which Trustor now has or may hereafter acquire in the Real Property or any part thereof.

### GRANTING CLAUSE TWELVE

All rights which Trustor now has or may hereafter acquire to be indemnified and/or held harmless from any liability, loss, damage, cost or expense (including, without limitation, attorneys' fees and disbursements) relating to the Real Property or any part thereof.

### GRANTING CLAUSE THIRTEEN

All plans and specifications, maps, surveys, studies, reports, contracts, subcontracts, service contracts, management contracts, franchise agreements and other agreements, franchises, trade names, trademarks, symbols, service marks, approvals, consents, permits, special permits, licenses and rights, whether governmental or otherwise, respecting the use, occupation, development, construction and/or operation of the Real Property or any part thereof or the activities conducted thereon or therein, or otherwise pertaining to the Real Property or any part thereof.

### GRANTING CLAUSE FOURTEEN

All proceeds, products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

WITH RESPECT to any portion of the Property which is not real estate under the laws of the State of California, Trustor hereby grants, bargains, sells and conveys the same to Lender for the purposes set forth hereunder and the references above to Trustee shall be deemed to be to Lender with respect to such portion of the Property and Lender shall be vested with all rights, power and authority granted hereunder or by law to Trustee with respect thereto.

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Trustee and its successors and assigns for the benefit of Lender and the successors and assigns of Lender forever.

IN TRUST, WITH POWER OF SALE, to secure the payment to Lender of the Indebtedness at the time and in the manner provided for its payment in the Note and in this Security Instrument;

PROVIDED, HOWEVER, these presents are upon the express condition, if Trustor shall well and truly pay to Lender the Indebtedness at the time and in the manner provided in the Note and this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein, in the Note and in the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void;

AND Trustor represents and warrants to and covenants and agrees with Lender and Trustee as follows:

Trustor warrants to Trustee for the benefit of Lender, and agrees to defend title to the Property against the claims of any Person or Governmental Authority, subject to the Permitted Encumbrances. This Security Instrument will have no further force or effect on the Termination Date. Trustee on behalf of

Lender will (unless otherwise required by Applicable Law) release this Security Instrument within 30 days after the Termination Date, at Trustor's expense.

Trustor acknowledges receiving good and valuable consideration, including the Indebtedness, to execute and deliver this Security Instrument.

AND Trustor represents and warrants to and covenants and agrees with Lender and Trustee as follows:

<div align="center">

ARTICLE I.
**Definitions and Loan Documents**

</div>

1.1    <u>Loan Documents</u>.  All representations, covenants and other terms (including those terms that apply to all Loan Documents) of the other Loan Documents are, by reference, fully incorporated in this Security Instrument.  All covenants in the Loan Documents are covenants running with the Land.

1.2    <u>Definitions</u>.  Capitalized terms not otherwise defined below will have the meanings set forth in the Loan Agreement.  Each of the below capitalized terms has the following meaning:

*"737 S Broadway Borrower"* means **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company.

*"737 S Broadway Loan"* means that Loan made to 737 S Broadway Borrower in an amount equal to $16,9420,500.00.

*"737 S Broadway Loan Documents"* means the loan agreement, the 737 S Broadway Security Instrument, the environmental indemnity agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the 737 S Broadway Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing 737 S Broadway Loan Documents.

*"737 S Broadway Property"* means the property located at 737 S. Broadway, Los Angeles, CA 90014.

*"737 S Broadway Security Instrument"* means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by 737 S Broadway Borrower, in favor of the Trustee for the benefit of Lender concerning the 737 S Broadway Property.

*"Additional Land"* means all additional lands, estates and development rights hereafter acquired by Trustor for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental Deed of Trust or otherwise, be expressly made subject to the lien thereof.

*"Collateral"* means the Property and all of Trustor's other assets, whether now owned or hereafter acquired, including the Leases, and all proceeds from Trustor's assets.

*"Equipment"* means all machinery, equipment, fixtures, goods which are or are to become fixtures, furnishings, inventory and other property of every kind and nature whatsoever owned by Trustor or in which Trustor has or shall have an interest (to the extent of such interest) now or hereafter located upon the Real Property or appurtenant thereto and usable in connection with the present or future operation and occupancy of the Real Property and all building equipment, materials and supplies of any nature whatsoever owned by Trustor or in which Trustor has or shall have an interest (to the extent of such interest) now or hereafter located upon the Real Property or appurtenant thereto or usable in connection with the present or future operation and occupancy of the Real Property, including but not limited to all heating, ventilating, air conditioning, plumbing, lighting, communications and elevator machinery, equipment and fixtures.

*"Foreclosure Statute"* has the meaning set forth in <u>Section 4.2</u> below.

<div align="center">4</div>

"*Foxdale Borrower*" means Negev Investments, LLC, a California limited liability company.

"*Foxdale Loan*" means that Loan made to Foxdale Borrower in an amount equal to $1,300,000.00.

"*Foxdale Loan Documents*" means the loan agreement, the Foxdale Security Instrument, the environmental indemnity agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Foxdale Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Foxdale Loan Documents.

"*Foxdale Property*" means the property located at property known as "The Sandpiper" and located at 12800 Foxdale Drive, Desert Hot Springs, CA 92240.

"*Foxdale Security Instrument*" means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by Foxdale Borrower, in favor of the Trustee for the benefit of Lender concerning the Foxdale Property.

"*South Los Angeles Borrower*" means SLA Investments LLC, a California limited liability company.

"*South Los Angeles Loan*" means that Loan made to South Los Angeles Borrower in an amount equal to $125,000.00.

"*South Los Angeles Loan Documents*" means the loan agreement, the South Los Angeles Security Instrument, the environmental indemnity agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the South Los Angeles Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing South Los Angeles Loan Documents.

"*South Los Angeles Property*" means the property located at 1040 S Los Angeles Street, Los Angeles, CA 90015.

"*South Los Angeles Security Instrument*" means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by South Los Angeles Borrower, in favor of the Trustee for the benefit of Lender concerning the South Los Angeles Property.

"*Improvements*" means any and all buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located on the Land or any part thereof.

"*Land*" the real property or properties described on *Exhibit A* attached hereto.

"*Loan Agreement*" means the Loan Agreement, dated as of the date hereof, between Lender and Borrower.

"*Payment Notice*" means Lender's notice to Tenant of an Event of Default Period.

"*Personal Property*" means all (i) Awards, (ii) Leases, (iii) all of Trustor's accounts (as defined in the UCC), goods (as defined in the UCC), fixtures, accessions (as defined in the UCC), general intangibles (as defined in the UCC), chattel paper (as defined in the UCC), investment property (as defined in the UCC) and deposits accounts (as defined in the UCC) (including any accounts opened in connection with cash management), which are ever situated on, derived from or used in connection with the Property, (iv) Additional Collateral, (v) all insurance policies covering the Property, the other Personal Property and the liability of any Trustor, Trustee or Lender, and all insurance proceeds from any of the policies, (vi) amounts deposited in the Tax and Insurance Escrow Account, and (vii) all proceeds of the Personal Property described in (i) – (vi).

"*Property*" means the Real Property and the Personal Property.

"*Real Property*" means, collectively, (i) the Land (as legally described in *Exhibit A* annexed to this Security Instrument), (ii) the Improvements, (iii) Leases, Rents and Awards, (iv) all fixtures, accessions and appurtenances to the Land or Improvements, (v) all easements and rights of way now or hereafter benefiting the Land, (vi) all of Trustor's interest in any lands adjoining the Land, (vii) all water and all of Trustor's water rights benefiting the Land, and (viii) all rights, estates and privileges appurtenant or incident to the foregoing.

"*Security Instrument*" means this Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, as amended, modified, restated and extended.

"*Termination Date*" means day on which Trustor fully pays the Indebtedness and performance all of Trustor's obligations under the Loan Documents.

"*Transferee*" means any Person, including Lender, who takes title to any Collateral after a Transfer Event.

"*Trustee*" means Fidelity National Title, and the successors and substitutes Lender designates.

"*Uniform Commercial Code*" or "*UCC*" means the Uniform Commercial Code of the State of California, as amended.

1.3    Terms Generally; References and Titles.    References in this Security Instrument to "Articles," "Sections," "Exhibits" or "Schedules" will be to the Articles, Sections, Exhibits or Schedules of this Agreement unless otherwise specifically provided.  All Exhibits and Schedules annexed to this Security Instrument are incorporated in, and are a part of, this Security Instrument for the purposes set forth in this Security Instrument.  Any term defined in this Security Instrument may be used in the singular or plural. Words of any gender include all other genders. The terms "include," "includes," and "including" are followed by "without limitation".  Except as otherwise specified or limited in this Security Instrument, a reference to any Person includes the successors and assigns of the Person.  Unless otherwise specified all references "from" or "through" any date mean "from and including" or "through and including" the date. References to any statute or act include all related current regulations and all amendments and any successor statutes, acts and regulations.  References to any statute or act, without additional reference, refer to federal statutes and acts of the United States.  References to any agreement, instrument or document includes all schedules, exhibits, annexes and other attachments to the agreement, instrument or document.

1.4    Prepayment Premium.    Unless Lender specifically waives the Prepayment Premium (as defined in the Loan Agreement) in any purported payoff statement, the Prepayment Premium is due and payable as provided in the Loan Agreement.

ARTICLE II.
**Assignment of Leases and Rents**

2.1    Assignment.    For the Indebtedness and other good and valuable consideration, Trustor absolutely and unconditionally assigns and transfers to Lender (a) the Leases, (b) the Rents, and (c) any and all guaranties of payment of the Rent.  Trustor does hereby absolutely and unconditionally assign to Lender its right, title and interest in all current and future Leases and Rents and all proceeds from the sale, cancellation, surrender or other disposition of the Leases, it being intended by Trustor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.  Such assignment to Lender shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any such Lease or otherwise to impose any obligation upon Lender. Trustor agrees to execute and deliver to Lender such additional instruments in form and substance satisfactory to Lender, as may hereafter be requested by Lender to further evidence and confirm such assignment.  Nevertheless, subject to the terms of this Section 2.1, Lender grants to Trustor a revocable license to operate and manage the Property and to collect the Rents.  Trustor shall hold the Rents, or a

6

portion thereof sufficient to discharge all current sums due on the Indebtedness, in trust for the benefit of Lender for use in the payment of such sums.  During an Event of Default Period, the license granted to Trustor herein shall be automatically revoked and Lender shall immediately be entitled to possession of all Rents, whether or not Lender enters upon or takes control of the Property.  Lender is hereby granted and assigned by Trustor the right, at its option, upon the revocation of the license granted herein to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents.  Any Rents collected after the revocation of the license herein granted may be applied toward payment of the Indebtedness in such priority and proportion as Lender in its reasonable discretion shall deem proper.  It is further the intent of Trustor and Lender that the Rents hereby absolutely assigned are no longer, during the term of this Security Instrument, property of Trustor or property of any estate of Trustor as defined in Section 541 of the Bankruptcy Code and shall not constitute collateral, cash or otherwise, of Trustor.

2.2    <u>Application of Rent.</u>

(a)    Each Tenant may, until Lender delivers a Payment Notice, pay Rent directly to Trustor (or its designee).  Trustor shall hold all Rent it (or its designee) receives in trust for the benefit of Lender and the Loan.  Unless Lender otherwise agrees, Trustor must first only use the Rent to satisfy obligations arising under the Loan Documents, including payment of all Real Estate Taxes, insurance premiums, maintenance and repair costs, for the Property.

(b)    After a Tenant receives a Payment Notice, Tenant shall pay directly to Lender all Rent thereafter accruing.  Tenant is relieved of its obligations to pay Trustor under any Lease to the extent of all Rent Tenant pays to Lender.

(c)    Lender may use any Rent it receives for (in the priority and amounts as Lender determines in its discretion): (i) (1) the expenses to operate, maintain and manage the Property, and (2) the expenses incident to taking and retaining possession of the Property and collecting Rent; and (ii) the Indebtedness.  The assignment in <u>Section 2.1</u> above does not reduce the Indebtedness unless Lender actually receives Rent and applies it to the Indebtedness.

(d)    Lender may, at its option and without impairing its rights under the assignment in this <u>Section 2.1</u>, release any Rent Lender receives to Trustor.

(e)    As between Trustor, Lender and any other Person, except a Tenant who has not received a Payment Notice, the assignment in <u>Section 2.1</u> above is absolute, unconditional and presently effective.  Lender's delivery of a Payment Notice is solely for the benefit and protection of each Tenant and does not otherwise benefit or affect Trustor or any Person claiming through or under Trustor.

(f)    Lender is not required to institute legal proceedings to enforce the terms of this <u>Section</u>.

2.3    <u>No Third Party Beneficiary</u>.  The assignment in <u>Section 2.1</u> above is not made for the benefit of any Person other than Lender.

2.4    <u>Release and Termination</u>.  The assignment in <u>Section 2.1</u> above terminates upon Lender's release of this Security Instrument.

<div align="center">ARTICLE III.<br><b>Leases</b></div>

3.1    <u>Intentionally Omitted.</u>

3.2    <u>Approval</u>.  Except as set forth below and in the Loan Agreement, no Lease (including any Lease amendments) will be effective unless approved by Lender.

3.3    <u>Terms</u>.  Notwithstanding the terms of any Lease made on or after the Closing Date, each Lease is subordinate to this Security Instrument and each Tenant shall, if Lender elects, execute an instrument (in form and substance acceptable to Lender in its sole discretion) subordinating the Tenant's

<div align="center">7</div>

leasehold interest to Lender's liens and security interests. Unless Lender specifically agrees in writing, no Leases may impose obligations upon Lender or any Transferee prior to or following a Transfer Event.

    3.4    <u>Lender's Preapproval</u>. Notwithstanding <u>Section 3.2</u> above and subject to <u>Sections</u> **Error! Reference source not found.** and <u>3.3</u> above, Trustor may enter into and modify, but not terminate, Leases (except ground or master Leases) that:

    (a)    are with Tenants who are not affiliated with Trustor;

    (b)    do not grant Tenant's more than 1 month of free rent for each year of the lease or renewal term or any reduced Rents, except as permitted pursuant to clause (d) hereof;

    (c)    do not afford Tenants any termination rights;

    (d)    are an arm's length transaction on economic terms conforming to current market conditions;

    (e)    have a market rental rate; and

    (f)    do not contain any rights of first refusal or options to purchase.

<div align="center">

ARTICLE IV.
**<u>Remedies</u>**
</div>

    4.1    <u>Possession</u>. During an Event of Default Period, Lender may (a) enter upon and take possession of the Property and (b) exercise, without Trustor's interference, any rights which Trustor has with respect to the managing, possessing, operating, leasing, protecting or preserving the Property. If Lender rents any of the Property, Lender will do so for the account of Trustor, and Lender may deduct from the Rents all expenses and liabilities Lender incurs in collecting the Rents and in managing, operating, maintaining, protecting or preserving the Property. Lender may apply any remaining Rents to the Indebtedness in any manner Lender chooses. All costs, expenses and liabilities Lender incurs in collecting the Rents and in managing, operating, maintaining, protecting or preserving the Property, which exceed the Rents Lender actually collects from Tenants will be Additional Costs. If Lender elects to take possession of the Property, then Trustor will quietly surrender possession of the Property. If Trustor fails to quietly surrender possession of the Property, then Lender may invoke all legal remedies to dispossess Trustor.

    4.2    <u>Foreclosure</u>. Trustor grants Trustee on behalf of Lender a power of sale. During an Event of Default Period, Trustee, if Lender directs, on behalf of Lender may exercise the power of sale and foreclose the liens and security interests created by this Security Instrument in any manner provided at law or in equity (as amended, replaced or re-codified, the "***Foreclosure Statute***"). If the Foreclosure Statute is no longer in force or effect, then, in addition to Lender's other rights at law or in equity, Lender may foreclose pursuant to the rules set forth in the last effective Foreclosure Statute. In addition to the power of sale and non-judicial foreclosure rights granted to Trustee on behalf of Lender, if Trustee on behalf of Lender desires, then Trustee on behalf of Lender may file suit on the Indebtedness and for the foreclosure of the liens and security interests created by this Security Instrument.

    4.3    <u>Receiver</u>. In addition to all other remedies in the Loan Documents, at law or in equity, during an Event of Default Period, (a) without notice to any Trustor Party, (b) whether or not Trustor is solvent, (c) whether or not a Trustor Party commits fraud or mismanages the Property, (d) even if the Property is sufficient to repay the Indebtedness, or (e) without filing any proceeding other than a proceeding seeking the appointment of a receiver, Lender will be entitled to the appointment of a receiver or receivers for the Property and the Rents. Trustor irrevocably consents to the appointment of a receiver and waives all defenses to any Lender application for a receiver. During a receivership for the Property, Trustor irrevocably consents to (i) Lender commencing any additional proceeding to enforce any other right or remedy under the Loan Documents, at law or in equity, and (ii) Trustee on behalf of Lender conducting a non-judicial sale of the Collateral pursuant to the Foreclosure Statute. Any money Lender advances in

<div align="center">8</div>

connection with a receivership will be Additional Costs. This **Section** is an express condition upon which the Loan is made.

4.4    <u>Proceeds of Sale</u>. The proceeds of any Trustee's or receiver's sale of the Property in foreclosure of the liens evidenced by this Security Instrument will be:

> **FIRST**, applied to the payment of all costs of the sale, and a reasonable fee, to Trustee acting under <u>Section 4.2</u> above; **SECOND**, applied to the Indebtedness, in the order Lender elects, until the Indebtedness is paid in full; and **THIRD**, the remainder, if any, paid to any Person (including Trustor) as required by Applicable Law.

4.5    <u>Lender as Purchaser</u>. Lender may purchase the Property at any foreclosure sale. In connection with any foreclosure sale, Lender may credit bid in an amount up to the Indebtedness then owed to Lender.

4.6    <u>Uniform Commercial Code</u>. During an Event of Default Period, Lender may exercise its rights of enforcement with respect to the Collateral under the UCC. In addition to or in substitution for Lender's UCC rights and remedies:

(a)    Lender may enter upon the Property to take possession of, assemble and collect the Collateral or to render it unusable, subject to the rights of any Tenants;

(b)    Lender may require Trustor to assemble the Collateral and make it available at the Property or any place Lender designates which is mutually convenient to allow Lender to take possession or dispose of the Collateral;

(c)    Lender may mail written notice to Trustor as provided in the Loan Agreement ten (10) days prior to the date of any sale of the Collateral, and such notice will constitute reasonable notice under the UCC;

(d)    Lender need not take possession of the Collateral prior to any Transfer Event; and

(e)    prior to applying Transfer Event proceeds to the Indebtedness, Lender may apply the proceeds to the reasonable expenses (including Lender's legal expenses and reasonable attorneys' fees, including allocated in-house counsel expenses) incurred to collect the Indebtedness, enforce the Loan Documents or to take possession of, hold or prepare the Collateral for transfer.

4.7    <u>Delivery of Possession After Foreclosure</u>. Immediately after a Transfer Event, Trustor and any Person claiming any Collateral interest by, through or under Trustor, who is occupying or using the Property or other Collateral, will become the tenant or lessee of the Transferee. Subject to the terms of the applicable Lease and to any non-disturbance and attornment agreement between Lender and a Tenant, the post-Transfer Event tenancy will be a tenancy at will, terminable at the will of either Transferee or the tenant, at a daily fair market rental. If a Tenant fails to surrender possession of the Collateral to Transferee after Transferee's demand, then Transferee may institute and maintain an action for forcible entry and detainer of the Property.

<div align="center">

ARTICLE V.
**Miscellaneous**

</div>

5.1    <u>Successor Trustee</u>. Lender may remove Trustee, or Trustee may resign, at any time with or without cause. If Trustee dies, resigns or is removed, then Lender may, in writing, appoint a successor or substitute trustee. Lender may exercise its right to remove any Trustee or appoint any number of successor or substitute trustees as often as Lender desires until the Termination Date. Lender may appoint a single or multiple substitute trustees to act instead of the original trustee. If multiple substitute trustees are appointed, then each may act alone without the other substitute trustees. Immediately after a successor or substitute trustee is appointed, (i) all of the Trustee's estate in and title to the Collateral vests in the

<div align="center">9</div>

successor or substitute trustee(s), (ii) the successor or substitute trustee(s) will succeed to all rights, powers, privileges and immunities conferred upon Trustee, and (iii) the prior Trustee(s) shall assign, transfer and deliver to the successor or substitute Trustee(s) all of the Collateral the prior Trustee holds.  Upon the written request of Lender or of the successor or substitute Trustee(s), the prior Trustee shall execute and deliver an instrument transferring to the successor or substitute Trustee(s) all of the estate in and title to the Collateral.

5.2    Authorization to File Financing Statement.  Trustor authorizes Lender to file in any jurisdiction a reproduction of this Security Instrument or financing statements covering the Collateral.  If Lender desires, Lender may describe the Collateral in any financing statement as "*all assets*" of Trustor or words of similar effect.

5.3    Fixture Filing.  This Security Instrument is a financing statement filed as a fixture filing.  For purposes of this Security Instrument being a financing statement:  Trustor is the debtor, Lender is the secured party, and the collateral is the Personal Property, including fixtures.

5.4    Dealing with Successor.  If Trustor no longer owns the Collateral, then Lender may, without notice to Trustor, deal with Trustor's successor in interest concerning this Security Instrument and the Indebtedness in the same manner as with Trustor, without in any way vitiating or discharging Trustor's liability under the Loan Documents or for the Indebtedness.  Notwithstanding the foregoing, Lender does not consent to any transfer of the Collateral, except as expressly set forth in the Loan Documents or as Lender hereafter agrees in writing.

5.5    Subrogation.  If Loan proceeds pay indebtedness secured by any outstanding lien, security interest or prior encumbrance against the Collateral, then Lender has advanced the proceeds at Trustor's request and Lender is subrogated to all rights, security interests and liens held by the holder of the outstanding liens, security interests or encumbrances, irrespective of whether the liens, security interests or encumbrances are released.  However, the terms and provisions of the Loan Documents will govern the rights and remedies of Lender and supersede the terms, provisions, rights and remedies under and pursuant to the instruments creating the original lien, security interest or encumbrance.

5.6    Application of Indebtedness.  If this Security Instrument or any of the Collateral cannot lawfully secure any of the Indebtedness or if the liens or security interests created by this Security Instrument are invalid or unenforceable as to any of the Indebtedness or any of the Collateral, then all payments made on the Indebtedness will be applied first to all of the Indebtedness which is not secured by this Security Instrument or the Collateral.

5.7    Agents.  Lender or Trustee may appoint one or more Persons as agent to perform any act necessary or incidental to any sale of the Collateral, in the name and on behalf of Lender or Trustee.

5.8    Transfer Recitals.  All statements of fact in any instrument evidencing a Transfer Event concerning (i) nonpayment of the Indebtedness, (ii) any Event of Default, (iii) acceleration of the Indebtedness, or (iv) any other matter, are prima facie evidence of the truth of the recited fact.

5.9    Notices.  Any notice required or permitted to be given under this Security Instrument shall be in writing and either (a) shall be mailed by certified mail, postage prepaid, return receipt requested, or (b) sent by overnight air courier service, or (c) personally delivered to a representative of the receiving party, or (d) sent by facsimile or email. All such communications shall be mailed, sent or delivered, addressed to the party for whom it is intended at its address set forth below.

To Lender:          Archway Real Estate Income Fund I SPE I, LLC
                    1875 Century Park East. Suite #900
                    Los Angeles, CA 90067
                    Attention: Joshua Kohan
                    Phone: (310) 893-5277

Greenfield PH (Palm Drive)– Security Instrument

Email: joshua@archwayfund.com

| | |
|---|---|
| with a copy to: | Thompson Coburn LLP<br>10100 Santa Monica Blvd., Suite 500<br>Los Angeles, CA 90067<br>Attention: Joshua Mogin<br>Phone: (310) 282-2520<br>Email: jmogin@thompsoncoburn.com |
| To Trustor: | c/o David Halevy<br>257 S. Linden Drive<br>Beverly Hills CA 90212<br>Phone: (310) 666-2885<br>Email: danhalevy@gmail.com |
| with a copy to | Locke Lord LLP<br>300 S. Grand Ave., Suite 2600<br>Los Angeles, CA 90071<br>Attention: David S. Kupetz<br>Phone: (213) 687-6774<br>Email: David.Kupetz@lockelord.com |
| Trustee: | Fidelity National Title<br>555 S. Flower Street, Suite 4420<br>Los Angeles, CA 90071<br>Attention: JB Jennings<br>Phone: (213) 452-7100<br>Email: JB.Jennings@fnf.com |

Any notice so addressed and sent by United States mail or overnight courier shall be deemed to be given on the earliest of (1) when actually delivered, (2) on the first Business Day after deposit with an overnight air courier service, or (3) on the third Business Day after deposit in the United States mail, postage prepaid, in each case to the address of the intended addressee. Any notice so delivered in person shall be deemed to be given when receipted for by, or actually received by, Lender or Indemnitor, as the case may be. Notices transmitted by facsimile or email shall be deemed received on the date of transmission, provided that a confirming copy of such notice is also sent by mail, overnight courier or personal delivery, as provided above. Either party may designate a change of address by written notice to the other by giving at least ten (10) days prior written notice of such change of address.

## ARTICLE VI.
### Concerning the Trustee

6.1    <u>Trustee's Fees</u>.  Trustor shall pay all costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

Greenfield PH (Palm Drive)– Security Instrument

6.2    Substitute Trustee.  Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction.  Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for willful negligence or misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof.  Lender may remove Trustee at any time or from time to time and select a successor trustee by filing the appropriate instrument in the office where this Security Instrument is recorded.  Trustor hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, with full power of substitution to file, execute and record any document required to appoint such substitute trustee.  In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever, Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor.  Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender.  The procedure provided for in this paragraph for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.  Trustor agrees to the foregoing for itself, its successors and assigns.

6.3    Power of Sale.

(a)    Upon the occurrence of an Event of Default, Trustee, or the agent or successor of Trustee, at the request of Lender, shall sell or offer for sale the Property in such portions, order and parcels as Lender may determine with or without having first taken possession of same, to the highest bidder for cash at one or more public auctions in accordance with the terms and provisions of the law of the State in which the Property is located.  Such sale shall be made at the area within the courthouse of the county in which the Property (or any portion thereof to be sold) is situated (whether the parts or parcels thereof, if any, in different counties are contiguous or not, and without the necessity of having any Personal Property hereby secured present at such sale) which is designated by the applicable court of such County as the area in which public sales are to take place, or, if no such area is designated, at the area at the courthouse designated in the notice of sale as the area in which the sale will take place, on such day and at such times as permitted under applicable law of the State where the Property is located, after advertising the time, place and terms of sale and that portion of the Property in accordance with such law, and after having served written or printed notice of the proposed sale by certified mail on each Trustor obligated to pay the Note and other secured indebtedness secured by this Security Instrument according to the records of Lender in accordance with applicable law.  The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

(b)    At any such public sale, Trustee may execute and deliver in the name of Trustor to the purchaser a conveyance of the Property or any part of the Property in fee simple.  In the event of any sale under this Security Instrument by virtue of the exercise of the powers herein granted, or pursuant to any order in any judicial proceeding or otherwise, the Property may be sold in its entirety or in separate parcels and in such manner or order as Lender in its sole discretion may elect, and if Lender so elects, Trustee may sell the Personal Property covered by this Security Instrument at one or more separate sales in any manner permitted by the Uniform Commercial Code of the State in which the Property is located, and one or more exercises of the powers herein granted shall not extinguish or exhaust such powers, until all the Property is sold or the Note and other secured indebtedness is paid in full.  If the Note and other secured indebtedness is now or hereafter further secured by any chattel mortgages, pledges, contracts or guaranty, assignments of lease, or other security instruments, Lender at its option may exhaust the remedies granted under any of said security instruments either concurrently or independently, and in such order as Lender may determine.

Greenfield PH (Palm Drive)– Security Instrument

(c)    Upon any foreclosure sale or sales of all or any portion of the Property under the power herein granted, Lender may bid for and purchase the Property and shall be entitled to apply all or any part of the Indebtedness as a credit to the purchase price.

(d)    In the event of a foreclosure or a sale of all or any portion of the Property under the power herein granted, the proceeds of said sale shall be applied, in whatever order Lender in its sole discretion may decide, to the expenses of such sale and of all proceedings in connection therewith (including, without limitation, attorneys' fees and expenses), to fees and expenses of Trustee (including, without limitation, Trustee's attorneys' fees and expenses), to insurance premiums, liens, assessments, taxes and charges (including, without limitation, utility charges advanced by Lender), to payment of the outstanding principal balance of the Indebtedness, and to the accrued interest on all of the foregoing; and the remainder, if any, shall be paid to Trustor, or to the person or entity lawfully entitled thereto.

(e)    In case Trustee shall have proceeded to enforce any right or remedy under this Security Instrument by foreclosure, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason, or shall have been determined adversely to Lender, then in every case, Trustor, Lender and Trustee shall be restored to their former positions and the rights, powers and remedies of Lender and Trustee herein provided or arising, or existing otherwise as herein set forth shall continue as if no such proceeding had been taken.

6.4    <u>Acceptance by Trustee</u>.  Trustee accepts the Property when this Security Instrument, duly executed and acknowledged, becomes a public record as provided by law.  Trustee shall not be obligated to perform any act required hereunder unless the performance of such act is requested in writing and Trustee is reasonably indemnified against loss, cost, liability and expense.

6.5    <u>Acts of Trustee</u>.  From time to time, upon written request of Lender and without affecting the liability of any person for payment of any indebtedness or performance of the obligations secured hereby, Trustee may, without liability therefor and without notice reconvey all or any part of the Property; consent to the making of any map or plat thereof; join in granting any easement thereon; join in any declaration of covenants and restrictions; or join in any extension agreement or any agreement subordinating the lien or charge hereof.  Trustee may from time to time apply in any court of competent jurisdiction for aid and direction in the execution of the trust hereunder and the enforcement of the rights and remedies available hereunder, and Trustee may obtain orders or decrees directing or confirming or approving acts in the execution of said trust and the enforcement of said remedies.  Trustee has no obligation to notify any party of any pending sale or any action or proceeding unless held or commenced and maintained by Trustee under this Security Instrument.

6.6    <u>No Liability of Trustee</u>.  The Trustee shall not be liable for any error of judgment or act done by the Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except due to the Trustee's gross negligence, breach of agreement, fraud or willful misconduct.  The Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by them hereunder, believed by the Trustee in good faith to be genuine.  All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law or under the Loan Documents), and the Trustee shall be under no liability for interest on any moneys received by the Trustee hereunder.

6.7    <u>Trustee Powers</u>.  Trustee may exercise any of its powers through appointment of attorney-in-fact or agents.  Trustee may select and employ legal counsel at the expense of Trustor.

6.8    <u>Priority</u>.  All amounts advanced by either of Lender or Trustee hereunder shall be secured by this Security Instrument with priority dating back to the date of the grant of this Security Instrument.

Greenfield PH (Palm Drive)– Security Instrument

6.9     Ratification.  Trustor hereby ratifies and confirms every act that Trustee and its successors may lawfully do at the Property by virtue of powers granted to Trustee hereunder.

## ARTICLE VII.
### State Law Provisions

7.1     Conflicts.  This Article VII will control any conflict between the terms of this Article VII and the other provisions of this Security Instrument and the other Loan Documents.

7.2     Full Reconveyance.  Upon written request of Lender stating that all sums secured hereby have been paid, upon surrender to Trustee of the Note and the original or a certified copy of this Security Instrument for cancellation and retention, and upon payment of its fees, Trustee shall fully reconvey, without warranty, the entire remaining Property then held hereunder.  The recitals in such reconveyance of any matters of facts shall be conclusive proof of the truthfulness thereof.  The grantee in such reconveyance may be described as "the person or persons legally entitled thereto."

7.3     Dwellings.  No portion of the proceeds of the Loan shall be used by Trustor to finance the purchase or construction of real property containing four (4) or fewer residential units or on which four (4) or fewer residential units are to be constructed.  No portion of the Property is or will be a "dwelling" within the meaning of Section 10240.1 or Section 10240.2 of the California Business and Professions Code.

7.4     Civil Code.  Trustor represents, warrants and acknowledges that the Loan is not subject to the provisions of Chapter 3, Title IV, Part 4, Division Third of the Civil Code of the State of California (Civil Code Sections 1912 et seq.) other than Section 1916.1 thereof.

7.5     Indemnity; Expenses.  Trustor will pay or reimburse the Trustee and the Lender for all reasonable attorneys' fees, costs and expenses incurred by either of them in any suit, action, legal proceeding or dispute of any kind in which either of them is made a party or appears as party plaintiff or defendant, affecting the Indebtedness, this Security Instrument or the interest created herein, or the Property, or any appeal thereof, including, but not limited to, activities related to enforcement of the remedies of Lender, activities related to protection of Lender's collateral, any foreclosure action or exercise of the power of sale, any condemnation action involving the Property or any action to protect the security hereof, any bankruptcy or other insolvency proceeding commenced by or against Trustor, and any such amounts paid or incurred by the Trustee or the Lender shall be added to the Indebtedness and shall be secured by this Security Instrument.  The agreements of this subsection shall expressly survive in perpetuity satisfaction of this Security Instrument and repayment of the Indebtedness, any release, reconveyance, discharge of foreclosure of this Security Instrument, conveyance by deed in lieu of foreclosure, sale, and any subsequent transfer by trustee's conveyance of the Property.  Notwithstanding the forgoing, Trustor shall have no liability under this Section for any fees, costs or expenses arising solely from the gross negligence, fraud, or willful misconduct of Lender.

7.6     Supplemental Environmental Provisions.  In the event that any portion of the Property is determined to be "environmentally impaired" (as "environmentally impaired" is defined in California Code of Civil Procedure Section 726.5(e)(3)) or to be an "affected parcel" (as "affected parcel" is defined in California Code of Civil Procedure Section 726.5(e)(1)), then, without otherwise limiting or in any way affecting Lender's or Trustee's rights and remedies under this Security Instrument, Lender may elect to exercise its right under California Code of Civil Procedure Section 726.5(a) to (i) waive its lien on such environmentally impaired or affected portion of the Property, and (ii) exercise the rights and remedies of an unsecured creditor, including reduction of its claim against Trustor to judgment and any other rights and remedies permitted by law.  Lender shall have the right under Section 7.1 of this Security Instrument to allocate amounts recovered on the Indebtedness first to those portions thereof other than damages and other

amounts recoverable under California Code of Civil Procedure Section 736, and thereafter to damages and other amounts recoverable under said Section.

7.7    Foreclosure By Power of Sale.

(i)  Should Lender elect to foreclose by exercise of the power of sale herein contained, Lender shall deliver to Trustee a written declaration of default and demand for sale, and shall deposit with Trustee this Security Instrument and the Note and such receipts and evidence of expenditures made and secured hereby as Trustee may require.

(a)    Upon receipt of notice from Lender, Trustee shall cause to be recorded, published and delivered to Trustor such notice of default and election to sell as is then required by law.  Trustee shall, without demand on Trustor, after lapse of such time as may then be required by law and after recordation of such notice of default and after notice of sale having been given as required by law, sell the Property at the time and place of sale fixed by it in said notice of sale, either as a whole, or in separate lots or parcels or items and in such order as Lender may direct Trustee so to do, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale.  Trustee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matter or fact shall be conclusive proof of the truthfulness thereof.  Any person, including, without limitation, Trustor, Trustee or Lender, may purchase at such sale, and Trustor hereby covenants to warrant and defend the title of such purchaser or purchasers.

(b)    Subject to applicable law, Trustee may postpone the sale of all or any portion of the Property by public announcement at the time and place of sale, and from time to time thereafter may postpone such sale by public announcement or subsequently noticed sale, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give a new notice of sale.

7.8    Separate Sales.  The Property may be sold in one or more parcels and in such manner and order as Lender, in its sole discretion, may direct Trustee so to do.  A sale of less than the whole of the Property or any defective or irregular sale made hereunder shall not exhaust the power of sale provided for herein, and subsequent sales may be made hereunder until all obligations secured hereby have been satisfied, or the entire Property sold, without defect or irregularity.

7.9    Release of and Resort to Collateral.  Lender may release, regardless of consideration and without the necessity for any notice to a consent by the holder of any subordinate lien on the Property, any part of the Property without, as to the remainder, in any way impairing, affecting, subordinating or releasing the lien or security interests created in or evidenced by the Loan Documents or their stature as a first and prior lien and security interest in and to the Property.  For payment of the Indebtedness, Lender may resort to any other security in such order and manner as Lender may elect.

7.10    Waiver of Redemption, Notice and Marshalling of Assets.  To the fullest extent permitted by law, Trustor hereby irrevocably and unconditionally waives and releases (i) all benefit that might accrue to Trustor by virtue of any present or future statute of limitations or law or judicial decision exempting the Property from attachment, levy or sale on execution or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment, (ii) all notices of any Event of Default or of Trustee's election to exercise or his actual exercise of any right, remedy or recourse provided for under the Loan Documents, and (iii) any right to a marshalling of assets or a sale in inverse order of alienation.

7.11    Discontinuance of Proceedings.  If Lender shall have proceeded to invoke any right, remedy or recourse permitted under the Loan Documents and shall thereafter elect to discontinue or abandon it for any reason, Lender shall have the unqualified right to do so and, in such an event, Trustor

and Lender shall be restored to their former positions with respect to the Indebtedness, the Loan Documents, the Property and otherwise, and the rights, remedies, recourses and powers of Lender shall continue as if the right, remedy or recourse had never been invoked, but no such discontinuance or abandonment shall waive any Event of Default which may then exist or the right of Lender thereafter to exercise any right, remedy or recourse under the Loan Documents for such Event of Default.

7.12    No Mortgagee in Possession.   Neither the enforcement of any of the remedies under this Security Instrument nor any other remedies afforded to Lender under the Loan Documents, at law or in equity, shall cause Lender or Trustee to be deemed or construed to be a mortgagee in possession of the Property, to obligate Lender or Trustee to lease the Property or attempt to do so, or to take any action, incur any expense, or perform or discharge any obligation, duty or liability whatsoever under any of the Leases or otherwise.

7.13    Concerning the Trustee.   With the approval of Lender, Trustee shall have the right to take any and all of the following actions:  (i) to select, employ and consult with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, including the preparation, execution and interpretation of the Loan Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (ii) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his or her agents or attorneys, (iii) to select and employ, in and about the execution of his or her duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of Trustee (and Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for Trustee's gross negligence, bad faith, fraud or willful misconduct), and (iv) any and all other lawful action that Lender may instruct Trustee to take to protect or enforce Lender's rights hereunder. Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property. Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting any action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine. Trustee shall be entitled to reimbursement for expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered. Trustor will, from time to time, pay the compensation due to Trustee hereunder and reimburse Trustee for, and save and hold Trustee harmless against, any and all liability and expenses which may be incurred by Trustee in the performance of Trustee's duties.

7.14    Retention of Money.   All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, and shall be segregated from any other moneys of Trustee.

7.15    Successor Trustees.   Trustee may resign by the giving of notice of such resignation in writing to Lender.  If Trustee shall die, resign or become disqualified from acting in the execution of this trust, or if, for any reason, Lender, in Lender's sole discretion and with or without cause, shall prefer to appoint a substitute trustee or multiple substitute trustees, or successive substitute trustees or successive multiple substitute trustees, to act instead of the aforenamed Trustee, Lender shall have full power to appoint a substitute trustee (or, if preferred, multiple substitute trustees) in succession who shall succeed (and if multiple substitute trustees are appointed, each of such multiple substitute trustees shall succeed) to all the estates, rights, powers and duties of the aforenamed Trustee.  Such appointment may be executed by any authorized agent of Lender, and if such Lender be a corporation and such appointment be executed on its behalf by any officer of such corporation, such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by the board of directors or any

16

superior officer of the corporation.  Trustor hereby ratifies and confirms any and all acts which the aforenamed Trustee, or his or her successor or successors in this trust, shall do lawfully by virtue hereof. If multiple substitute trustees are appointed, each of such multiple substitute trustees shall be empowered and authorized to act alone without the necessity of the joinder of the other multiple substitute trustees, whenever any action or undertaking of such substitute trustees is requested or required under or pursuant to this Security Instrument or applicable law.  Any prior election to act jointly or severally shall not prevent either or both of such multiple substitute Trustees from subsequently executing, jointly or severally, any or all of the provisions hereof.

7.16    Perfection of Appointment.  Should any deed, conveyance, or instrument of any nature be required from Trustor by any Trustee or substitute Trustee to more fully and certainly vest in and confirm to Trustee or substitute Trustee such estates, rights, powers, and duties, then, upon request by Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Trustor.

7.17    Succession Instruments.  Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its, his or her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in such Trustee's place.

7.18    No Representation by Trustee or Lender.  By accepting or approving anything required to be observed, performed, or fulfilled or to be given to Trustee or Lender pursuant to the Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal or insurance policy, neither Trustee nor Lender shall be deemed to have warranted, consented to, or affirmed the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or affirmation with respect thereto by Trustee or Lender.

7.19    Border Zone.  To Trustor's knowledge, Trustor represents to Lender that, as of the date hereof, the Property has not been designated as "border zone property" under the provisions of California Health and Safety Code, Sections 25220 et. seq. and there has been no occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be designated as Border Zone Property.

<div align="center">

ARTICLE VIII.
**Cross Default And Cross Collateralization.**

</div>

8.1    737 S Broadway.  In addition to the obligations herein, Trustor shall also be subject to the payment and performance of all obligations secured by:

(a)    The 737 S Broadway Security Instrument made by 737 S Broadway Borrower made in connection the 737 S Broadway Loan, which 737 S Broadway Security Instrument secures a lien on the 737 S Broadway Property;

(b)    In addition to the obligations secured by the 737 S Broadway Security Instrument shall also secure the payment and performance of all obligations secured by this Loan.

<div align="center">17</div>

(c)     An Event of Default under the Note, the Security Instrument or any of the other Loan Documents shall constitute an Event of Default under 737 S Broadway Security Instrument and the 737 S Broadway Loan.

(d)     An Event of Default under the 737 S Broadway the Security Instrument or the 737 S Broadway Loan shall constitute an Event of Default under this Security Instrument and the Loan.

(e)     Trustor waives all rights to have all or part of the Collateral described herein and the Land marshalled upon any foreclosure of the 737 S Broadway Security Instrument or the exercise of Trustor's rights and remedies hereunder.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of the Land and Collateral described in either or both of said security instruments as a whole or in separate parcels, in any order that Lender may designate.  Trustor makes this waiver for itself, for all persons and entities claiming through or under Trustor and for persons and entities who may acquire a lien or security interest on all or any part of the 737 S Broadway Loan and Collateral described in the 737 S Broadway Security Instrument or herein.

8.2     <u>South Los Angeles</u>.  In addition to the obligations herein, Trustor shall also be subject to the payment and performance of all obligations secured by:

(a)     The South Los Angeles Security Instrument made by South Los Angeles Borrower made in connection the South Los Angeles Loan, which South Los Angeles Security Instrument secures a lien on the South Los Angeles Property;

(b)     In addition to the obligations secured by the South Los Angeles Security Instrument shall also secure the payment and performance of all obligations secured by this Loan.

(c)     An Event of Default under the Note, the Security Instrument or any of the other Loan Documents shall constitute an Event of Default under South Los Angeles Security Instrument and the South Los Angeles Loan.

(d)     An Event of Default under the South Los Angeles the Security Instrument or the South Los Angeles Loan shall constitute an Event of Default under this Security Instrument and the Loan.

(e)     Trustor waives all rights to have all or part of the Collateral described herein and the Land marshalled upon any foreclosure of the South Los Angeles Security Instrument or the exercise of Trustor's rights and remedies hereunder.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of the Land and Collateral described in either or both of said security instruments as a whole or in separate parcels, in any order that Lender may designate.  Trustor makes this waiver for itself, for all persons and entities claiming through or under Trustor and for persons and entities who may acquire a lien or security interest on all or any part of the South Los Angeles Loan and Collateral described in the South Los Angeles Security Instrument or herein.

8.3     <u>Foxdale</u>.  In addition to the obligations herein, Trustor shall also be subject to the payment and performance of all obligations secured by:

(a)     The Foxdale Security Instrument made by Foxdale Borrower made in connection the Foxdale Loan, which Foxdale Security Instrument secures a lien on the Foxdale Property;

(b)     In addition to the obligations secured by the Foxdale Security Instrument shall also secure the payment and performance of all obligations secured by this Loan.

(c)     An Event of Default under the Note, the Security Instrument or any of the other Loan Documents shall constitute an Event of Default under Foxdale Security Instrument and the Foxdale Loan.

(d)     An Event of Default under the Foxdale the Security Instrument or the Foxdale Loan shall constitute an Event of Default under this Security Instrument and the Loan.

(e)     Trustor waives all rights to have all or part of the Collateral described herein and the Land marshalled upon any foreclosure of the Foxdale Security Instrument or the exercise of Trustor's rights and remedies hereunder.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of the Land and Collateral described in either or both of said security instruments as a whole or in separate parcels, in any order that Lender may designate.  Trustor makes this waiver for itself, for all persons and entities claiming through or under Trustor and for persons and entities who may acquire a lien or security interest on all or any part of the Foxdale Loan and Collateral described in the Foxdale Security Instrument or herein.

8.4     Payoff.  Notwithstanding anything to the contrary contained herein, Trustor shall not pay off the this Loan while the 737 S Broadway Loan, the Greenfield PH Loan or the Foxdale Loan remain outstanding.

## ARTICLE IX.
## Additional Security

9.1     Additional Security – Obligations Secured by Additional Mortgages. In addition to the obligations secured by this Security Instrument and described as obligations herein, this Security Instrument shall also secure the payment and performance of all obligations secured by that certain Deeds of Trust, Security Agreement and Fixture Filing made by Borrower, as Borrower, for the benefit of Lender, its successors and assigns forever, as beneficiary, dated as of the date hereof (collectively ,the "***Additional Security Instrument***") with respect to the properties more commonly known as the addresses set forth on the Property Schedule attached as Exhibit B under "***Additional Properties***."

9.2     Secured Payment and Performance. In addition to the obligations secured by the Additional Security Instrument, the Additional Security Instrument shall also secure the payment and performance of all obligations secured by this Security Instrument.

9.3     Cross Default. An Event of Default under any of the Additional Security Instrument, as defined therein, shall, at Lender's option, constitute an Event of Default under this Security Instrument. An Event of Default under this Security Instrument shall, at Lender's option, constitute an Event of Default under the Additional Security Instrument.

9.4     Waiver of Marshalling. Trustor waives all rights to have all or part of the Property described in this Security Instrument and/or the Additional Security Instrument marshalled upon any foreclosure of this Security Instrument or any foreclosure of the Additional Security Instrument.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of, the Property described in any of said Additional Security Instruments as a whole or in separate parcels, in any order that Lender may designate.  Trustor makes this waiver for itself, for all persons and entities claiming through or under Trustor and for persons and entities who may acquire a lien or security interest on all or any part of the Property described in either of said Additional Security Instrument, or on any interest therein.

9.5     Additional Representations and Warranties of Trustor.

(a)    Trustor represents and warrants that the lien of the Additional Security Instrument is a first lien on each of the properties described therein and covered thereby and that the provisions of this Security Instrument will not cause intervening liens to become prior to the lien of any of the Additional Security Instrument.  If any intervening lien exists or hereafter arises, Trustor shall cause the same to be released or subordinated to the lien of the Additional Security Instrument, without limiting any other right or remedy available to Lender.

(b)    Trustor further warrants that Trustor has no legal or equitable claim against any Trustor named in the Additional Security Instrument which would be prior to the lien of the Additional Security Instrument, or which would entitle Trustor to a judgment entitling Trustor to an equitable lien on all or any portion of that property prior in lien to the Additional Security Instrument.

(c)    Except as supplemented and/or modified by this Security Instrument, all of the terms, covenants and conditions of the Additional Security Instrument and the other loan documents executed in connection therewith shall remain in full force and effect.

(d)    Trustor and Lender acknowledge and agree that: this Security Instrument shall constitute a lien or charge upon only that property described herein as the "***Property***;" and the Additional Security Instrument shall constitute liens or charges upon only that property described therein as the "***Property***."

9.6    <u>Release</u>. This Security Instrument shall not be released until all the entire Loan in paid in full.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

Greenfield PH (Palm Drive)– Security Instrument

Trustor has executed this Security Instrument on the date of the below acknowledgement, but to be effective on the Closing Date.

**TRUSTOR:**

_____

**DAVID HALEVY, Trustee of
the Halevy Family Trust dated September 8, 2010,
by Daniel Halevy as his attorney in fact**

_____

**SUE HALEVY, Trustee of
the Halevy Family Trust dated September 8, 2010**

SIGNATURE/NOTARY PAGE
TO
SECURITY INSTRUMENT

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the
individual who signed the document to which this certificate is attached, and not the
truthfulness, accuracy or validity of that document.

STATE OF CALIFORNIA
COUNTY OF *LOS ANGELES*

On *APRIL 17*, 2023 before me, *ALAN KABAKER* (a notary public),
personally appeared *DANIEL HALEVY*, who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

ALAN KABAKER
COMM. # 2307449
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. OCT. 28, 2023

A notary public or other officer completing this certificate verifies only the identity of the
individual who signed the document to which this certificate is attached, and not the
truthfulness, accuracy or validity of that document.

STATE OF CALIFORNIA
COUNTY OF *LOS ANGELES*

On *APRIL 17*, 2023 before me, *ALAN KABAKER* (a notary public),
personally appeared *SUE HALEVY*, who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

ALAN KABAKER
COMM. # 2307449
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. OCT. 28, 2023

SIGNATURE/NOTARY PAGE
TO
SECURITY INSTRUMENT

## EXHIBIT A

LEGAL DESCRIPTION OF LAND

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 1118 TRACT 6380, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 69 PAGES 11 TO 20 INCLUSIVE OF MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXHIBIT A
TO
SECURITY INSTRUMENT

**EXHIBIT B**

**PROPERTY**

133 South Palm Dr, Apt 0005, Beverly Hills, CA 90212

**ADDITIONAL PROPERTIES**

3538 Greenfield Avenue, Los Angeles, CA,

8561 Horner Street, Los Angeles, CA 90035

EXHIBIT B
TO
SECURITY INSTRUMENT

# EXHIBIT 4



**This page is part of your document - DO NOT DISCARD**



## 20230259825



**Pages:**
**0007**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**04/24/23 AT 08:00AM**

| | |
|---|---|
| FEES: | 29.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 29.00 |



**L E A D S H E E T**



**202304240110008**

**00023380272**



**014033488**

**SEQ:**
**02**

**SECURE – 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E442318

30097266C-DZ

FOR REFERENCE ONLY Filed 02/19/23 Desc Main Document      Page 101 of
126

RECORDING REQUESTED BY
FIDELITY NATIONAL TITLE

AND WHEN RECORDED MAIL DOCUMENT TO:

NAME THOMPSON COBURN LLP

STREET ADDRESS

10100 SANTA MONICA BLVD., #500

CITY, STATE &
ZIP CODE

LOS ANGELES, CA 90067

30097266C-D2

SPACE ABOVE FOR RECORDER'S USE ONLY

## UCC- FINANCING STATEMENT

**Title of Document**

Pursuant to Senate Bill 2 – Building Homes and Jobs Act (GC Code Section 27388.1), effective January 1, 2018, a fee of
seventy-five dollars ($75.00) shall be paid at the time of recording of every real estate instrument, paper, or notice required or
permitted by law to be recorded, except those expressly exempted from payment of recording fees, per each single
transaction per parcel of real property. The fee imposed by this section shall not exceed two hundred twenty-five dollars
($225.00).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer subject to the imposition of
documentary transfer tax (DTT).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer of real property that is a
residential dwelling to an owner-occupier.

☒ Exempt from fee per GC 27388.1 (a) (1); fee cap of $225.00 reached.

☐ Exempt from the fee per GC 27388.1 (a) (1); not related to real property.

Exempt from fee per GC 27388.1 (a) (1);
fee cap of $225.00 reached.

THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
($3.00 Additional Recording Fee Applies)

RECORDING REQUESTED BY
FIDELITY NATIONAL TITLE

AND WHEN RECORDED MAIL DOCUMENT TO:

NAME  *Thompson Coburn LLP*

STREET ADDRESS  *10100 Santa Monica Blvd., #500*

CITY, STATE & ZIP CODE  *Los Angeles, CA 90067*

*30097266C-DZ*

**SPACE ABOVE FOR RECORDER'S USE ONLY**

## UCC - FINANCING STATEMENT

**Title of Document**

Pursuant to Senate Bill 2 – Building Homes and Jobs Act (GC Code Section 27388.1), effective January 1, 2018, a fee of seventy-five dollars ($75.00) shall be paid at the time of recording of every real estate instrument, paper, or notice required or permitted by law to be recorded, except those expressly exempted from payment of recording fees, per each single transaction per parcel of real property. The fee imposed by this section shall not exceed two hundred twenty-five dollars ($225.00).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer subject to the imposition of documentary transfer tax (DTT).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer of real property that is a residential dwelling to an owner-occupier.

☒ Exempt from fee per GC 27388.1 (a) (1); fee cap of $225.00 reached.

☐ Exempt from the fee per GC 27388.1 (a) (1); not related to real property.

Exempt from fee per GC 27388.1 (a) (1);
fee cap of $225.00 reached.

**THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION**
**($3.00 Additional Recording Fee Applies)**

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Joshua Mogin  (310) 282-2520

**B. E-MAIL CONTACT AT FILER (optional)**
jmogin@thompsoncoburn.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**
Joshua Mogin
Thompson Coburn LLP
10100 Santa Monica Blvd., Suite 500
Los Angeles, CA 90067

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| DAVID HALEVY and SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010 | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| c/o David Halevy, 257 S. Linden Drive | Beverly Hills | CA | 90212 | USA |

**2. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2b blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ALAN GOMPERTS, and SHARON HALEVY, as Trustees of The Gomperts and Halevy Family Trust | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| c/o Alan Gomperts, 264 S. Oakhurst Drive | Beverly Hills | CA | 90212 | USA |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Archway Real Estate Income Fund I SPE I, LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1875 Century Park East, Suite #900 | Los Angeles | CA | 90067 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
See Schedule I attached.

**5.** Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

**6a.** Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

**6b.** Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
Los Angeles County, California

UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| DAVID HALEVY and SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010 |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
|---|

OR

| 10b. INDIVIDUAL'S SURNAME |
|---|
| HALEVY |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| DANIEL |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| c/o David Halevy, 257 S. Linden Drive | Beverly Hills | CA | 90212 | USA |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☑ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

**See Exhibit A attached.**

17. MISCELLANEOUS:
Los Angeles County, California

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

**FINANCING STATEMENT**
**SCHEDULE I**

This financing statement covers the following types (or items) of property (the
"*Collateral Property*"):

1)    **Land**. All of Debtor's right, title and interest in and to the Land.

2)    **Additional Land**. All of Debtor's right, title and interest in and to the Additional
Land.

3)    **Improvements**. All of Debtor's right, title and interest in and to the Improvements.

4)    **Easements**. All easements, rights-of-way, strips and gores of land, streets, ways,
alleys, passages, sewer rights, water, water courses, water rights and powers, oil, gas and mineral
rights, air rights and development rights, zoning rights, tax credits or benefits and all estates, rights,
titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature
whatsoever in any way now or hereafter belonging, relating or pertaining to the Real Property or any
part thereof and the reversion and reversions, remainder and remainders and all land lying in the bed of
any street, road or avenue, opened or proposed, in front of or adjoining the Land or any part thereof to
the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy,
property, possession, claim and demand whatsoever, both in law and in equity, of Debtor in, of and to
the Real Property and every part and parcel thereof, with the appurtenances thereto.

5)    **Equipment**. All right, title and interest in and to the Equipment and the right, title
and interest of Debtor in and to any of the Equipment which may be subject to any Security
Agreements (as defined in the Uniform Commercial Code) superior, inferior or pari passu in lien to
the lien of this Security Instrument. In connection with Equipment which is leased to Debtor or which
is subject to a lien or security interest which is superior to the lien of this Security Instrument, this
Security Instrument shall also cover all right, title and interest of each Debtor in and to all deposits
and the benefit of all payments now or hereafter made with respect to such Equipment.

6)    **Awards**. All awards or payments, including interest thereon, which may heretofore
and hereafter be made with respect to the Real Property or any part thereof, whether from the
exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or
in anticipation of the exercise of said right), or for a change of grade or for any other injury to or
decrease in the value of the Real Property.

7)    **Leases**.   All leases and subleases (including, without limitation, all guarantees
thereof) and other agreements affecting the use, enjoyment and/or occupancy of the Real Property or
any part thereof, now or hereafter entered into (including any use or occupancy arrangements created
pursuant to Bankruptcy Code or otherwise in connection with the commencement or continuance of
any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar
proceedings or any assignment for the benefit of creditors in respect of any tenant or occupant of any
portion of the Real Property) and all income, rents, issues, profits, revenues and proceeds including,
but not limited to, all oil and gas or other mineral royalties and bonuses from the Real Property
(including any payments received pursuant to Section 502(b) of the Bankruptcy Code or otherwise in
connection with the commencement or continuance of any bankruptcy, reorganization, arrangement,
insolvency, dissolution, receivership or similar proceedings or any assignment for the benefit of

1

creditors in respect of any tenant or occupant of any portion of the Real Property and all claims as a creditor in connection with any of the foregoing) and all proceeds from the sale, cancellation, surrender or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Indebtedness.

8)    **Insurance Proceeds**. All proceeds of and any unearned premiums on any insurance policies covering the Real Property or any part thereof including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Real Property or any part thereof.

9)    **Tax Awards**. All tax refunds, including interest thereon, tax credits and tax abatements and the right to receive or benefit from the same, which may be payable or available with respect to the Real Property.

10)    **Right to Appear**. The right, in the name of and on behalf of Debtor, to appear in and defend any action or proceeding brought with respect to the Real Property or any part thereof and to commence any action or proceeding to protect the interest of Lender in the Real Property or any part thereof and all awards and/or judgments received by Debtor from any source whatsoever.

11)    **Accounts**. All cash on hand, bank accounts, accounts receivable, security deposits, utility or other deposits, intangibles, contract rights, interests, estates or other claims, both in law and in equity, which Debtor now has or may hereafter acquire in the Real Property or any part thereof.

12)    **Indemnification**. All rights which Debtor now has or may hereafter acquire to be indemnified and/or held harmless from any liability, loss, damage, cost or expense (including, without limitation, attorneys' fees and disbursements) relating to the Real Property or any part thereof.

13)    **Plans**. All plans and specifications, maps, surveys, studies, reports, contracts, subcontracts, service contracts, management contracts, franchise agreements and other agreements, franchises, trade names, trademarks, symbols, service marks, approvals, consents, permits, special permits, licenses and rights, whether governmental or otherwise, respecting the use, occupation, development, construction and/or operation of the Real Property or any part thereof or the activities conducted thereon or therein, or otherwise pertaining to the Real Property or any part thereof.

14)    **Proceeds**. All proceeds, products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

Capitalized terms not defined herein are as defined in Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Debtor in favor of Secured Party.

2

Schedule I to UCC

## EXHIBIT A

### Legal Description of Land

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 1118 TRACT 6380, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 69 PAGES 11 TO 20 INCLUSIVE OF MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

# EXHIBIT 5

# SETTLEMENT AND LOAN MODIFICATION AGREEMENT

This SETTLEMENT AND LOAN MODIFICATION AGREEMENT ("Agreement"), is dated as of April 19, 2023, by and among BROADWAY AVENUE INVESTMENTS LLC, a California limited liability company ("Borrower"), ALAN GOMPERTS ("Alan"), an individual, DANIEL HALEVY ("Daniel"), an individual, and DAVID HALEVY ("David"), an individual together with Alan and Daniel, collectively and individually hereinafter referred to as "Guarantor"), on the one hand, and ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company ("Lender"), on the other hand, with respect to the following facts, matters and issues. Borrower and Guarantor together when referred to with Lender shall be collectively hereinafter referred to as the "Parties."

## RECITALS

A.    Lender has heretofore made a loan (the "Broadway Loan") to Borrower in the original maximum principal sum of Sixteen Million Nine Hundred Forty-Two Thousand Five Hundred and No/100 Dollars ($16,942,500.00) evidenced by, among other things, (i) that certain Promissory Note dated July 21, 2021 (together with any and all amendments thereto or modifications thereof, the "Note"), in the original principal face amount of $16,942,500.00, executed by Borrower to and in favor of Lender, and (ii) that certain Loan Agreement dated July 21, 2021, by and between Borrower and Lender (together with any and all amendments thereto or modifications thereof, the "Loan Agreement").

B.    As security for, among other things, the indebtedness and obligations under the Broadway Loan, Borrower, as trustor, executed and delivered to and in favor of Lender, as beneficiary, that certain  Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated July 23, 2021, and recorded on July 26, 2021, as Instrument No. 20211142009 in the Official Records of Los Angeles County, California (together with any and all amendments thereto or modifications thereof, the "Deed of Trust"), encumbering, without limitation, certain real property more particularly described in **Exhibit "A"** attached hereto and incorporated herein by this reference (as more particularly described therein, the "Property").

C.    Payment and performance of Borrower's indebtedness and obligations in connection with the Broadway Loan was and is guaranteed by Guarantor pursuant to a Continuing Guaranty executed by Guarantor and dated as of July 21, 2021 (the "Continuing Guaranty").

D.    Pursuant to the Deed of Trust, Borrower granted to and in favor of Lender a first priority security interest in and lien upon certain real and personal property described in the Deed of Trust (the "Deed of Trust Collateral"), to secure, without limitation, payment and performance of the indebtedness and obligations under and in connection with the Broadway Loan and the Note.  The Deed of Trust Collateral and any other collateral securing the indebtedness and obligations under the Broadway Loan shall be collectively referred to as the "Collateral." Lender's security interest in the Collateral was and is perfected under applicable law.

E.    This Agreement, the Note, Loan Agreement, Deed of Trust, Continuing Guaranty, and all other agreements, instruments and other documents executed by Borrower or Guarantor

in connection with the Broadway Loan shall at times hereinafter be referred to collectively as the "Broadway Loan Documents." Any and all terms used but not defined herein shall have the meanings ascribed to them in the Loan Agreement.

F.      Lender alleges that Borrower and Guarantor defaulted under the terms of the Broadway Loan Documents by, among other things, failing to obtain a certificate of occupancy for the Property by January 21, 2022 and failing to pay the Loan off in full as of August 1, 2022, the maturity date (collectively hereinafter the "defaults").

G.      On September 28, 2022, Lender filed its Verified Complaint for Breach of Guaranty against Guarantor in the Los Angeles County Superior Court entitled *Archway Real Estate Income Fund I SPE I, LLC, Plaintiff v. Alan Gomperts, et al., Defendants* Case Number 22STCV31742 (the "Litigation").

H.      On August 30, 2022, Lender caused to be commenced non-judicial foreclosure proceedings through the filing of a notice of default ("NOD") as instrument no. 20220859022 in the Official Records of Los Angeles County, California. The NOD is still pending.

I.      The Parties now desire to modify the Broadway Loan Documents, resolve and settle the Litigation, and rescind the NOD, subject to the terms and conditions set forth herein.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.      Recitals. The recitals are incorporated herein by this reference as are all exhibits attached hereto. Borrower and Guarantor, and each of them, represent and warrant to Lender that the factual information recited above is true and correct. Except as specified herein, all of the terms and conditions of the Broadway Loan Documents, and each of them, shall remain in full force and effect. In the event of any conflict or inconsistency between the terms, conditions, and provisions of this Agreement and the Broadway Loan Documents, the terms, conditions, and provisions of this Agreement shall prevail.

2.      Reaffirmation. This Agreement is, in part, a reaffirmation of the obligations and indebtedness of Borrower and Guarantor to Lender as evidenced by the Broadway Loan Documents. Therefore, Borrower and Guarantor each represent, warrant, covenant, and agree, that except as specified herein, all of the terms and conditions of the Broadway Loan Documents are in full force and effect, without waiver or modification of any kind whatsoever, and are ratified and confirmed in all respects.

3.      Acknowledgments.

A.      Borrower and Guarantor, and each of them, acknowledge the validity, priority and extent of the Broadway Loan Documents and acknowledge that the following sums are owed to the Lender as of April 19, 2023:

| | | | |
|---|---|---|---|
| (1) | Principal balance in the amount of | $16,942,500.00 | |
| (2) | Non-default interest in the amount of | $1,171,385.63 | |
| (3) | Default interest ("Default Interest") in the amount of | $1,656,129.46 | |
| (4) | Late charges ("Late Charges") in the amount of | $0.00 | |
| (5) | Legal and Trustee fees and costs ("Legal/Trustee Fees') in the amount of | $65,000.00 $30,000.00 $16,489.00 | (FRBC) (TC) (Trustee) |
| (6) | GRAND TOTAL ("Amounts Owed") | $19,881,504.09 | |

In addition, interest continues to accrue at the rate of $8,471.25 per day, inclusive of default interest (the "Per Diem").

B.    Borrower and Guarantor, and each of them, acknowledge and confirm that neither Borrower nor Guarantor has any valid offset or defense to the Amounts Owed, obligations, and liability under the Broadway Loan Documents.

4.    New Loans.

A.    Concurrently with the execution of this Agreement, Lender shall make three (3) new loans in the aggregate amount of $4,000,000.00 (collectively, "New Loans"), as follows:

(1)    A loan to _Negev Investments, LLC ("Negev") in the principal amount of One Million Three Hundred Thousand and No/100 Dollars ($1,300,000.00) ("Negev Loan"), secured by the real property commonly known as 12800 Foxdale Drive, Desert Hot Springs, California ("Foxdale Property") and guaranteed by David. The guaranty shall be secured by his membership interest in Negev. The documents and instruments evidencing the Negev Loan are identified in Exhibit "B-1" attached hereto;

(2)    A loan to SLA Investments, LLC ("SLA") in the principal amount of One Hundred Twenty-Five Thousand and No/100 Dollars ($125,000.00) ("SLA Loan"), secured by the real property commonly known as 1040 S. Los Angeles Street, Los Angeles, California ("Los Angeles Property") and guaranteed by David, Sue Halevy ("Sue"), Alan, Sharon Gomperts a/k/a Sharon Halevy ("Sharon") and Daniel. The guaranty shall be secured by David, Sue, Alan, Sharon and Daniel's membership interest in SLA. The documents and instruments evidencing the SLA Loan are identified in Exhibit "B-2" attached hereto; and

(3)    A loan to David, David Halevy and Sue Halevy, as trustees of the Halevy Family Trust dated September 6, 2010 ("D&S Trust"), Alan, Alan Gomperts and Sharon Gomperts, as trustees of the Gomperts and Halevy Family Trust ("G&H Trust") and Daniel in the principal amount of Two Million Five Hundred Seventy-Five Thousand and No/100 Dollars

($2,575,000.00) ("Guarantor Loan"), secured by the real property commonly known as 3538 Greenfield Avenue, Los Angeles, California, owned by G&H Trust, 133 S. Palm Drive, Beverly Hills, California, owned by D&S Trust, and 8561 Horner Street, Los Angeles, California, owned by Daniel. The documents and instruments evidencing the Guarantor Loan are identified in Exhibit "B-3" attached hereto.

B.    The proceeds of the New Loans ("New Loans Proceeds") shall be disbursed and allocated as provided in the Negev Loan, SLA Loan and Guarantor Loan, as more particularly described in Exhibit "C" attached hereto, and shall be used for the creation of an interest reserve for the New Loan, payment of past due amounts owed by Broadway to Lender under the Broadway Loan Documents, creation of an interest reserve for the Broadway Loan and to pay certain fees and costs. To the extent that the New Loans Proceeds are insufficient to make all payments or deposits required pursuant to this Agreement, the Negev Loan, SLA Loan and Guarantor Loan, or any of them, Guarantor shall be required to do so, from their own funds, concurrently with the Settlement Closing (as herein defined).

5.    Amendments to Broadway Loan.

Upon Settlement Closing:

A.    The Maturity Date under the Broadway Loan shall be extended to December 1, 2023, at which time the entire principal balance under the Broadway Loan plus all accrued and unpaid interest thereon shall be due and payable as provided under the Broadway Loan Documents. From and after the Settlement Closing, any and all references in the Note, Loan Agreement, and the other Broadway Loan Documents to a maturity date of "August 1, 2022" shall be replaced with "December 1, 2023."

B.    The obligations of Borrower to obtain the Certificate of Occupancy on the Property no later than January 21, 2022 pursuant to Section 5.1(a) of the Loan Agreement is hereby amended to be required as soon as is reasonably practicable in the best efforts of Borrower, but in any event no later than the Maturity Date.

6.    Interest Reserve Deposit. Concurrently with the Settlement Closing, Guarantor shall deposit the sum of $892,874.03 (the "Interest Reserve Shortfall") into the Interest Reserve. The Interest Reserve Shortfall shall not bear interest. Borrower continues to authorize Lender, on a monthly basis, to disburse from the Interest Reserve the amount of interest accrued and unpaid to Lender under the terms of Section 12(b) of the Loan Agreement without further authorization on the part of Borrower. Such disbursements by Lender may be made by such means (including, as shall be satisfactory to Lender, in its sole and absolute discretion. Notwithstanding the Interest Reserve, Borrower remains liable and obligated to pay all accrued and unpaid interest when it is due and payable, in the event that the amounts in the Interest Reserve are insufficient to do so.

7.    Conditions Precedent to Settlement Closing. The obligations of Lender hereunder are expressly conditioned upon the following having occurred, or Lender having received on or prior to April 19, 2023 ("Settlement Closing"), all of the following amounts, documents, and

instruments in form and content satisfactory to Lender, in its sole and absolute discretion, opinion, and judgment:

      A.    This Agreement, fully executed by Borrower and Guarantor;

      B.    The closing of the Negev Loan;

      C.    The closing of the SLA Loan;

      D.    The closing of the Guarantor Loan;

      E.    Payment of the Legal/Trustee Fees;

      F.    Payment and/or deposit of any additional monies required pursuant to Section 6, above;

      G.    At Borrower's expense, endorsements to Lender's existing policy of title insurance insuring the continuing priority of the lien of the Deed of Trust in a first priority position; and

      H.    A Memorandum of Modification to the Deed of Trust, fully executed by Borrower and notarized for recording purposes.

      8.    <u>Rescission of NOD; Dismissal of Action</u>.  Upon the Settlement Closing:

      A.    Lender will cause the NOD to be rescinded, subject to the right of Lender to cause to a new notice of default to be recorded in the event there is any default under this Agreement or any of the other Broadway Loan Documents subsequent to the Settlement Closing. Further, as long as there is no default under this Agreement or any of the other Broadway Loan Documents from and after the date of this Agreement, interest on the Broadway Loan shall accrue and be payable at the non-default rate of interest provided for in the Note. Furthermore, upon the Settlement Closing, Lender shall waive its right to collect the Default Interest and Late Charges.

      B.    Lender will cause to be filed with the Court a dismissal without prejudice of the Litigation, subject to the right of Lender to commence a new action or proceeding against Guarantor and any other parties, as determined by Lender, if there is a default under this Agreement or any of the other Broadway Loan Documents by which Guarantor is bound.

      9.    <u>Representations and Warranties of Borrower and Guarantor</u>.  Borrower and Guarantor hereby represent and warrant to Lender and covenant and agree with Lender as follows:

      A.    Borrower and Guarantor, and each of them, have full legal right, power and authority to enter into and perform this Agreement.  The execution and delivery of this Agreement by Borrower and Guarantor and the consummation by Borrower and Guarantor of the transactions contemplated hereby have been duly authorized by all necessary action by or on behalf of Borrower and Guarantor.  This Agreement is a valid and binding obligation of

Borrower and Guarantor, enforceable against Borrower and Guarantor in accordance with its terms.

B. Neither the execution and delivery of this Agreement by Borrower and Guarantor, or either of them, nor the consummation by Borrower and Guarantor of the transactions contemplated hereby, conflicts with or constitutes a violation or a default under any law applicable to Borrower and Guarantor, or either of them, or any contract, commitment, agreement, arrangement or restriction of any kind to which Borrower or Guarantor is a party, by which Borrower or Guarantor is bound or to which any of Borrower's or Guarantor's property or assets is subject.

C. There are no actions, suits or proceedings pending, or to the knowledge of Borrower or Guarantor, threatened against or affecting Borrower or Guarantor, in relation to its obligations to Lender or involving the validity and enforceability of this Agreement, or any of the other Broadway Loan Documents, as applicable, at law or in equity, or before or by any Governmental Agency, or which could have a material adverse effect on the financial condition, operations, properties, assets, liabilities or earnings of Borrower or Guarantor, or the ability of Borrower or Guarantor to perform their obligations to Lender.

D. Borrower and Guarantor, and each of them, hereby reaffirm and confirm that the representations and warranties of Borrower and Guarantor, and each of them, contained in the Broadway Loan Documents are true, correct and complete in all material respects as of the date of this Agreement.

10. Revival of Obligation.

A. Borrower and Guarantor acknowledge and agree that in the event that the payment of money, this Agreement, or the grant of collateral should for any reason subsequently be declared to be "fraudulent" or "voidable" within the meaning of any state, federal or foreign law relating to fraudulent conveyances, preferential or otherwise voidable or recoverable, in whole or in part, for any reason, under the United States Bankruptcy Code or any other federal, foreign or state law (collectively referred to herein as "Voidable Transfer"), and Lender is required to pay or restore any such Voidable Transfer, or any portion thereof, then as to that which is repaid or restored pursuant to any such Voidable Transfer (including all costs, expenses and attorneys' fees of Lender related thereto, including, without limitation, relief from stay or similar proceedings), the liability of Borrower and Guarantor to Lender shall automatically be revived, reinstated and restored as though such Voidable Transfer had never been made to Lender.

B. Nothing set forth herein is an admission that such Voidable Transfer has occurred. Borrower and Guarantor expressly acknowledge that Lender may rely upon advice of counsel, and if so advised by counsel, may, in the exercise of Lender's sole opinion and judgment, settle, without defending, any action to void any alleged Voidable Transfer, and that upon such settlement, Borrower and Guarantor shall again be liable for any deficiency resulting from such settlement as provided in this Agreement.

11. Waiver of Certain Bankruptcy Rights.

Borrower and Guarantor acknowledge and agree that but for Lender entering into this Agreement with Borrower and Guarantor, Lender would have continued to diligently pursue all of its rights and remedies under the Broadway Loan Documents, at law and in equity, against Borrower and Guarantor.  As an additional inducement to and material consideration for Lender agreeing to the modifications and extension provided in this Agreement, Borrower and Guarantor agree that in the event a Bankruptcy or Judicial Action (as hereinafter defined in this Section 11) is commenced which subjects Lender to any stay in the exercise of Lender's rights and remedies under the Broadway Loan Documents with respect to the Collateral, including, but not limited to, the automatic stay imposed by Section 362 of the United States Bankruptcy Code (individually and collectively, "Stay"), then Borrower and Guarantor irrevocably consent and agree that such Stay shall automatically be lifted and released against Lender with respect to the Collateral, and Lender shall thereafter be entitled to exercise all of its rights and remedies under the Broadway Loan Documents with respect to the Collateral, subject, however, to the terms and conditions of this Agreement.  Borrower and Guarantor acknowledge that each is knowingly, voluntarily, and intentionally waiving each of such party's rights to any Stay and agrees that the benefits provided to Borrower and Guarantor under the terms of this Agreement are valuable consideration for such waiver.  As used in this Section 11, the term "Bankruptcy or Judicial Action" shall mean any voluntary or involuntary case filed by or against Borrower and Guarantor, or either of them, under the United States Bankruptcy Code, or any voluntary or involuntary petition in composition, readjustment, liquidation, or dissolution, or any state and federal bankruptcy law action filed by or against Borrower and Guarantor, or either of them, any action where Borrower and Guarantor, or either of them, are adjudicated as bankrupt or insolvent, any action for dissolution of Borrower and Guarantor, or either of them, or any action in furtherance of any of the foregoing, or any other action, case, or proceeding that has the effect of staying (or in which a stay is being obtained against) the enforcement by Lender of its rights and remedies with respect to the Collateral under the Broadway Loan Documents.

12.    _Successors and Assigns_.  This Agreement shall be binding upon and inure to the benefit of Borrower and Guarantor and their respective successors, assigns, directors, officers, shareholders, partners, accountants, heirs, executors, administrators, trustees and trustees in bankruptcy.

13.    _Release by Borrower and Guarantor_.

A.    Borrower and Guarantor, on behalf of themselves, their respective successors and assigns, and each of them, do hereby forever relieve, release, acquit and discharge Lender and its predecessors, successors and assigns, and their respective past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Borrower and Guarantor, or either of them, now own or hold or have at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing, in whole or in part, on or before the date of this Agreement, including, but not limited to, those based upon, arising out of, appertaining to, or

in connection with the Recitals above, the Loan, the facts pertaining to this Agreement, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and Guarantor, or either of them, to Lender, or the lending arrangements between Lender and Borrower and Guarantor, all individually and collectively.

(1)    As to the matters released herein, Borrower and Guarantor expressly waive any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her, would have materially affected his or her settlement with the debtor or released party."

(2)    Borrower and Guarantor expressly waive and release any right or benefit which they have or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein.  In connection with such waiver and relinquishment, Borrower and Guarantor acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true.  Nevertheless, it is the intention of Borrower and Guarantor, through this Agreement, to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed.  In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

B.    Borrower and Guarantor are the sole and lawful owners of all right, title and interest in and to every claim and other matter which they purport to release herein, and they have not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims or other matters herein released.  Borrower and Guarantor shall indemnify, defend and hold Lender and each of the other Released Parties, and each of them, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

14.    <u>No Joint Venture, Management or Control</u>.  Notwithstanding any provision of this Agreement and/or of the Broadway Loan Documents:

A.    Lender is not and shall not be construed to be a partner, joint venture, alter ego, manager, controlling person or other business associate or participant of any kind of Borrower, Guarantor or any other Person;

        B.     Lender shall not be deemed responsible to perform or participate in any acts, omissions, or decisions of Borrower or Guarantor; and

        C.     Borrower and Guarantor, or either of them, do not have any claims, causes of action or defenses to their obligations to Lender based on any allegations of management or control exercised by Lender. Borrower and Guarantor, and each of them acknowledge and agree that Lender does not manage or control them in any way.

     15.    <u>No Further Commitments to Lend</u>**.**  Borrower and Guarantor agree and acknowledge that Lender will not and has no obligation to advance, provide or loan any further or additional monies or credit to Borrower and the obligation of Lender to advance any further sums to Borrower under the Broadway Loan Documents has been terminated thereunder. Borrower and Guarantor further agree and acknowledge that Lender will not and has no obligation to further extend the time for payment of any obligations owing to or arising in favor of Lender by Borrower and Guarantor, or either of them.

     16.    <u>Miscellaneous.</u>

        A.     Section headings used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

        B.     This Agreement may be executed in one or more counterparts but all of the counterparts shall constitute one agreement; provided, however, this Agreement shall not be effective and enforceable unless and until it is executed by all parties hereto.

        C.     This Agreement and the other documents and instruments executed in connection therewith constitute the product of the negotiation of the parties hereto and the enforcement hereof shall be interpreted in a neutral manner, and not more strongly for or against any party based upon the source of the draftsmanship hereof.

        D.     This Agreement is not a novation, nor, except as expressly provided in this Agreement, is it to be construed as a release or modification of any of the terms, conditions, warranties, waivers or rights set forth in the Broadway Loan Documents. Nothing contained in this Agreement shall be deemed to constitute a waiver by Lender of any required performance by Borrower and Guarantor, or either of them, of any default heretofore or hereafter occurring under or in connection with the other Broadway Loan Documents. In the event there is a conflict in any term, condition or provision of this Agreement, on the one hand, and the Loan Agreement or any of the other Broadway Loan Documents, on the other hand, the terms, conditions and provisions of this Agreement are to control.

        E.     Borrower and Guarantor hereby further represent and warrant as follows:

        (1)     Borrower and Guarantor have received, or have had the opportunity to receive, independent legal advice from attorneys of each of their choice with respect to the advisability of executing this Agreement and prior to the execution of this Agreement by Borrower and Guarantor, their attorneys reviewed this Agreement and discussed this Agreement with them and have made all desired changes;

(2)    Except as expressly stated in this Agreement, neither Lender nor any other person or entity has made any statement or representation to Borrower or Guarantor regarding facts relied upon by Borrower or Guarantor;

(3)    Borrower and Guarantor do not rely upon any statement, representation or promise of Lender or any other person or entity in executing this Agreement except as expressly stated in this Agreement;

(4)    The terms of this Agreement are contractual and not a mere recital;

(5)    This Agreement has been carefully read by, the contents hereof are known and understood by, and it is signed freely by Borrower; and

(6)    This Agreement and the releases contained herein are intended to be final and binding against Borrower and Guarantor, and Borrower and Guarantor acknowledge that Lender is expressly relying on the finality of this Agreement as a substantial, material factor inducing Lender's execution of this Agreement.

F.    This Agreement and any and all documents executed in connection herewith are entered into and made to be performed in Los Angeles County, California, and in the event that litigation is instituted in connection with this Agreement, and any and all documents executed in connection herewith, it shall be instituted in the Courts for Los Angeles County, California.  This Agreement shall be construed under the laws of the State of California.

G.    Upon indefeasible payment and performance in full of the Broadway Loan Documents, Lender shall provide Borrower the <u>Limited Release</u> in the form of Exhibit "D" attached hereto.

H.    The waiver of any existing or future default by any party to this Agreement or of any of the terms of this Agreement shall not be deemed a waiver of any future default or term.  No waiver of any other provisions hereof shall be deemed or constitute a waiver of any other provision, and no waiver of any type shall be binding unless evidenced by a writing signed by the party making waiver.

17.    <u>JUDICIAL REFERENCE</u> – The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Agreement and ANY MATTER RELATED THERETO, shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision. The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery.  The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding.  Notwithstanding the foregoing, the judicial reference provided herein shall not apply to the New Loans.  ***By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.***

The parties below have initialed this section to further indicate their awareness and acceptance of each and every provision hereof.

_____            _____            _____
Borrower's Initials                Alan's Initials                    Daniel's Initials

_____            _____            _____
David's Initials                   Guarantor's Initials               Lender's Initials

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and year first written above.

**BORROWER:**

BROADWAY AVENUE INVESTMENTS LLC.
a California limited liability company

By: _____
Name: Alan Gomperts
Its: Manager

**GUARANTOR:**

_____
ALAN GOMPERTS, an individual

_____
DANIEL HALEVY, an individual

_____
DAVID HALEVY, an individual, by Daniel Halevy as his attorney in fact

**LENDER:**
ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,
A Delaware limited liability company

By: _____
Name: Bobby Khorshidi
Title: Authorized Signer

# EXHIBIT "A"
## LEGAL DESCRIPTION

THE LAND REFERRED TO IS SITUATED IN THE COUNTY OF LOS ANGELES, CITY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 25 OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2, PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY LINE OF BROADWAY, 80 FEET WIDE, WITH THE DIVIDING LINE ESTABLISHED BY AGREEMENT AND DEED BETWEEN THE LOS ANGELES TRUST COMPANY AND NIAGARA BUILDING COMPANY, RECORDED DECEMBER 11, 1908 IN BOOK 3568, PAGE 93 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING DISTANT NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 180.47 FEET, MORE OR LESS, FROM THE NORTHERLY LINE OF 8TH STREET, 60 FEET WIDE, AS SHOWN ON MAP OF A RESUBDIVISION OF A PORTION OF BLOCK 25, HUBER TRACT, RECORDED IN BOOK 5, PAGE 15 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 60 FEET, MORE OR LESS, TO THE MOST EASTERLY CORNER OF LOT 4 IN SAID BLOCK 25 OF HUBER TRACT; THENCE NORTH 52° 12' WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT 4, A DISTANCE OF 165 FEET, MORE OR LESS, TO THE MOST NORTHERLY CORNER OF SAID LOT 4; THENCE SOUTH 37° 48' WEST ALONG THE NORTHWESTERLY LINE OF SAID LOT 4 AND OF LOT 3 OF BLOCK 25 OF SAID HUBER TRACT, 60 FEET, MORE OR LESS, TO SAID DIVIDING LINE; THENCE SOUTH 52° 12' EAST, ALONG SAID DIVIDING LINE, 165 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN: 5144-014-030

**EXHIBIT "B-1"**
**NEGEV LOAN**

1. Loan Agreement
2. Promissory Note
3. Assignment of Leases and Rents
4. Security Instrument -Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
5. Guaranty
6. Borrower's Closing Certificate
7. Borrower's Resolutions
8. Building Laws Indemnity Agreement
9. Hazardous Materials Indemnity Agreement
10. Undelivered Items Letter
11. Pledge and Security Agreement

# EXHIBIT "B-2"
## SLA LOAN

1. Promissory Note
2. Loan Agreement
3. Security Instrument -Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
4. Assignment of Leases and Rents
5. Guaranty
6. Hazardous Materials Indemnity Agreement
7. Building Laws Indemnity Agreement
8. Borrowers Incumbency Certificate and Resolutions
9. Borrower's Closing Certificate
10. Undelivered Items letter
11. Pledge Agreement

# EXHIBIT "B-3"
# G&H LOAN

1. Promissory Note
2. Loan Agreement
3. Security Instrument (Greenfield) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
4. Security Instrument (Horner Street) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
5. Security Instrument (Palm Drive) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
6. Hazardous Materials Indemnity Agreement
7. Building Laws Indemnity Agreement
8. Borrower's Closing Certificate
9. Undelivered Items letter

# EXHIBIT "C"
## ALLOCATION OF NEW LOANS PROCEEDS

| SLA Loan | | | Negev Loan | | | Guarantor Loan | |
|---|---|---|---|---|---|---|---|
| Sources | | | Sources | | | Sources | |
| Loan | $ 125,000.00 | | Loan | $ 1,300,000.00 | | Loan | $ 2,575,000.00 |
| Total Sources | $ 125,000.00 | | Total Sources | $ 1,300,000.00 | | Total Sources | $ 2,575,000.00 |
| | | | | | | | |
| Uses | | | Uses | | | Uses | |
| Interest Reserve SLA Loan | $ 6,927.08 | | Interest Reserve Negev Loan | $ 72,041.67 | | Interest Reserve Guarantor Loan | $ 142,697.92 |
| Per Diem SLA Loan (4/19-5/1) | $ 395.83 | | Per Diem Negev Loan (4/19-5/1) | $ 4,116.67 | | Per Diem Guarantor Loan (4/19-5/1) | $ 8,154.17 |
| Back Pay Broadway (4/19) | $ 36,605.80 | | Back Pay Broadway (4/19) | $ 380,700.33 | | Back Pay Broadway (4/19) | $ 754,079.50 |
| Per Diem Broadway Loan (4/19-5/1) | $ 1,508.23 | | Per Diem Broadway Loan (4/19-5/1) | $ 15,685.62 | | Per Diem Broadway Loan (4/19-5/1) | $ 31,069.60 |
| 8-Month IR Broadway Loan | $ 26,394.08 | | 8-Month IR Broadway Loan | $ 274,498.44 | | 8-Month IR Broadway Loan | $ 543,718.05 |
| Paydown Broadway Loan | $ 53,168.97 | | Paydown Broadway Loan | $ 552,957.28 | | Paydown Broadway Loan | $ 1,095,280.76 |
| | | | | | | | |
| Total Uses | $ 125,000.00 | | Total Uses | $ 1,300,000.00 | | Total Uses | $ 2,575,000.00 |

**EXHIBIT "D"**
**LIMITED RELEASE**

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company ("Lender"), hereby releases:

a.    BROADWAY AVENUE INVESTMENTS LLC, a California limited liability company ("Borrower") from all contractual liability and obligations under the Note and any of the other Loan Documents executed by Borrower in favor of Lender, except as otherwise provided in this Limited Release ("Release").

b.    ALAN GOMPERTS ("Alan"), DANIEL HALEVY ("Daniel") and DAVID HALEVY ("David," and together with Alan and Daniel, individually and collectively, "Guarantor") from all contractual liability and obligations under the Continuing Guaranty and any of the other Loan Documents executed by Guarantor in favor of Lender, except as otherwise provided in this Release.

1.    Notwithstanding the foregoing, the Release shall not apply to and hereby excludes Borrower's obligations and liability under (a) that certain Hazardous Materials Indemnity Agreement, dated July 21, 2021 by Borrower in favor of Lender, (b) Guarantor's obligations and liabilities under clause (g) of "Recourse Amounts" under Section 1 Definitions of the Continuing Guaranty, and (c) any other obligations, liability or indemnity contained in any Loan Document that survives repayment of the Note and any other obligations under the Loan Documents.

2.    Borrower and Guarantor acknowledge and agree that in the event that all or any part of any payment or credit that reduces or pays off the Note or any other obligation under the Loan Documents is declared by a court of competent jurisdiction declared to be "fraudulent" or "voidable" within the meaning of any state, federal or foreign law relating to fraudulent conveyances, preferential or otherwise voidable or recoverable, in whole or in part, for any reason, under the United States Bankruptcy Code or any other federal, foreign or state law (collectively referred to herein as "Voidable Transfer"), and Lender is required to pay or restore any such Voidable Transfer, or any portion thereof, then this Release shall be null and void, and of no force and effect, unless and until the Note and any such obligations under the Loan Obligations are indefeasibly paid in full.

3.    Any capitalized term not expressly defined in this Release shall have the meaning ascribed to it in that certain Settlement and Loan Modification Agreement by and among Borrower, Guarantor and Lender, dated as of April __, 2023.

This Release is executed by the undersigned as of the ___ day of _____, 202_.

ARCHWAY REAL ESTATE INCOME FUND I
SPE I, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

EXHIBIT B

## ASSIGNMENT OF LOAN DOCUMENTS

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, **ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company ("***Assignor***"), does hereby sell, transfer and assign to **ARCHWAY BROADWAY LOAN SPE, LLC**, a Delaware limited partnership ("***Assignee***"), all of Assignor's right, title and interest in and to the documents, instruments and agreements listed on Exhibit A, attached hereto and incorporated herein by this reference, (collectively, the "***Loan Documents***").  It is the intention of Assignor to transfer and assign to Assignee all of the right, title and interest, benefits and obligations and duties held by Assignor in, to and under the Loan Documents and the loan evidenced thereby.

IN CONNECTION THEREWITH, Assignee hereby accepts the foregoing assignment and hereby assumes all of the duties, obligations and liabilities of Assignor under and with respect to the loan as evidenced by the Loan Documents.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this Assignment of Loan Documents to be effective as of the date set forth below.

Date: As of September 30, 2024

**ASSIGNOR:**

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name: Bobby Khorshidi
Title: Authorized Signatory

**ASSIGNEE:**

**ARCHWAY BROADWAY LOAN SPE, LLC,**
a Delaware limited partnership

By: _____
Name: Bobby Khorshidi
Title: Authorized Signatory

EXHIBIT A
LOAN DOCUMENTS

1) Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of April 14, 2023, made by **ALAN GOMPERTS, and SHARON HALEVY, as Trustees of The Gomperts and Halevy Family Trust** ("*Gomperts*"), as trustor, in favor of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*"), as Lender, and recorded April 24, 2023, as Document No. 20230261978 in the official records of Los Angeles County, California.

2) Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of April 14, 2023, made by **DANIEL HALEVY (A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY**)("*Daniel*"), as trustor, in favor of Lender, as beneficiary, and recorded April 24, 2023, as Document No. 20230259819 in the official records of Los Angeles County, California.

3) Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of April 14, 2023, made by **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010** ("*Halevy*"), as trustor, in favor of Lender, as beneficiary, and recorded April 24, 2023, as Document No. 20230259824 in the official records of Los Angeles County, California.

4) Borrower Closing Certificate, dated April 14, 2023, executed by Gomperts, Daniel, and Halevy in favor of Lender.

5) Building Laws Indemnity Agreement, dated April 14, 2023, executed by Gomperts, Daniel, and Halevy in favor of Lender.

6) Hazardous Material Indemnity Agreement, dated April 14, 2023, executed by Gomperts, Daniel, and Halevy in favor of Lender.

7) Loan Agreement, dated April 14, 2023, executed by Gomperts, Daniel, and Halevy and Lender.

8) Promissory Note dated April 14, 2023, in the original amount of $2,575,000.00, made by Gomperts, Daniel, and Halevy, and payable to the order of Lender.

9) UCC Financing Statement filed with the California Secretary of State's Office; and

10) All other instruments and agreements executed in connection with any of the foregoing in or under which Lender has any right, title or interest.

## ALLONGE

FOR VALUE RECEIVED, the undersigned, **ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company ("*Archway*"), the original payee under that certain Promissory Note, dated as of April 14, 2023, in the original principal amount of $2,575,000.00, made by (i) **ALAN GOMPERTS**, and **SHARON HALEVY, as Trustees of The Gomperts and Halevy Family Trust** ("*G&H Trust*"), (ii) **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010** ("*D&S Trust*"),, and (iii) **DANIEL HALEVY**, an individual ("*DH*") (G& H Trust, D&S Trust and DH are collectively, referred to herein as, "*Borrower*"), and payable to the order of Archway (the "*Note*"), to which this endorsement is affixed, absolutely assigns, transfers, endorses, negotiates, and sets over to and makes payable to the order of **ARCHWAY BROADWAY LOAN SPE, LLC**, a Delaware limited liability company ("("*Archway Broadway*"), its successors and assigns, the Note, without recourse, representation or warranty of any kind, except as and to the extent set forth in the Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing from Archway to Archway Broadway, dated on or about the hereof. This assignment includes the Note, all interest, principal, and other sums due or to become due under the Note, and all other rights of any nature accrued or to accrue under the Note.

Dated: September 18, 2024

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name: Bobby Khorshidi, a.k.a. Babak Khorshidi
Title: Authorized Officer and Agent

**This page is part of your document - DO NOT DISCARD**



# 20240679809



**Pages: 0006**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**10/04/24 AT 08:00AM**

| | |
|---|---:|
| FEES: | 100.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 225.00 |
| PAID: | 325.00 |



**L E A D S H E E T**



202410040120011

00024851826



014927553

**SEQ:
01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E441953

30097266

RECORDING REQUESTED BY
FIDELITY NATIONAL TITLE

**RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:**

Thompson Coburn LLP
10100 Santa Monica Blvd., Suite 500
Los Angeles, CA 90067
Attention: Joshua Mogin
Phone: (310) 282-2520
Email: jmogin@thompsoncoburn.com

30097206    *(space above this line for recorder's use only)*

---

## ASSIGNMENT OF DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING
### and
## ASSIGNMENT OF LOAN DOCUMENTS

---

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
**Assignor**

**to**

**ARCHWAY BROADWAY LOAN SPE, LLC,**
**Assignee**


| | |
|---|---|
| Dated: | As of September 16, 2024 |
| Address: | 3538 Greenfield Avenue, Los Angeles, CA 90034 |
| | 133 South Palm Dr, Apt 0005, Beverly Hills, CA 90212 |
| | 8561 Horner Street, Los Angeles, CA 90035 |

**ASSIGNMENT OF DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY
AGREEMENT AND FIXTURE FILING and ASSIGNMENT OF LOAN DOCUMENTS**

KNOW THAT, **ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL
ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company, with its principal place of
business at 1875 Century Park East. Suite #900, Los Angeles, CA 90067, Attention: Joshua Kohan (the
"*Assignor*"), for good and other valuable consideration, hereby assigns unto the **ARCHWAY BROADWAY
LOAN SPE, LLC**, a Delaware limited liability company, with its principal place of business at 1875 Century
Park East. Suite #900, Los Angeles, CA 90067, Attention: Joshua Kohan (the "*Assignee*"), without recourse
to assignor in any event, the following Deeds of Trust, Assignment of Leases and Rents, Security Agreement
and Fixture Filing (collectively, the "*Security Instrument*") on the real property described in Schedule A
attached hereto:

> Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by
> **ALAN GOMPERTS**, and **SHARON HALEVY, as Trustees of The Gomperts and Halevy
> Family Trust**, in favor of Assignor, in the principal amount of $2,575,000.00, dated April 14, 2023
> and recorded on April 24, 2023, in the Official Records of Los Angeles County, California as
> Instrument #2023061978.

> Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by
> **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated
> September 8, 2010,** in favor of Assignor, in the principal amount of $2,575,000.00, dated April 14,
> 2023 and recorded on April 24, 2023, in the Official Records of Los Angeles County, California as
> Instrument #20230259824.

> Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by
> **DANIEL HALEVY**, an individual, in favor of Assignor, in the principal amount of $2,575,000.00,
> dated April 14, 2023 and recorded on April 24, 2023, in the Official Records of Los Angeles County,
> California as Instrument #20230259819.

TOGETHER with the bonds or notes or obligations described in said Security Instrument, and the monies due
and to grow due thereon with the interest;

TO HAVE AND TO HOLD the same unto Assignee and to the successors, legal representatives and assigns
of Assignee forever.

ADDITIONALLY, Assignor hereby assigns hereby assigns to Assignee, without recourse, all loan documents
(collectively, "*Loan Documents*") evidencing that loan made to (i) **ALAN GOMPERTS**, and **SHARON
HALEVY, as Trustees of The Gomperts and Halevy Family Trust** ("*G&H Trust*"), (ii) **DAVID
HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010** ("*D&S
Trust*"),, and (iii) **DANIEL HALEVY**, an individual ("*DH*") (G& H Trust, D&S Trust and DH are
collectively, referred to herein as, "*Borrower*") on or about April 14, 2023, in the original principal amount of
$2,575,000.00 (the "*Loan*").

Assignor represents and warrants to Assignee that it owns the Security Instrument, the Loan Documents and
all the indebtedness evidenced and/or secured thereby, that same have not been previously pledged or
assigned by it and are owned by it free and clear of liens and encumbrances, that it has the capacity and
authority to execute and deliver this assignment and that it has not previously satisfied the Security Instrument
or issued a partial release not yet recorded in the public records in respect of the Security Instrument.

IT IS EXPRESSLY UNDERSTOOD AND AGREED that, except as forestated, this Assignment is made

without any recourse to, and without any covenant, representation or warranty, express or implied by the Assignor in any event whatsoever.

The word "Assignor" or "Assignee" shall be construed as if it read "Assignors" or "Assignees" whenever the sense of this instrument so requires.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the Assignor has delivered this Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing and Assignment of Loan Documents as of the date hereof.

**Assignor:**

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name: Bobby Khorshidi, a.k.a. Babak Khorshidi
Title: Authorized Officer and Agent

<div style="border:1px solid black">
A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.
</div>

STATE OF CALIFORNIA
COUNTY OF _LOS ANGELES_ :

On _SEPTEMBER 18_, 20_24_ before me, _ALAN KABAKER_ _____ (a notary public), personally appeared _BOBBY KHORSHIDI aka Babak Kh_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)



ALAN KABAKER
COMM. # 2464960
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. OCT. 28, 2027

## EXHIBIT A

## LEGAL DESCRIPTION OF LAND

**3538 GREENFIELD AVENUE, LOS ANGELES, CA 90034**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 195 OF TRACT NO. 10516, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 159, PAGES 18 TO 20 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**133 SOUTH PALM DR, APT 0005, BEVERLY HILLS, CA 90212**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 1118 TRACT 6380, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 69 PAGES 11 TO 20 INCLUSIVE OF MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**8561 HORNER STREET, LOS ANGELES, CA 90035**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 192 OF TRACT NO. 7385, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 81 PAGES 72 AND 73 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.